QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Robert W. Stone (Bar No. 163513)
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Fax:           (650) 801-5100
robertstone@quinnemanuel.com

  Sam S. Stake (Bar No. 257916)
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700
samstake@quinnemanuel.com

  Aaron Perahia (Bar No. 304554)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100
aaronperahia@quinnemanuel.com

*Attorneys for Commure, Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| COMMURE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CANOPY WORKS, INC. f/k/a SMPLABS, INC., a Delaware corporation,<br><br>Defendants. | Case No. 5:24-cv-2592<br><br>**COMPLAINT FOR:**<br><br>1. **FEDERAL TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION (15 U.S.C. §§ 1114, 1125(a))**<br>2. **BREACH OF CONTRACT**<br>3. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>4. **INTENTIONAL INTERFERENCE WITH CONTRACT**<br>5. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>6. **UNFAIR COMPETITION (CAL. B&P § 17200)**<br>7. **DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Commure, Inc. ("Commure"), for its claims against Defendant Canopy Works, Inc. (f/k/a SMPLabs, Inc.) ("Canopy"), alleges as follows:

## INTRODUCTION

1. Commure is a healthcare technology company. Commure's products include Strongline®, an innovative system to reduce workplace violence in healthcare—where about 75% of all workplace violence occurs. Strongline® is a small badge with a big impact: nurses, doctors, and other frontline healthcare workers simply press a button on their wearable badge when under duress. The button sends a silent alarm to onsite security teams and nearby colleagues, enabling early intervention and quick de-escalation of incidents.

2. Commure, under its predecessor, conceived of Strongline® in 2018. It owns the United States trade and service mark registrations in the Strongline® marks, and it secured the first hospital commitments which led to production. Commure then outsourced production to Canopy to supply the system with Strongline® branding according to Commure's specifications. Due to Commure's efforts, Strongline® has been hugely successful.

3. Now, Canopy, through a series of unlawful acts, seeks to harness that success for itself. Earlier this year, Canopy purported to terminate the parties' contract so it can sell a system virtually identical to Strongline®, under its own brand name, directly to Commure's customers. In doing so, it seeks to cut off the supply of Strongline®. Commure has also uncovered evidence that Canopy, among other things, neglected its duty to secure the technology underlying Strongline®, wrongfully interfered with Commure's contractual relationships, infringed Commure's registered trademark, and engaged in other unfair competition to sow confusion and mislead consumers.

4. To stop this unlawful conduct and protect its rights, Commure brings this action for trademark infringement, unfair competition, breach of contract, interference with existing contracts and prospective economic advantage, and declaratory relief.

## THE PARTIES

5. Plaintiff Commure, Inc. is a Delaware corporation, with its principal place of business at 160 South Whisman Road, Mountain View, California 94041. In or around December 2021, Commure acquired Strongline, LLC, including its intellectual property and

confidential business information for Strongline®. Commure and its predecessor, Strongline, LLC, are hereinafter referred to collectively as "Commure." Commure provides solutions to manage and operate healthcare facilities, including Strongline®.

6. Defendant Canopy Works, Inc., f/k/a SMPLabs, Inc., is a Delaware corporation, with its principal place of business located at 868 Southampton Drive, Palo Alto, California 94303.

## JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction over the federal trademark infringement and unfair competition claims under 15 U.S.C. §§ 1114, 1121(a), 1125 and 28 U.S.C. § 1338(a), as well as supplemental jurisdiction over the state law claims under 28 U.S.C. §§ 1338(b) and 1367(a), because the claims are part of the same case or controversy.

8. The Court has personal jurisdiction over Canopy because its principal place of business is in this District, and, on information and belief, Canopy has substantial, systematic, and continuous contacts with this District. In addition, Canopy committed acts giving rise to Commure's claims in this District, where Canopy is likely to confuse residents and cause injury.

9. Venue is proper under 28 U.S.C. §§ 1391 and 1400(b) because: (a) a substantial part of the events or omissions giving rise to the claims occurred in this District, (b) Canopy has committed, and is likely to commit acts of infringement, false designation of origin, and unfair competition in this District, (c) Canopy has a regular and established place of business in this District, and (d) Commure's principal place of business is in this District, where it will suffer harm.

## FACTUAL ALLEGATIONS

### Commure Develops the Strongline® Staff Safety System

10. Commure is the company behind Strongline®—a groundbreaking system designed to combat the epidemic of workplace violence in healthcare, where approximately 75% of all workplace violence occurs. The heart of Strongline® is an innovative badge, worn by nurses, doctors, and hospital staff, featuring an alert button. When pressed, the badge communicates via Bluetooth to Internet-connected gateways, which relay alert data to the facility's security and other nearby staff for help. Purpose-built for healthcare settings, Strongline® enables more rapid aid for frontline workers, while being easier to implement and scale compared to hardwired panic buttons.

11. Commure conceived of and developed the Strongline® concept in 2018. After securing initial interest from a major hospital, Commure brought its vision to fruition—registering intellectual property, building out its sales strategy and team, and engaging a small vendor, Canopy Works, Inc. (f/k/a SMPLabs, Inc.) to supply the first commercial-grade system according to Commure's specifications.

12. The United States Trademark and Patent Office granted Commure federal registrations on the Principal Register for its trademark in Strongline® (Reg. No. 6,105,380) and its service mark in Strongline® (Reg. No. 6,111,205) in July 2020.

### The Parties' December 2022 Reseller Agreement

13. Starting effective December 31, 2022, Commure and Canopy were parties to a Reseller Agreement (hereinafter, the "Agreement" or "Agmt."). Among other things, the Agreement provided:

   a. Commure received a license to market and distribute Canopy's "Licensed Technology," as set forth in Exhibit A to the Agreement, to customers in the healthcare industry under Commure's Strongline® brand. (Agmt. §§ 2, 15.2-15.3.)

   b. Commure had sole responsibility for Strongline® sales, entering customer agreements, and providing first-level support. (Agmt. §§ 3.1-3.2.) Commure paid Canopy fixed monthly fees per badge and gateway assigned to an active customer, regardless of amounts Commure charges customers. (Agmt. § 4.1.)

   c. The initial term was two-years through December 1, 2024, with automatic one-year renewals, unless either party gave notice otherwise. (Agmt. § 13.1.) Upon termination, Commure retained a license to support its then-active Strongline® customers through their Commure contract terms, with Canopy's continued support. (*Id*. § 13.5.)

14. Canopy made robust commitments regarding the security and integrity of the Licensed Technology in the Agreement. Among other things:

   a. Canopy agreed to "implement and maintain" any "technical, physical, administrative and organizational safeguards" to "protect the confidentiality, security, and

integrity of Commure's Confidential Information and all Commure Data," including measures to protect against "unauthorized disclosure or access." (Agmt. § 14.6.)

    b.    Canopy agreed that the Licensed Technology "will conform to the terms set forth in Exhibit A" and to use "industry standard measures" to protect against any "harmful, malicious or hidden procedures, routines or mechanisms which are designed to cause such Licensed Technology or any component thereof to cease functioning." (Agmt. §§ 10.1(a), (e).)

    c.    Canopy agreed to "cooperate with any investigation by Commure [or] its affected Customers … as it concerns any security breach" and to "promptly take necessary and appropriate corrective actions" for any such breach. (Agmt. § 14.6.)

15.    Further, Canopy warranted that the Licensed Technology would be free of defects, and that it would provide regular updates and patches. Specifically, among other things:

    a.    Canopy warranted that each component "will be free from defects in material and manufacture" and agreed to replace "Damaged Hardware" due to "malfunction" at its sole expense. (Agmt. § 10.2.) These warranties expressly survive termination. (*Id*. § 13.5.)

    b.    Canopy agreed to provide "all generally applicable platform updates, enhancements and APIs" and "periodic updates" to fix bugs and errors and implement new functionality to maintain the Licensed Technology's competitiveness and compliance with industry standards. (Agmt. § 12.)

16.    Canopy's representations concerning product security, warranties, and updates were pivotal to the Agreement. As a provider of a system deployed in hospitals and used to safeguard healthcare staff, Commure would not have entered into the Agreement without receiving contractual assurances that Canopy would maintain the highest standards of product security and warranties.

### Canopy's Refusal To Remediate Security Vulnerabilities

17.    In late 2023, Commure's new management began a months-long security review of the Licensed Technology. The review revealed vulnerabilities that threatened the integrity and security of the Licensed Technology. For example:

      a.      communications between badges and gateways were unencrypted, creating the risk of interception, spoofing, eavesdropping, and alteration of data transmissions;

      b.      hospital floor plans were publicly accessible without authentication on Google Drive folders;

      c.      staff names, email addresses, phone numbers, and real-time locations were exposed publicly in certain instances; and

      d.      proximity alerts reflecting security incident details could be accessed by members of the public under certain circumstances.

18. These vulnerabilities raised serious risks, particularly in the healthcare context. They also violated Canopy's express commitments to implement "industry standard measures" and safeguard the Licensed Technology against unauthorized access. (Agmt. §§ 10.1, 14.6.)

19. Commure promptly notified Canopy and sought Canopy's full cooperation as Commure further investigated. Canopy failed to fully cooperate, however, including by refusing to state whether it suffered a security breach as a result of the vulnerabilities, notwithstanding its obligations under Section 14.6 of the Agreement.

20. Given the severity of the vulnerabilities, Commure asked Canopy to refrain from communicating with Commure's customers—customers with whom Canopy had no contractual relationship—while the investigation was ongoing to ensure that Canopy did not downplay the risks of the vulnerabilities. But Canopy proceeded to do exactly that. Canopy's CEO, Shan Sinha, communicated to one or more Commure customers in January 2024 that Commure had made "false," "misleading," "hyperbolic," and "fear-mongering" claims of vulnerabilities in the Licensed Technology. Commure is informed and believes, and thereon alleges, that Canopy privately tried to fix certain vulnerabilities while publicly claiming they were "false."

21. Commure also demanded Canopy provide a plan to remediate the vulnerabilities in accordance with its obligations under the Agreement's warranty and update provisions. But Canopy largely rejected those requests through a series of misleading and contradictory claims. For instance, with respect to the lack of encryption, Canopy initially claimed this vulnerability was "easily mitigated" through an "over-the-air firmware update mechanism available for all Strongline

badges." But then Canopy abruptly reversed course, claiming its over-the-air update was "not safe" to roll out. When Commure noted Canopy had said "the encryption was ready and working," Canopy drew a nonsensical distinction between "ready and working" and "deployed in production."

22. Since then, Canopy has continued to acknowledge the need to encrypt Commure's Strongline® badges. Commure is informed and believes, and thereon alleges, that Canopy is preparing an over-the-air update that will be available to roll out in four to six weeks. However, to date, Canopy has refused to confirm that it will provide the update to existing Commure customers using Strongline® badges. This refusal has rendered Commure unable to offer its Strongline® customers a solution to the known vulnerabilities.

23. Canopy has breached its obligations under the Agreement, including by refusing to provide encrypted replacements or any over-the-air update for the unencrypted badges to Commure for the benefit of its customers, as mandated by the Agreement. The lack of encryption impairs the devices' core functionality and security and triggers Canopy's warranty obligations. Encryption is also necessary for the system to conform to the "industry standard measures" warranted in Section 10.1. By failing to remedy this defect and conditioning upgrades on customers abandoning Commure, Canopy has violated the letter and spirit of its surviving obligations.

**Canopy Engages in Unfair Competition and Infringement**

24. For nearly all its existence since 2019, Canopy was a mere vendor of Commure, supplying unbranded technology that Commure incorporated into its Strongline® product. Commure is informed and believes, and thereon alleges, that Canopy had not provided the Licensed Technology to other companies in the healthcare industry, nor had it sold the Licensed Technology directly to customers other than Commure—until recently.

25. As Commure prepared to release an upgraded version of Strongline®, known as Strongline® Pro, Canopy announced a "major strategic shift" to its business plan: it would launch a directly competing product called Canopy Protect based on the same core technology as Strongline®, but with Canopy's branding instead.

26. Then, in January 2024, Canopy purported to terminate the Agreement with Commure immediately pursuant to Section 13.2. Commure is informed and believes, and thereon alleges, that this termination was wrongful and without proper cause.

27. Since launching its competing product, Canopy Protect, Canopy has infringed Commure's Strongline® marks and engaged in unfair competition. For example, Canopy infringed the Strongline® marks and engaged in unfair competition by marketing to consumers that, among other things: (i) "Strongline was created by, owned and operated by Canopy," (ii) "Strongline has been resold by Commure," and (iii) "Strongline Pro and Strongline are completely unrelated." Commure is informed and believes, and thereon alleges, that Canopy's infringement was willful and designed to sow consumer confusion and wrongfully profit off the positive reputation and goodwill that Commure's Strongline® has among consumers.

**Canopy Exploits the Same Vulnerabilities It Created**

28. Most recently, Canopy began exploiting for its own competitive sales efforts the same vulnerabilities in the Licensed Technology that it created. In April 2024, Canopy informed Commure of the availability of encrypted badges.

29. Canopy initially offered to make those encrypted badges available "immediately" and for "free" as replacements for existing Commure Strongline® customers. But Canopy later backtracked, stating it would only replace unencrypted Strongline® with encrypted badges if Commure agreed that all future badges for these customers would carry Canopy Protect branding, not Commure's Strongline® branding. And, now, Canopy has refused to provide these replacement badges at all.

30. Canopy's maneuvers not only breached the Agreement but also interfere with Commure's contractual relations and business expectations. They have undermined trust and confidence in Commure's product and services and threaten Commure with loss of customers, competitive harm, and reputational damage. By positioning Canopy Protect as the exclusive remedy to a problem of its own making, Canopy has unjustly disrupted Commure's customer relationships and blocked Commure from offering viable alternatives.

31.     Canopy has escalated its interference by refusing to provide any replacements or firmware updates to address the encryption flaw for Commure's customers who remain undecided. Canopy's campaign has already led multiple Commure's customers to terminate their contracts prematurely or indicate they will not renew.

## FIRST CAUSE OF ACTION

**Trademark Infringement, Passing Off and Unfair Competition**

**(Lanham Act, 15 U.S.C. §§ 1114, 1125(a)(1)(A))**

32.     Commure incorporates the allegations of paragraphs 1 to 31 above.

33.     Canopy and Commure are persons within the meaning of 15 U.S.C. § 1127.

34.     Canopy's website, marketing materials, and promotional materials described herein constitute commercial advertisements.

35.     Canopy has engaged and continues to engage in acts of trademark infringement, passing off, and unfair competition as described herein, in violation of Section 43(a) of the Trademark Act of 1946, as amended, by 15 U.S.C. section 1114 and 1125(a).

36.     Commure is entitled to recover profits earned by Canopy as a result of the foregoing wrongful acts, as well as its costs and attorney's fees in this action.  Because the exact amount of Canopy's unjust profits cannot be determined without an accounting, Commure is entitled to an accounting of Canopy's profits and the imposition of a constructive trust in favor of Commure on all profits obtained from Canopy's unlawful conduct.

37.     Canopy's wrongful activities have caused Commure irreparable injury and said conduct, unless enjoined by this Court, will be continued by Canopy to the continuing and irreparable harm of Commure.  Commure is, therefore, entitled to injunctive relief pursuant to 15 U.S.C. § 1116, restraining and enjoining Canopy and its agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from acts of trademark infringement, passing off, unfair competition, and for orders mandating that Canopy make corrective disclosures to remedy its misrepresentations.

## SECOND CAUSE OF ACTION

### Breach of Contract

38. Commure incorporates the allegations of paragraphs 1 to 37 above.

39. The Reseller Agreement constitutes a valid and enforceable contract between Commure and Canopy.

40. Commure has performed all its material obligations under the Agreement, except those excused by Canopy's breach.

41. Canopy has breached the Reseller Agreement by, among other things:

   a. Failing to implement and maintain reasonable security safeguards to protect the confidentiality and integrity of the Licensed Technology and customer data, in violation of Section 14.6;

   b. Providing a system that fails to conform to Canopy's express warranties due to material security vulnerabilities in violation of Sections 10.1 and 10.2;

   c. Refusing to provide available updates and replacement badges to remedy known security defects in the Licensed Technology, including by implementing encryption, in violation of Canopy's ongoing warranty obligations under Section 10, which expressly survive any termination of the Agreement;

   d. Failing to provide Commure with available updates and bug fixes to address known security issues, in violation of Section 12; and

   e. Wrongfully purporting to terminate the Agreement on January 4, 2024.

42. As a direct and proximate result of Canopy's breaches, Commure has suffered damages in the form of lost business, lost profits, loss of goodwill and reputation, and increased support costs in an amount to be determined at trial. Commure is also entitled to its reasonable attorneys' fees and costs under Section 20.6 of the Agreement.

43. Canopy's breaches have caused and are causing irreparable harm to Commure for which damages are an inadequate remedy, as they impair the security and integrity of Commure's critical systems and relationships. Preliminary and permanent injunctions are necessary to prevent further harm and preserve the status quo pending trial.

## THIRD CAUSE OF ACTION

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

44. Commure incorporates the allegations of paragraphs 1 to 43 above.

45. The Reseller Agreement contains an implied covenant of good faith and fair dealing requiring Canopy to refrain from actions that unfairly interfere with Commure's rights and benefits under the Agreement.

46. Canopy has breached the implied covenant by:

    a. Refusing to provide available security fixes and updates to the Licensed Technology, includes the Strongline® badges, to protect Commure's existing Strongline® customers; and

    b. Exploiting known vulnerabilities in Commure's system to encourage migration to Canopy's competing service.

47. Canopy's conduct unfairly undermines the purpose of the Agreement: to enable Commure to succeed as a value-added reseller in the healthcare industry using Canopy's technology under Commure's own brand.

48. As a direct and proximate result of Canopy's breaches of the implied covenant, Commure has been damaged in an amount to be determined at trial. Preliminary and permanent injunctions are also warranted.

## FOURTH CAUSE OF ACTION

**Tortious Interference with Contractual Relations**

49. Commure incorporates the allegations of paragraphs 1 to 48 above.

50. Commure has valid contracts with its Strongline® customers.

51. Canopy is aware of Commure's customer contracts. With knowledge of these relationships, Canopy has intentionally and wrongfully taken actions to disrupt them, including by:

    a. Exploiting vulnerabilities in the Licensed Technology used for the Strongline® system to undermine customer confidence;

    b. Withholding necessary security updates from the Licensed Technology used for the Strongline® system, but offering them to Commure's Strongline® customers through

Canopy Protect, to induce Commure's Strongline® customers to terminate and switch to Canopy; and

      c.    Making it impossible for Commure to perform its customer contracts by refusing to support the Licensed Technology used for the Strongline® system properly.

52. Canopy's actions were designed to harm Commure and have made Commure's performance under its contracts more expensive and burdensome.

53. As a direct result of Canopy's tortious interference, Commure has suffered damage to its business and contractual relationships in an amount to be proven at trial. Injunctive relief is also necessary to prevent further irreparable harm.

54. Canopy's conduct was malicious, oppressive, and fraudulent, entitling Commure to punitive damages.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

55. Commure incorporates the allegations of paragraphs 1 to 54 above.

56. Commure had prospective contractual and economic relationships with current and potential Strongline® customers, as well as with other third parties in the healthcare technology space. Commure had a reasonable expectation that these relationships would yield future economic benefits.

57. Canopy knew of Commure's prospective customer and business relationships. With that knowledge, Canopy intentionally engaged in wrongful conduct designed to disrupt Commure's relationships and divert those opportunities to Canopy, including by:

      a.    Encouraging Commure's existing Strongline® customers to terminate their contracts and switch to Canopy's competing product;

      b.    Offering financial incentives and free replacement hardware to Commure's existing Strongline® customers conditioned on them ceasing business with Commure; and

      c.    Leveraging its position as Commure's sole supplier and its insider knowledge of the vulnerabilities in the Licensed Technology used for the Strongline® system to poach Commure's pipeline and unfairly compete.

58. As a direct and proximate result of Canopy's interference, Commure has lost specific customer sales and other business opportunities. This has caused economic harm to be proven at trial. Injunctive relief is also necessary to prevent further irreparable harm.

## SIXTH CAUSE OF ACTION

### Unfair Competition (Cal. Bus. & Prof. Code § 17200, *et seq*.)

59. Commure incorporates the allegations of paragraphs 1 to 58 above.

60. Canopy has engaged in unlawful, unfair, and deceptive business practices in violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq*., including:

    a. Breaching its contractual obligations and warranties to Commure;

    b. Tortiously interfering with Commure's existing and prospective customer relationships;

    c. Exploiting vulnerabilities in the Licensed Technology used for the Strongline® system rather than supporting Commure; and

    d. Offering free upgrades conditioned on customers terminating Commure's contracts.

61. Canopy's practices violate established public policies recognized in statutes and common law, including policies against unfair competition, interference with contract, and deceptive trade practices. The practices threaten competition and innovation in the healthcare technology market.

62. As a direct result of Canopy's conduct, Commure has lost money and property and suffered irreparable injury. Canopy has been unjustly enriched at Commure's expense.

63. Under the UCL, this Court has broad equitable powers to remedy Canopy's unlawful practices and prevent future misconduct. Injunctive relief is particularly necessary given the ongoing harm to competition and the public interest in secure healthcare technologies. Damages alone will not deter Canopy's behavior or restore the market.

## SEVENTH CAUSE OF ACTION

### Declaratory Relief

64. Commure incorporates the allegations of paragraphs 1 to 63 above.

65. An actual and justiciable controversy has arisen between Commure and Canopy concerning their respective rights and obligations under the Agreement. In particular, the parties dispute:

    a. Whether Canopy remains obligated to support Commure's existing Strongline® customers, including by providing replacement badges, post-termination;

    b. The scope of Canopy's ongoing warranty obligations to remedy defects in the Strongline® system, including the implementation of encryption; and

    c. Whether Canopy's purported termination of the Agreement was wrongful.

66. Commure maintains that Canopy's purported termination was wrongful, and in any event, that Canopy remains bound by the warranty obligations in Section 10, which survive termination and require Canopy to remedy defects in the system provided to Commure's customers, including by implementing encryption on badges and gateways to address known vulnerabilities. Canopy, however, contends its termination was proper and that it has been relieved of all obligations to Commure and its customers and that Commure must immediately cease all activities related to the Licensed Technology. Canopy insists it need not provide any further updates, bug fixes, or replacement badges to address security issues.

67. Commure desires a judicial determination of its rights and Canopy's duties to resolve this controversy and guide the parties' future conduct. Such a declaration is necessary and appropriate to prevent further harm to Commure's business and customers.

## PRAYER FOR RELIEF

WHEREFORE, Commure prays for relief, as follows:

A. A judgment that Canopy has:

    (i) has infringed Commure's federal trademark rights;

    (ii) is unfairly competing with Commure, and has been unjustly enriched;

    (iii) has breached the Agreement;

           (iv)    has tortiously interfered with Commure's existing contracts and prospective economic relations;

           (v)    acted willfully and with malice, oppression, and/or fraud;

    B.    A preliminary and permanent injunction against Canopy and all of its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them:

           (i)    enjoining them from further acts of infringement of Commure's rights in the Strongline® marks;

           (ii)    enjoining them further false or misleading statements about Commure or Strongline® to Commure's customers or others;

           (iii)    enjoining them further tortious interference with Commure's existing and prospective customer relationships;

           (iv)    requiring them to replace under the Agreement any unencrypted badges in use by Commure's existing Strongline® customers with encrypted badges;

           (v)    requiring them to fulfill its ongoing warranty and support obligations to Commure for the benefit of Commure's existing Strongline® customers, including by providing updates, bug fixes, and security patches for the Licensed Technology used in Strongline® through the end of those customers' contract terms with Commure; and

           (vi)    granting such other injunctive relief as the Court deems necessary and proper to prevent irreparable harm to Commure and protect the public interest;

    C.    Actual damages suffered as a result of Canopy's unlawful conduct, in an amount to be proven at trial, plus all pre-judgment and post-judgment interest, at the maximum rate permitted law;

    D.    A judgment trebling any damages award;

    E.    Punitive damages;

    F.    An accounting of Canopy's profits;

    G.    Restitution against Canopy and in favor of Commure, including disgorgement of any wrongfully obtained profits and any other appropriate relief;

1  H. Costs of suit and reasonable attorneys' fees; and

2  I. For a judicial declaration that:

3  (i) Canopy remains obligated to support Commure's existing Strongline®
4  customers through the end of their contract terms, including by providing updates, bug fixes, and
5  replacement badges as required to maintain the functionality and security of the Strongline® system;
6  and

7  (ii) Canopy's warranty obligations under Section 10 of the Agreement remain in
8  effect with respect to the Licensed Technology used in Strongline® supplied to Commure's existing
9  customers, requiring Canopy to remedy defects and provide all available replacements and fixes,
10  including the implementation of encryption on the badges and gateways; and

11  J. For such other and further relief as the Court deems just and proper.

13  DATED: April 30, 2024            QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP

                                     By    */s/   Sam S. Stake*
                                           Sam S. Stake
                                           Attorneys for Commure, Inc.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Commure respectfully demands a trial by jury on all issues triable by jury.

DATED: April 30, 2024

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/  Sam S. Stake*
Sam S. Stake
Attorneys for Commure, Inc.