QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Robert W. Stone (Bar No. 163513)
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5000
Fax:          (650) 801-5100
robertstone@quinnemanuel.com

  Sam S. Stake (Bar No. 257916)
  Elle Xuemeng Wang (Bar No. 328839)
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700
samstake@quinnemanuel.com
ellewang@quinnemanuel.com

  Aaron Perahia (Bar No. 304554)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100
aaronperahia@quinnemanuel.com

*Attorneys for Commure, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMURE, INC., a Delaware corporation,<br><br>              Plaintiff,<br><br>       vs.<br><br>CANOPY WORKS, INC. f/k/a SMPLABS, INC., a Delaware corporation, SHAN SINHA, an individual, and VINAY PULIM, an individual,<br><br>              Defendants. | Case No. 3:24-cv-02592-AMO<br><br>Assigned to the Hon. Araceli Martínez-Olguín<br><br>**AMENDED COMPLAINT FOR:**<br><br>1. **FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)**<br>2. **UNFAIR COMPETITION, FALSE DESIGNATION OF ORIGIN, AND FALSE ADVERTISING (15 U.S.C. § 1125(a))**<br>3. **BREACH OF CONTRACT**<br>4. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>5. **INTENTIONAL INTERFERENCE WITH CONTRACT**<br>6. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>7. **UNFAIR COMPETITION (B&P §17200)**<br>8. **DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Commure, Inc. ("Commure"), for its claims against Defendants Canopy Works, Inc. (f/k/a SMPLabs, Inc.) ("Canopy"), Shan Sinha, and Vinay Pulim (collectively, "Defendants"), alleges as follows:

**INTRODUCTION**

1. Commure is a healthcare technology company. Commure's products include Strongline®, an innovative system to reduce workplace violence in healthcare—where about 75% of all workplace violence occurs. Strongline® is a small badge with a big impact: nurses, doctors, and other frontline healthcare workers simply press a button on their wearable badge when under duress. The button sends a silent alarm to onsite security teams and nearby colleagues, enabling early intervention and quick de-escalation of incidents.

2. Commure, under its predecessor, conceived of Strongline® in 2018. It owns the United States trade and service mark registrations in the Strongline® marks, and it secured the first hospital commitments which led to production. Commure then outsourced production to Canopy to supply the system with Strongline®-branding according to Commure's specifications. Due to Commure's efforts, Strongline® has been hugely successful.

3. Now, Canopy, through a series of unlawful acts, seeks to harness that success for itself. Earlier this year, Canopy purported to terminate the parties' contract so it can sell a system virtually identical to Strongline®, under its own brand name, directly to Commure's customers. In doing so, it seeks to cut off the supply of Strongline®. Commure has also uncovered evidence that Canopy, among other things, neglected its duty to secure the technology underlying Strongline®, wrongfully interfered with Commure's contractual relationships, infringed Commure's registered trademark, and engaged in other unfair competition to sow confusion and mislead consumers.

4. To stop this unlawful conduct and protect its rights, Commure brings this action for trademark infringement, unfair competition, breach of contract, interference with existing contracts and prospective economic advantage, and declaratory relief.

**THE PARTIES**

5. Plaintiff Commure, Inc. is a Delaware corporation, with its principal place of business at 160 South Whisman Road, Mountain View, California 94041. In or around

December 2021, Commure acquired Strongline, LLC, including its intellectual property and confidential business information for Strongline®. Commure and its predecessor, Strongline, LLC, are hereinafter referred to collectively as "Commure." Commure provides solutions to manage and operate healthcare facilities, including Strongline®.

6.  Defendant Canopy Works, Inc., f/k/a SMPLabs, Inc., is a Delaware corporation, with its principal place of business located at 868 Southampton Drive, Palo Alto, California 94303.

7.  Defendant Shan Sinha is the Chief Executive Officer of Defendant Canopy who, on information and belief, resides in Palo Alto, California 94303.

8.  Defendant Vinay Pulim is the Chief Financial Officer of Defendant Canopy and, on information and belief, the Chief Technology Officer of Defendant Canopy, who, on information and belief, resides in New York, New York, 11249.

9.  On information and belief, at relevant times, Defendants Sinha and Pulim, and each of them, have been the agents of Defendant Canopy, and in doing the things alleged, each of them have acted within the course and scope of an agency relationship and have been subject to and under the supervision of each other. Commure further alleges that its injuries to its property rights, goodwill, and reputation have been directly proximately caused by each and all the Defendants.

**JURISDICTION AND VENUE**

10.  The Court has subject matter jurisdiction over the federal trademark infringement and unfair competition claims under 15 U.S.C. §§ 1114, 1121(a), 1125 and 28 U.S.C. § 1338(a), as well as supplemental jurisdiction over the state law claims under 28 U.S.C. §§ 1338(b) and 1367(a), because the claims are part of the same case or controversy.

11.  The Court has personal jurisdiction over Canopy because its principal place of business is in this District, and, on information and belief, Canopy has substantial, systematic, and continuous contacts with this District. In addition, Canopy committed acts giving rise to Commure's claims in this District, where Canopy is likely to confuse residents and cause injury.

12.  The Court has personal jurisdiction over Sinha because he resides in this District. In addition, Sinha committed acts giving rise to Commure's claims in this District.

13.     The Court has personal jurisdiction over Pulim because he is a director and officer of Defendant Canopy and committed acts giving rise to Commure's claims in this District.

14.     Venue is proper under 28 U.S.C. §§ 1391 and 1400(b) because: (a) a substantial part of the events or omissions giving rise to the claims occurred in this District, (b) Canopy has committed, and is likely to commit acts of infringement, false designation of origin, and unfair competition in this District, (c) Canopy has a regular and established place of business in this District, and (d) Commure's principal place of business is in this District, where it will suffer harm.

## FACTUAL ALLEGATIONS

### Commure Develops the Strongline® Staff Safety System

15.     Commure is the company behind Strongline®—a groundbreaking system designed to combat the epidemic of workplace violence in healthcare, where approximately 75% of all workplace violence occurs.  The heart of Strongline® is an innovative badge, worn by nurses, doctors, and hospital staff, featuring an alert button.  When pressed, the badge communicates via Bluetooth to Internet-connected gateways, which relay alert data to the facility's security and other nearby staff for help.  Purpose-built for healthcare settings, Strongline® enables more rapid aid for frontline workers, while being easier to implement and scale compared to hardwired panic buttons.

16.     Commure conceived of and developed the Strongline® concept in 2018.  After securing initial interest from a major hospital, Commure brought its vision to fruition—registering intellectual property, building out its sales strategy and team, and engaging a small vendor, Canopy Works, Inc. (f/k/a SMPLabs, Inc.) to supply the first commercial-grade system according to Commure's specifications.

17.     The United States Trademark and Patent Office granted Commure federal registrations on the Principal Register for its trademark in Strongline® (Reg. No. 6,105,380) and its service mark in Strongline® (Reg. No. 6,111,205) in July 2020.

18.     Commure's federal registration for the '380 trademark covers the following goods: "Providing temporary use of non-downloadable software for monitoring, locating and reporting on the location and other telemetry data of people and objects; Providing temporary use of non-

downloadable software for monitoring, locating and reporting emergencies in the nature of medical, environmental, terrorism, or other emergencies involving attacks on persons."

19.    Commure's federal registration for the '205 service mark covers the following services:  "downloadable software for monitoring, locating and reporting on the location and other telemetry data of people and objects; downloadable software for monitoring, locating and reporting emergencies in the nature of medical, environmental, terrorism, or other emergencies involving attacks on persons; devices for wireless radio transmission; emergency position-indicating radio beacons."

**The Parties' December 2022 Reseller Agreement**

20.    Starting effective December 31, 2022, Commure and Canopy were parties to a Reseller Agreement, a true and correct copy of which is attached hereto as Exhibit A (the "Agreement").  Among other things, the Agreement provided:

a.    Commure received a license to market and distribute Canopy's "Licensed Technology," as set forth in Exhibit A to the Agreement, to customers in the healthcare industry under Commure's Strongline® brand.  (Ex. A §§ 2.1, 15.2-15.3.)

b.    Commure had sole responsibility for Strongline® sales, entering customer agreements, and providing first-level support.  (Ex. A §§ 3.1-3.2.)  Commure paid Canopy fixed monthly fees per badge and gateway assigned to an active customer, regardless of amounts Commure charges customers.  (Ex. A § 4.1.)

c.    The initial term was two-years through December 1, 2024, with automatic one-year renewals, unless either party gave notice otherwise.  (Ex. A § 13.1.)  Upon termination, Commure retained a license to support its then-active Strongline® customers through their Commure contract terms, with Canopy's continued support.  (Ex. A § 13.5.)

21.    Canopy made robust commitments regarding the security and integrity of the Licensed Technology in the Agreement.  Among other things:

a.    Canopy agreed to "implement and maintain" any "technical, physical, administrative and organizational safeguards" to "protect the confidentiality, security, and

-4-                                    Case No. 3:24-cv-02592-AMO

AMENDED COMPLAINT

integrity of Commure's Confidential Information and all Commure Data," including measures to protect against "unauthorized disclosure or access." (Ex. A § 14.6.)

b. Canopy agreed that the Licensed Technology "will conform to the terms set forth in Exhibit A" and to use "industry standard measures" to protect against any "harmful, malicious or hidden procedures, routines or mechanisms which are designed to cause such Licensed Technology or any component thereof to cease functioning." (Ex. A §§ 10.1(a), (e).)

c. Canopy agreed to "cooperate with any investigation by Commure [or] its affected Customers … as it concerns any security breach" and to "promptly take necessary and appropriate corrective actions" for any such breach. (Ex. A § 14.6.)

22. Further, Canopy warranted that the Licensed Technology would be free of defects, and that it would provide regular updates and patches. Specifically, among other things:

a. Canopy warranted that each component "will be free from defects in material and manufacture" and agreed to replace "Damaged Hardware" due to "malfunction" at its sole expense. (Ex. A § 10.2.) These warranties expressly survive termination. (*Id*. § 13.5.)

b. Canopy agreed to provide "all generally applicable platform updates, enhancements and APIs" and "periodic updates" to fix bugs and errors and implement new functionality to maintain the Licensed Technology's competitiveness and compliance with industry standards. (Ex. A § 12.)

23. Canopy's representations concerning product security, warranties, and updates were pivotal to the Agreement. As a provider of a system deployed in hospitals and used to safeguard healthcare staff, Commure would not have entered into the Agreement without receiving contractual assurances that Canopy would maintain the highest standards of product security and warranties.

**Canopy's Refusal To Remediate Security Vulnerabilities**

24. In late 2023, Commure's new management began a months-long security review of the Licensed Technology. The review revealed vulnerabilities that threatened the integrity and security of the Licensed Technology. For example:

Case No. 3:24-cv-02592-AMO

AMENDED COMPLAINT

     a.     communications between badges and gateways were unencrypted, creating the risk of interception, spoofing, eavesdropping, and alteration of data transmissions;

     b.     hospital floor plans were publicly accessible without authentication on Google Drive folders;

     c.     staff names, email addresses, phone numbers, and real-time locations were exposed publicly in certain instances; and

     d.     proximity alerts reflecting security incident details could be accessed by members of the public under certain circumstances.

25. These vulnerabilities raised serious risks, particularly in the healthcare context. They also violated Canopy's express commitments to implement "industry standard measures" and safeguard the Licensed Technology against unauthorized access. (Ex. A §§ 10.1, 14.6.)

26. Commure promptly notified Canopy and sought Canopy's full cooperation as Commure further investigated. Canopy failed to fully cooperate, however, including by refusing to state whether it suffered a security breach as a result of the vulnerabilities, notwithstanding its obligations under Section 14.6 of the Agreement.

27. Given the severity of the vulnerabilities, Commure asked Canopy to refrain from communicating with Commure's customers—customers with whom Canopy had no contractual relationship—while the investigation was ongoing to ensure that Canopy did not downplay the risks of the vulnerabilities. But Canopy proceeded to do exactly that. Canopy's CEO, Shan Sinha, communicated to one or more Commure customers in January 2024 that Commure had made "false," "misleading," "hyperbolic," and "fear-mongering" claims of vulnerabilities in the Licensed Technology. Commure is informed and believes, and thereon alleges, that Canopy privately tried to fix certain vulnerabilities while publicly claiming they were "false."

28. Commure also demanded Canopy provide a plan to remediate the vulnerabilities in accordance with its obligations under the Agreement's warranty and update provisions. But Canopy largely rejected those requests through a series of misleading and contradictory claims. For instance, with respect to the lack of encryption, Canopy initially claimed this vulnerability was "easily mitigated" through an "over-the-air firmware update mechanism available for all Strongline

badges." But then Canopy abruptly reversed course, claiming its over-the-air update was "not safe" to roll out. When Commure noted Canopy had said "the encryption was ready and working," Canopy drew a nonsensical distinction between "ready and working" and "deployed in production."

29. Since then, Canopy has continued to acknowledge the need to encrypt Commure's Strongline® badges. Commure is informed and believes, and thereon alleges, that Canopy is preparing an over-the-air update that will be available to roll out in four to six weeks. However, to date, Canopy has refused to confirm that it will provide the update to existing Commure customers using Strongline® badges. This refusal has rendered Commure unable to offer its Strongline® customers a solution to the known vulnerabilities.

30. Canopy has breached its obligations under the Agreement, including by refusing to provide encrypted replacements or any over-the-air update for the unencrypted badges to Commure for the benefit of its customers, as mandated by the Agreement. The lack of encryption impairs the devices' core functionality and security and triggers Canopy's warranty obligations. Encryption is also necessary for the system to conform to the "industry standard measures" warranted in Section 10.1. By failing to remedy this defect and conditioning upgrades on customers abandoning Commure, Canopy has violated the letter and spirit of its surviving obligations.

<u>**Canopy Engages in Unfair Competition and Infringement**</u>

31. For nearly all its existence since 2019, Canopy was a mere vendor of Commure, supplying unbranded technology that Commure incorporated into its Strongline® product. Commure is informed and believes, and thereon alleges, that Canopy had not provided the Licensed Technology to other companies in the healthcare industry, nor had it sold the Licensed Technology directly to customers other than Commure—until recently.

32. As Commure prepared to release an upgraded version of Strongline®, known as Strongline® Pro, Canopy, through its CEO, Sinha, announced a "major strategic shift" to its business plan: it would launch a directly competing product called Canopy Protect based on the same core technology as Strongline®, but with Canopy's branding instead.

33. Then, in January 2024, Canopy purported to terminate the Agreement with Commure immediately pursuant to Section 13.2. Commure is informed and believes, and thereon alleges, that this termination was wrongful and without proper cause.

34. Since launching its competing product, Canopy Protect, Canopy has infringed Commure's Strongline® marks and engaged in unfair competition. For example, Canopy, at the direction of Sinha, infringed the Strongline® marks and engaged in unfair competition by making untruthful marketing statements to consumers that, among other things: (i) "Strongline was created by, owned and operated by Canopy," (ii) "Strongline has been resold by Commure," and (iii) "Strongline Pro and Strongline are completely unrelated." Commure is informed and believes, and thereon alleges, that Canopy's infringement was willful and designed to sow consumer confusion and wrongfully profit off the positive reputation and goodwill that Commure's Strongline® has among consumers.

35. Sinha and Pulim, as the directors and officers of Canopy, personally directed, controlled, ratified, and participated in the above infringing acts and orchestrated Canopy's acts of unfair competition. Sinha, Canopy's CEO, and Pulim, Canopy's CTO, are chiefly responsible for the security vulnerabilities of Strongline® badges, which Canopy later conveniently exploited. Upon information and belief, Sinha and Pulim were aware of the existence of the security vulnerabilities that exposed the wearers of Strongline® badges to unsafe conditions, but they made no attempt to direct Canopy to rectify these security vulnerabilities as it should under the Reseller Agreement at any point prior to Commure's own discovery of these vulnerabilities. Upon further information and belief, at the same time of knowingly subjecting Strongline® badge wearers to security attack, Sinha and Pulim directed, ratified, and controlled Canopy to start developing Canopy Protect to directly compete with Strongline®.

36. Upon information and belief, as Sinha and Pulim were well aware of the security weaknesses of Strongline®, when developing Canopy Protect, Canopy, under the direction of Sinha and Pulim, was able to mitigate those vulnerabilities and enhance safety features that they knew Strongline® lacked, such as encryption. In doing so, Canopy, under the direction of Sinha and Pulim,

deliberately failed to remedy the vulnerabilities in Commure's product insecure so that it could later promote Canopy protect and unfairly compete with Commure.

37. In particular, when promoting the Canopy Protect product, Sinha specifically touted to consumers that Canopy Protect is encrypted—a feature and he knew to be a vulnerability of Strongline—for the purpose of diverting business away from Commure.

**Canopy Continues to Exploit the Same Vulnerabilities It Created**

38. For the many months after Commure complained to Canopy about security vulnerabilities of the unencrypted Strongline® badges and asked for replacement under the Reseller Agreement, Canopy delayed rectifying the security vulnerabilities. In April 2024, Canopy informed Commure of the availability of encrypted badges.

39. Canopy initially offered to make those encrypted badges available "immediately" and for "free" as replacements for existing Commure Strongline® customers. But Canopy later backtracked, stating it would only replace unencrypted Strongline® with encrypted badges under the Reseller Agreement if Commure agreed that all future badges for these customers would carry Canopy Protect branding, not Commure's Strongline® branding. And, now, Canopy, through Sinha, has refused altogether to provide these replacement badges pursuant to the Reseller Agreement, but rather offered to provide Canopy Protect—over which Commure has no control—to all Commure customers, in a blatant effort to convert Commure's customers into Canopy's to unfairly compete with Commure.

40. Canopy's maneuvers not only breached the Agreement but also interfere with Commure's contractual relations and business expectations. They have undermined trust and confidence in Commure's product and services and threaten Commure with loss of customers, competitive harm, and reputational damage. By positioning Canopy Protect as the exclusive remedy to a problem of its own making, Canopy has unjustly disrupted Commure's customer relationships and blocked Commure from offering viable alternatives.

41. Canopy has escalated its interference by refusing to provide any replacements or firmware updates to address the encryption flaw for Commure's customers who remain undecided and injecting itself between Commure and Commure's customers. Canopy's campaign has already

led multiple Commure customers to terminate their contracts prematurely or indicate they will not renew.

**Sinha Induced Commure Employees To Disclose Commure's Confidential Information**

42.    Since Sinha announced that Canopy would be competing directly with Commure, Sinha had approached a number of then-employees of Commure to induce them to disclose and misuse Commure's confidential customer information to unfairly compete and tortiously inference with Commure's relationships with both its existing and prospective customers.

43.    Upon information and belief, since at least December 6, 2023, Sinha had approached at least three then-employees on Commure's sales team.  After being approached by Sinha, these former employees quickly announced their intention to leave Commure.  Leading up to their departure, each of these former sales employees accessed and downloaded unusually large number of documents from Commure's Salesforce database, which contained Commure's confidential existing customer list and prospective customer list.  Following their departure from Commure, these former employees joined Canopy, working in virtually identical roles.

44.    Upon information and belief, Canopy, through Sinha, schemed with Commure's former sales employees to exploit Commure's confidential compensation information, as well as existing and prospective customer information to use this information to tortiously interfere with Commure's existing contracts and future business prospects.

45.    In particular, following the departure of one of Commure's former sales employees, Anil Mitra, Canopy approached at least two prospective customers that Mitra was working with closely prior to leaving Commure.  Both customers were under discussions to enter a contract with Commure but unexpectedly went cold following Mitra's departure, one of them citing an opportunity to "continue to work with [Mitra]" with the same product, suggesting that Mitra approached the same two customers after joining Canopy and that the customers believed Canopy sold Strongline®.  Having the benefit of Commure's confidential information, Canopy successfully hijacked Commure's prospective business opportunities.

46.     Upon information and belief, Canopy, through Sinha, induced Commure's former employees to share further Commure's confidential information to inject itself between Commure's existing contractual relationship or prospective contractual relationship.

47.     Commure has lost customers and prospective business opportunities because of Canopy's interference.

### FIRST CAUSE OF ACTION

**Federal Trademark Infringement**

**(Lanham Act, 15 U.S.C. § 1114)**

**(Against All Defendants)**

48.     Commure incorporates the allegations of paragraphs 1 to 47 above.

49.     Commure is the owner of the federally registered trademark in Strongline® (Reg. No. 6,105,380) and service mark in Strongline® (Reg. No. 6,111,205), registered with the United States Patent and Trademark Office in July 2020.  Commure has continuously used the Strongline® marks in commerce to identify its healthcare safety system and has built significant goodwill and consumer recognition associated with the Strongline® brand.

50.     Despite Commure's well-established rights in the Strongline® marks, Canopy has used and continues to use marks that are identical to the Strongline® marks in connection with the advertising, marketing, and sale of its competing staff safety systems, without Commure's authorization or permission, in a manner likely to cause consumer confusion.  Specifically, as alleged above, Canopy has used the Strongline® marks in its marketing materials and website to describe its own competing product, Canopy Protect; made statements in customer communications such as "Strongline was created by, owned and operated by Canopy"; and claimed in promotional materials that "Strongline has been resold by Commure" and "Strongline Pro and Strongline are completely unrelated," among other things.

51.     Canopy's unauthorized use of the Strongline® marks is likely to cause confusion, mistake, or deception among consumers as to the source, origin, sponsorship, or approval of Canopy's products and services.  Consumers are likely to believe that Canopy's products are associated with or endorsed by Commure, which is not the case.  This confusion is evidenced by

instances where customers have expressed uncertainty about the relationship between Canopy and Commure due to Canopy's misleading statements, such as customer communications to Commure indicating that customers believe that Canopy sells the same product as Commure. Canopy's use of the Strongline® marks goes beyond what is necessary and falsely suggests sponsorship or endorsement by Commure. Canopy's statements serve to create consumer confusion rather than avoid it.

52. As a direct and proximate result of Canopy's infringement, Commure has suffered and will continue to suffer irreparable harm to its reputation and goodwill, as well as monetary damages including lost profits and loss of control over its brand.

53. Canopy's infringing acts have been willful and deliberate, as evidenced by Canopy's continued use of the Strongline® marks after receiving notices from Commure to stop such wrongful conduct.

54. Defendants Sinha and Pulim, as directors and officers of Canopy, personally directed, controlled, ratified, and participated in Canopy's aforementioned wrongful acts and actively and knowingly caused Canopy's violations of 15 U.S.C. § 1114.

55. Commure is entitled to injunctive relief pursuant to 15 U.S.C. § 1116, restraining and enjoining Canopy, its agents, servants, and employees, and all persons acting in concert with them, including Sinha, from further acts of trademark infringement.

56. Commure is also entitled to recover Canopy's profits, actual damages, costs, and attorney's fees under 15 U.S.C. § 1117. Because the exact amount of Canopy's unjust profits cannot be determined without an accounting, Commure is entitled to an accounting of Canopy's profits and the imposition of a constructive trust in favor of Commure on all profits obtained from Canopy's unlawful conduct.

57. Commure further requests that the Court order Canopy to make corrective disclosures to remedy its misrepresentations and confusion caused in the marketplace.

## SECOND CAUSE OF ACTION

**Unfair Competition, False Designation of Origin, and False Advertising**

**(Lanham Act, 15 U.S.C. § 1125(a))**

**(Against All Defendants)**

58.    Commure incorporates the allegations of paragraphs 1 to 57 above.

59.    Commure is the owner of the federally registered trademark in Strongline® (Reg. No. 6,105,380) and service mark in Strongline® (Reg. No. 6,111,205), registered with the United States Patent and Trademark Office in July 2020.  Commure has continuously used the Strongline® marks in commerce to identify its innovative healthcare safety system and has built significant goodwill and consumer recognition associated with the Strongline® brand.

60.    As described above, Canopy has engaged in unfair competition, false designation of origin, and false advertising in violation of 15 U.S.C. § 1125(a) through the following actions:

a.    Unfair Competition (15 U.S.C. § 1125(a)(1)(A)):  Canopy has used the Strongline® marks in a manner likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Canopy with Commure, or as to the origin, sponsorship, or approval of Canopy's goods by Commure.  Canopy's false and misleading claims have misled consumers and unfairly competed with Commure's business.

b.    False Designation of Origin (15 U.S.C. § 1125(a)(1)(A)):  Canopy has misrepresented its products as those of Commure by using the Strongline® marks in its marketing materials and making false claims such as "Strongline was created by, owned and operated by Canopy."  These false designations of origin are likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Canopy with Commure, or as to the origin, sponsorship, or approval of Canopy's goods by Commure. Canopy's use of the Strongline® marks goes beyond what is necessary to identify or describe Canopy's products and falsely suggests endorsement by Commure.

c.    False Advertising (15 U.S.C. § 1125(a)(1)(B)):  Canopy has made false and misleading statements of fact in commercial advertisements, including claims that "Strongline has been resold by Commure" and "Strongline Pro and Strongline are

completely unrelated," among other statements. These statements misrepresent the nature, characteristics, and qualities of both Canopy's and Commure's products. Canopy made these statements in interstate commerce with the intent to deceive consumers and gain a competitive advantage over Commure. These false and misleading statements have actually deceived or have the tendency to deceive a substantial segment of consumers.

61.    As a direct and proximate result of Canopy's wrongful conduct, Commure has suffered and will continue to suffer irreparable injury, including loss of control over its brand and damage to its reputation, loss of sales and customers, and other damages, including lost profits.

62.    Defendants Sinha and Pulim, as directors and officers of Canopy, personally directed, controlled, ratified, and participated in Canopy's aforementioned wrongful acts and actively and knowingly caused Canopy's violations of 15 U.S.C. § 1125(a).

63.    Commure is entitled to injunctive relief pursuant to 15 U.S.C. § 1116 to prevent further violations and irreparable harm; recovery of Canopy's profits, Commure's actual damages, and costs pursuant to 15 U.S.C. § 1117; an accounting of Canopy's profits and the imposition of a constructive trust in favor of Commure on all profits obtained from Canopy's unlawful conduct; and an order requiring Canopy to make corrective disclosures to remedy its misrepresentations and the confusion caused in the marketplace.

**THIRD CAUSE OF ACTION**

**Breach of Contract**

**(Against Defendant Canopy)**

64.    Commure incorporates the allegations of paragraphs 1 to 63 above.

65.    The Reseller Agreement constitutes a valid and enforceable contract between Commure and Canopy.

66.    Commure has performed all its material obligations under the Agreement, except those excused by Canopy's breach.

67.    Canopy has breached the Reseller Agreement by, among other things:

a.      Failing to implement and maintain reasonable security safeguards to protect the confidentiality and integrity of the Licensed Technology and customer data, in violation of Section 14.6;

b.      Providing a system that fails to conform to Canopy's express warranties due to material security vulnerabilities in violation of Sections 10.1 and 10.2;

c.      Refusing to provide available updates and replacement badges to remedy known security defects in the Licensed Technology, including by implementing encryption, in violation of Canopy's ongoing warranty obligations under Section 10, which expressly survive any termination of the Agreement;

d.      Failing to provide Commure with available updates and bug fixes to address known security issues, in violation of Section 12; and

e.      Wrongfully purporting to terminate the Agreement on January 4, 2024.

68.    Moreover, irrespective of any purported termination of the Agreement, the Agreement provides that Canopy's obligations under Sections 10.1, 10.2, and 14.5 survive termination.

69.    As a direct and proximate result of Canopy's breaches, Commure has suffered damages in the form of lost business, lost profits, loss of goodwill and reputation, and increased support costs in an amount to be determined at trial.  Commure is also entitled to its reasonable attorneys' fees and costs under Section 20.6 of the Agreement.

70.    Canopy's breaches have caused and are causing irreparable harm to Commure for which damages are an inadequate remedy, as they impair the security and integrity of Commure's critical systems and relationships.  Preliminary and permanent injunctions are necessary to prevent further harm and preserve the status quo pending trial.

**FOURTH CAUSE OF ACTION**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

**(Against Defendant Canopy)**

71.    Commure incorporates the allegations of paragraphs 1 to 70 above.

72.    The Reseller Agreement contains an implied covenant of good faith and fair dealing requiring Canopy to refrain from actions that unfairly interfere with Commure's rights and benefits under the Agreement.

73.    Canopy has breached the implied covenant through conduct that, even if not expressly prohibited by the Reseller Agreement, frustrated the agreement's purpose and Commure's justified expectations, by, among other things:

a.    Refusing to provide available security fixes and updates to the Licensed Technology, includes the Strongline® badges, to protect Commure's existing Strongline® customers;

b.    Exploiting known vulnerabilities in Commure's system to encourage migration to Canopy's competing service;

c.    Offering security upgrades conditioned on customers switching to Canopy's competing service, effectively using Canopy's position as the technology provider to unfairly poach Commure's customers; and

d.    Abruptly ceasing to provide support and updates for the Licensed Technology used in Strongline®, contrary to the parties' established practice and Commure's reasonable expectations, leaving Commure unable to adequately service its customers.

74.    These actions, even if not explicitly prohibited by the Reseller Agreement, violated the spirit of the agreement and deprived Commure of the benefits it reasonably expected to obtain from the Reseller Agreement.

75.    Canopy's conduct unfairly undermines the purpose of the Agreement: to enable Commure to succeed as a value-added reseller in the healthcare industry using Canopy's technology under Commure's own brand.

76.    As a direct and proximate result of Canopy's breaches of the implied covenant, Commure has been damaged, including, without limitation, lost customers, damage to its reputation, and increased costs of performance, in an amount to be determined at trial.    Preliminary and permanent injunctions are also warranted.

## FIFTH CAUSE OF ACTION

### Tortious Interference with Contractual Relations

### (Against Defendants Canopy and Sinha)

77.    Commure incorporates the allegations of paragraphs 1 to 76 above.

78.    Commure has valid contracts with its Strongline® customers.

79.    Canopy is aware of Commure's customer contracts.  With knowledge of these relationships, Canopy has intentionally and wrongfully taken actions to disrupt them, including by:

a.    Exploiting vulnerabilities in the Licensed Technology used for the Strongline® system to undermine customer confidence;

b.    Misappropriating Commure's confidential information subject to confidentiality agreements to wrongfully solicit Commure's existing and prospective customers;

c.    Withholding necessary security updates from the Licensed Technology used for the Strongline® system, but offering them to Commure's Strongline® customers through Canopy Protect, to induce Commure's Strongline® customers to terminate and switch to Canopy; and

d.    Making it impossible for Commure to perform its customer contracts by refusing to support the Licensed Technology used for the Strongline® system properly.

80.    Canopy's actions were designed to harm Commure and have made Commure's performance under its contracts more expensive and burdensome.

81.    Defendant Sinha, as a director and officer of Canopy, directed, ratified, controlled, and participated Canopy's intentional and wrongful actions taken to interfere with Commure's existing contractual relationship with its customers.

82.    As a direct result of Canopy's tortious interference, Commure has suffered damage to its business and contractual relationships in an amount to be proven at trial. Injunctive relief is also necessary to prevent further irreparable harm.

83.    Canopy's conduct was malicious, oppressive, and fraudulent, entitling Commure to punitive damages.

## SIXTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

### (Against Defendants Canopy and Sinha)

84.    Commure incorporates the allegations of paragraphs 1 to 82 above.

85.    Commure had prospective contractual and economic relationships with current Strongline® customers who are subject to renewing their contracts and prospective Strongline® customers, as well as with other third parties in the healthcare technology space.  Commure had a reasonable expectation that these relationships would yield future economic benefits.

86.    Canopy knew of Commure's prospective customer and business relationships.  With that knowledge, Canopy intentionally engaged in wrongful conduct designed to disrupt Commure's relationships and divert those opportunities to Canopy, including by:

a.    Encouraging Commure's existing Strongline® customers to terminate their contracts and switch to Canopy's competing product;

b.    Misappropriating Commure's confidential information subject to confidentiality agreements to wrongfully solicit Commure's existing and prospective customers;

c.    Offering financial incentives and free replacement hardware to Commure's existing Strongline® customers conditioned on them ceasing business with Commure; and

d.    Leveraging its position as Commure's sole supplier and its insider knowledge of the vulnerabilities in the Licensed Technology used for the Strongline® system to poach Commure's pipeline and unfairly compete.

87.    Defendant Sinha, as a director and officer of Canopy, directed, ratified, controlled, and participated Canopy's intentional and wrongful actions taken to interfere with Commure's existing contractual relationship with its customers.

88.    As a direct and proximate result of Canopy's interference, Commure has lost specific customer sales and other business opportunities.  This has caused economic harm to be proven at trial.  Injunctive relief is also necessary to prevent further irreparable harm.

## **SEVENTH CAUSE OF ACTION**

### **Unfair Competition (Cal. Bus. & Prof. Code § 17200, *et seq*.)**

### **(Against All Defendants)**

89.    Commure incorporates the allegations of paragraphs 1 to 86 above.

90.    Canopy has engaged in unlawful, unfair, and deceptive business practices in violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq*., including:

a.    Breaching its contractual obligations and warranties to Commure;

b.    Misappropriating Commure's confidential information subject to confidentiality agreements to wrongfully solicit Commure's existing and prospective customers;

c.    Tortiously interfering with Commure's existing and prospective customer relationships;

d.    Exploiting vulnerabilities in the Licensed Technology used for the Strongline® system rather than supporting Commure; and

e.    Offering free upgrades conditioned on customers terminating Commure's contracts.

91.    Canopy's practices violate established public policies recognized in statutes and common law, including policies against unfair competition, interference with contract, and deceptive trade practices.  The practices threaten competition and innovation in the healthcare technology market.

92.    Defendants Sinha and Pulim, as directors and officers of Canopy, personally directed, controlled, ratified, and participated in Canopy's aforementioned wrongful acts and unfair competition.

93.    As a direct result of Canopy's conduct, Commure and its customers have lost money and property and suffered irreparable injury.  Canopy has been unjustly enriched at the expense of Commure and its customers .

94. Under the UCL, this Court has broad equitable powers to remedy Canopy's unlawful practices and prevent future misconduct. Injunctive relief is particularly necessary given the ongoing harm to competition and the public interest in secure healthcare technologies. Damages alone will not deter Canopy's behavior or restore the market.

**EIGHTH CAUSE OF ACTION**

**Declaratory Relief**

**(Against Defendant Canopy)**

95. Commure incorporates the allegations of paragraphs 1 to 94 above.

96. An actual and justiciable controversy has arisen between Commure and Canopy concerning their respective rights and obligations under the Agreement. In particular, the parties dispute:

a. Whether Canopy remains obligated to support Commure's existing Strongline® customers, including by providing replacement badges, post-termination;

b. The scope of Canopy's ongoing warranty obligations to remedy defects in the Strongline® system, including the implementation of encryption; and

c. Whether Canopy's purported termination of the Agreement was wrongful.

97. Commure maintains that Canopy's purported termination was wrongful, and in any event, that Canopy remains bound by the warranty obligations in Section 10, which survive termination and require Canopy to remedy defects in the system provided to Commure's customers, including by implementing encryption on badges and gateways to address known vulnerabilities. Canopy, however, contends its termination was proper and that it has been relieved of all obligations to Commure and its customers and that Commure must immediately cease all activities related to the Licensed Technology. Canopy insists it need not provide any further updates, bug fixes, or replacement badges to address security issues.

98. Commure desires a judicial determination of its rights and Canopy's duties to resolve this controversy and guide the parties' future conduct. Such a declaration is necessary and appropriate to prevent further harm to Commure's business and customers.

**PRAYER FOR RELIEF**

WHEREFORE, Commure prays for relief, as follows:

A.    A judgment that:

(i)    Defendants have infringed Commure's federal trademark rights;

(ii)    Defendants have engaged in violations of the Lanham Act, 15. U.S.C. § 1125(a), including unfair competition, false designation of origin, and false advertising, and have been unjustly enriched as a result;

(iii)    Defendant Canopy has breached the Agreement;

(iv)    Defendants have tortiously interfered with Commure's existing contracts and prospective economic relations;

(v)    Defendants acted willfully and with malice, oppression, and/or fraud;

B.    Preliminary and permanent injunction against that Canopy and all of its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns, and all those acting on behalf of or in active concert or participation with any of them:

(i)    enjoining them from further acts of infringement of Commure's rights in the Strongline® marks;

(ii)    enjoining them further false or misleading statements about Commure or Strongline® to Commure's customers or others;

(iii)    enjoining them further tortious interference with Commure's existing and prospective customer relationships;

(iv)    requiring them to replace under the Agreement any unencrypted badges in use by Commure's existing Strongline® customers with encrypted badges;

(v)    requiring them to fulfill its ongoing warranty and support obligations to Commure for the benefit of Commure's existing Strongline® customers, including by providing updates, bug fixes, and security patches for the Licensed Technology used in Strongline® through the end of those customers' contract terms with Commure; and

(vi)    granting such other injunctive relief as the Court deems necessary and proper to prevent irreparable harm to Commure and protect the public interest;

C.    Actual damages suffered as a result of Canopy's unlawful conduct, in an amount to be proven at trial, plus all pre-judgment and post-judgment interest, at the maximum rate permitted law;

D.    A judgment trebling any damages award;

E.    Punitive damages;

F.    An accounting of Canopy's profits;

G.    Restitution against Canopy and in favor of Commure, including disgorgement of any wrongfully obtained profits and any other appropriate relief;

H.    Costs of suit and reasonable attorneys' fees; and

I.    For a judicial declaration that:

(i)    Canopy remains obligated to support Commure's existing Strongline® customers through the end of their contract terms, including by providing updates, bug fixes, and replacement badges as required to maintain the functionality and security of the Strongline® system; and

(ii)    Canopy's warranty obligations under Section 10 of the Agreement remain in effect with respect to the Licensed Technology used in Strongline® supplied to Commure's existing customers, requiring Canopy to remedy defects and provide all available replacements and fixes, including the implementation of encryption on the badges and gateways; and

J.    For such other and further relief as the Court deems just and proper.

DATED: June 24, 2024                          QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP


                                              By _____ /s/  Sam S. Stake _____
                                                       Sam S. Stake
                                                  Attorneys for Commure, Inc.

-22-                                                      Case No. 3:24-cv-02592-AMO

AMENDED COMPLAINT

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Commure respectfully demands a trial by jury on all issues triable by jury.


DATED: June 24, 2024                    QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP


                                        By_____/s/   Sam S. Stake_____
                                              Sam S. Stake
                                           Attorneys for Commure, Inc.

AMENDED COMPLAINT