QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Robert W. Stone (Bar No. 163513)
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Facsimile:      (650) 801-5100
robertstone@quinnemanuel.com

  Sam S. Stake (Bar No. 257916)
  Elle Xuemeng Wang (Bar No. 328839)
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600
Facsimile:      (415) 875-6700
samstake@quinnemanuel.com
ellewang@quinnemanuel.com

  Aaron Perahia (Bar No. 304554)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:      (213) 443-3100
aaronperahia@quinnemanuel.com

*Attorneys for Commure, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMURE, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CANOPY WORKS, INC. f/k/a SMPLABS, INC., a Delaware corporation, SHAN SINHA, an individual, and VINAY PULIM, an individual,<br><br>Defendants. | Case No. 3:24-cv-02592-AMO<br><br>Honorable Araceli Martínez-Olguín<br><br>**PLAINTIFF COMMURE, INC.'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>[Concurrently filed with declarations of Tanay Tandon and Dr. Seth James Nielson; and [Proposed] Order]<br><br>Date:           January 2, 2025<br>Time:           2:00 p.m.<br>Courtroom:   10, 19th Floor |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 2, 2025, at 2:00 p.m., or as soon as the matter may be heard, in the courtroom of the Honorable Araceli Martínez-Olguín at the United States District Court for the Northern District of California, San Francisco Courthouse, 10 – 19th Floor, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiff Commure, Inc. ("Commure") will, and hereby does, move the Court for a preliminary injunction against Defendant Canopy Works, Inc. ("Canopy"), pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rules 7-2 and 65-2.

As detailed in the Proposed Order submitted with this Motion, Commure seeks an order preliminarily enjoining and restraining Canopy from failing to comply with its obligations under the Reseller Agreement, including: (a) refusing to acknowledge valid warranty claims for defective, unencrypted badges as set forth in the Reseller Agreement, (b) impeding Commure's ability to obtain replacement, encrypted badges that conform to the requirements in the Reseller Agreement, or (c) interpreting the warranty provisions of the Reseller Agreement in a manner that would allow the circulation of non-conforming, unencrypted badges.

This Motion is made on the grounds that: (1) Commure is likely to succeed on the merits of its claim for breach of contract, (2) Commure will be irreparably harmed if no preliminary injunction issues, (3) the balance of hardships weighs in Commure's favor, and (4) the public interest supports issuing a preliminary injunction.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the declarations of Tanay Tandon and Dr. Seth James Nielson, all matters of which the Court may take judicial notice, all other pleadings on file in this action, and any other written or oral argument or evidence that Commure may present to the Court.

DATED:        August 10, 2024              QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP


                                    By      /s/  Sam S. Stake
                                           Sam S. Stake
                                           Attorneys for Commure, Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................................................II

STATEMENT OF ISSUE TO BE DECIDED ..............................................................IV

STATEMENT OF FACTS.............................................................................................. 2

    A.    Commure Engages Canopy To Build Strongline® ................................... 2

    B.    Commure and Canopy Enter Into the Reseller Agreement...................... 3

    C.    Commure Discovers Strongline® Security Vulnerabilities...................... 4

    D.    Canopy's Pattern of Delay, Reversals, and Bad Faith ............................. 5

    E.    The Consequences of Canopy's Failure to Replace Defective Badges ................... 7

ARGUMENT ................................................................................................................. 7

I.    COMMURE IS LIKELY TO SUCCEED ON THE MERITS OF ITS BREACH OF CONTRACT CLAIM............................................................................................. 8

    A.    The Reseller Agreement Is An Enforceable Contract ............................. 8

    B.    Commure Performed Its Obligations Under the Reseller Agreement ..................... 8

    C.    Canopy Breached The Reseller Agreement ............................................. 9

    D.    Commure Has Been Damaged by Canopy's Breach ............................. 10

II.    COMMURE WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.......................................................................................................... 10

III.    THE BALANCE OF EQUITIES FAVORS GRANTING AN INJUNCTION.................. 12

IV.    GRANTING THE REQUESTED RELIEF FURTHERS THE PUBLIC INTEREST ....... 14

V.    THE SCOPE OF THE REQUESTED INJUNCTION IS APPROPRIATE....................... 15

CONCLUSION ........................................................................................................... 16

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### <u>Cases</u>

4

5

*All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................................................................ 8

6

*Allied Health Ass'n, Inc. v. Arthrocare Corp.,*
   2009 WL 1424509 (N.D. Cal. May 20, 2009) ...................................................................... 9

7

8

*AMG & Assocs., LLC v. Ameri Pride Servs., Inc.,*
   2016 WL 9275402 (C.D. Cal. Aug. 29, 2016) ...................................................................... 8

9

*Apple Inc. v. Psystar Corp.,*
   673 F. Supp. 2d 943 (N.D. Cal. 2009), *aff'd,* 658 F.3d 1150 (9th Cir. 2011) ........................ 11

10

11

*Clear Blue Specialty Ins. Co. v. Ozy Media, Inc.,*
   669 F. Supp. 3d 907 (N.D. Cal. 2023) .............................................................................. 14

12

*Fifty-Six Hope Rd. v. Jammin Java Corp.,*
   2017 WL 2457487 (C.D. Cal. Jan. 25, 2017) ...................................................................... 9

13

14

*Flextronics Int'l, Ltd. v. Parametric Tech., Corp.,*
   2013 WL 5200175 (N.D. Cal. Sept. 16, 2013) .............................................................. 12, 14

15

*GoTo.com, Inc. v. Walt Disney Co.,*
   202 F.3d 1199 (9th Cir. 2000) .......................................................................................... 15

16

17

*Hope Rd. Merch. LLC v. Jammin Java Corp.,*
   747 F. App'x 622 (9th Cir. 2019) ...................................................................................... 9

18

19

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
   571 F.3d 873 (9th Cir. 2009) ............................................................................................ 15

20

*Mitchell v. 3PL Sys., Inc.,*
   2013 WL 12129617 (C.D. Cal. Apr. 8, 2013) .................................................................... 11

21

22

*Novotech (Australia) Pty Ltd. v. SureClinical Inc.,*
   2022 WL 17419168 (E.D. Cal. Dec. 5, 2022) ................................................. 11, 12, 13, 14

23

24

*Oasis W. Realty, LLC v. Goldman,*
   51 Cal. 4th 811 (2011) ...................................................................................................... 8

25

26

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.,*
   512 F. Supp. 3d 966 (N.D. Cal. 2021) ................................................................................ 8

27

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,*
   944 F.2d 597 (9th Cir. 1991) ............................................................................................ 11

28

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ............................................................................ 11

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 8, 14

**STATEMENT OF ISSUE TO BE DECIDED**

Pursuant to Local Civil Rule 7-4(a)(3), Commure identifies the following issue to be decided:  Whether a preliminary injunction should issue where Commure will be irreparably harmed if Canopy continues to breach its warranty obligations, Commure is likely to succeed on the merits of its claims, the balance of hardships tips strongly in Commure's favor, and the public interest supports issuing an injunction.

## MEMORANDUM AND POINTS OF AUTHORITIES

## INTRODUCTION

Plaintiff Commure, Inc. ("Commure") is the company behind the Strongline® system, an innovative wearable badge featuring an alert button that is designed to combat the epidemic of workplace violence in healthcare, where approximately 75% of all workplace assaults occur. When pressed by a nurse, doctor, or other worker in distress, the Strongline® alert button immediately dispatches a silent alarm through the nearest wireless gateway to security teams and colleagues, enabling rapid intervention.

After conceiving of Strongline® in 2018 and securing initial hospital commitments, Commure contracted with Defendant Canopy Works, Inc. ("Canopy") in August 2019 to supply the first commercial-ready version of the system according to Commure's specifications, including hardware badges and wireless gateways that enable real-time location tracking and emergency response throughout a hospital. Through Commure's efforts, Strongline® achieved widespread adoption, becoming a key safety solution now deployed in hundreds of hospitals nationwide to more than 190,000 individuals.

Canopy's ongoing warranty breaches and reckless disregard for healthcare worker safety imperil this success. In January 2024, after completing a comprehensive, months-long security audit, Commure uncovered severe vulnerabilities in the Strongline® system supplied by Canopy. These included unencrypted badge-to-gateway communications that jeopardized the privacy and security of countless nurses and other frontline personnel. The flaws exposed staff locations in real-time and enabled false panic alerts, creating a direct pathway for bad actors to stalk hospital employees, disrupt operations, and even carry out violent attacks.

After discovering these issues, Commure demanded Canopy remedy them as required under the parties' Reseller Agreement, which obligated Canopy to safeguard system security and replace any defective badges at its own expense under a lifetime warranty. Canopy's response was stunning. It dismissed the vulnerabilities, misrepresenting them as "misleading" or outright "false"—even after third-party verification that the encryption flaw presented a "substantial risk" requiring urgent correction. Canopy later backtracked, conceded encryption was required and claimed it was

working on a firmware update to fix the defect.  However, after months of delay and repeated shifting stories, it has become clear that Canopy has no intention of fixing the defect or replacing the badges under warranty.  Instead, it seeks to promote its own competing Canopy Protect product over Strongline® as a self-serving "solution."

As Canopy stalls, the risks to healthcare workers and hospitals grow.  Every day that the encryption defect persists is another chance for bad actors to access sensitive location data and use it to stalk staff, interfere with security systems, or even attack personnel.  Commure and its customers cannot effectively monitor for or prevent such catastrophic intrusions.  With its reputation and customer relationships already damaged and more losses imminent, Commure has no choice but to seek a narrow but vital injunction: an order compelling Canopy to immediately deliver the conforming replacement badges it is obligated to provide under the warranty provisions of the Reseller Agreement.

The legal and equitable case for relief is compelling.  Commure is highly likely to prove Canopy's breach of its express contractual duties.  The human and economic costs of denying an injunction outweigh any burden on Canopy, which need only honor contractual commitments it assured were achievable.  And the public interest in safeguarding technologies that keep hospitals and healthcare workers safe is difficult to overstate.  With Canopy unwilling to act and lives hanging in the balance, the Court's intervention is urgently needed.

For those reasons, as discussed more fully below, Commure respectfully requests that the Court grant Commure's requested preliminary injunction.

## STATEMENT OF FACTS

### A.    Commure Engages Canopy To Build Strongline®

The heart of Strongline® is an innovative badge featuring an alert button worn by nurses, doctors, and other healthcare workers.  Declaration of Tanay Tandon dated August 9, 2024 ("Tandon Decl."), ¶ 3.  Strongline® badges are designed to connect wirelessly to a network of gateways strategically placed throughout the hospital.  *Id*.  When a healthcare worker presses the alert button on their wearable badge, it sends a silent alarm through the nearest gateway to security teams and nearby colleagues, enabling early intervention and quick de-escalation of incidents.  *Id*.  This

innovative system architecture allows for real-time location tracking and rapid response to emergencies anywhere in the hospital. *Id.*

Commure, under its predecessor, conceived of the Strongline® system in 2018.  Tandon Decl. ¶ 4.  It owns the United States trade and service mark registrations in the Strongline® marks, and it secured the first hospital commitments which led to the system's production.  *Id.*  After securing these commitments, Commure outsourced production to a vendor, Canopy, to supply the first commercial-grade system under an August 2019 agreement.  *Id*. ¶ 6.  Canopy supplied the system with Strongline®-branding according to Commure's specifications, including the hardware badges worn by staff and gateways to facilitate wireless connections.  *Id.*

Due to Commure's efforts, Strongline® has been hugely successful.  Tandon Decl. ¶ 5.  Today, Strongline® serves as a key staff safety solution deployed within hundreds of hospitals and used by more than 190,000 individuals nationwide.  *Id.*  Commure is currently under contract with more than 40 organizations to provide the Strongline® system.  *Id.*

**B.**   **Commure and Canopy Enter Into the Reseller Agreement**

Most recently, the parties replaced their initial supply agreement with a new Reseller Agreement effective December 1, 2022.  Tandon Decl., ¶ 7 & Ex. A.  The Reseller Agreement established a licensing and distribution arrangement for Canopy's technology and devices (described as the "Licensed Technology"), which Commure marketed and sold to customers in the healthcare industry under its Strongline® brand.  *Id*., Ex. A §§ 2.1, 15.2-15.3.  Commure had responsibility for all Strongline® sales, entering customer agreements, and providing first-level support.  *Id*. §§ 3.1-3.2.  In exchange, Commure paid Canopy fixed monthly fees per badge and gateway assigned to an active Commure customer.  *Id*. § 4.1.

The Reseller Agreement set mandatory security standards for the Licensed Technology.  *See* Tandon Decl., Ex. A §§ 10.1, 14.6.  Canopy was required to implement robust safeguards to protect the confidentiality and integrity of Commure's data, prevent unauthorized access, and employ industry-standard measures to defend against harmful or malicious mechanisms.  *Id*. §§ 10.1(a), (e), 14.6.  If a security breach occurred, Canopy committed to cooperating with any investigation and promptly take necessary corrective actions.  *Id*. § 14.6.

Significantly, the Reseller Agreement contained a lifetime warranty obligating Canopy to provide a product "free from defects in material and manufacture" and to replace, at its "sole expense," any "Damaged Hardware" resulting from a "malfunction." Tandon Decl., Ex. A § 10.2. Both the warranty obligations in Section 10 and the data security requirements in Section 14 *expressly survive any termination* of the Agreement. *Id*. § 13.5. Thus, even following any termination, Canopy must honor the lifetime warranty for all Strongline® systems previously provided to Commure customers, and Commure retains an ongoing license to support those systems as needed. *Id*. § 10.2.

**C.** **Commure Discovers Strongline® Security Vulnerabilities**

In January 2024, Commure completed a comprehensive, months-long security assessment of the Strongline® system, revealing systematic failures by Canopy to implement basic security measures. Tandon Decl. ¶ 11. The most alarming flaw was the lack of encryption for sensitive communications between Strongline badges and gateways. *Id*. & Ex. C. The review also found that hospital floor plans, staff information, and panic alerts were publicly exposed and unprotected. *Id.*

These vulnerabilities jeopardized the safety, privacy and security of countless healthcare workers who rely on Strongline daily. Tandon Dec. ¶ 12. The lack of encryption enabled tracking hospital staff movements in real-time and triggering false panic alerts that could overwhelm security teams. Declaration of Dr. Seth James Nielson ("Nielson Decl.") ¶¶ 57-59.

Upon discovering these flaws, Commure notified affected customers of the risks to healthcare worker safety. Tandon Decl. ¶ 13. Commure's Chief Technology Officer also sent Canopy an urgent email with a detailed technical report, executive summary, and video demonstrations of potential exploits, emphasizing the severe risks and need for an immediate response. *Id*. & Exs. C – E.

Rather than promptly take responsibility, Canopy resorted to obstruction and denial. Tandon Decl. ¶ 14. In unauthorized outreach to Commure's clients and direct communications with Commure, Canopy downplayed the risks as minor, calling most findings "misleading" or "false." *Id*. & Ex. G. Regarding encryption, Canopy asserted Commure's conclusions were misleading, claiming the vulnerability could be "easily mitigated" through over-the-air firmware updates

without replacing hardware.[1]  *Id.* Ex. G at 5.  After Commure corrected those inaccurate claims (*id.* ¶ 15 & Exs. H, I), Canopy doubled down, telling Commure's customers that Commure's assertions about security "do not make such a claim true" and accusing Commure of proposing a "hyperbolic, unnecessary and fear-mongering" solution (*id.* ¶ 16 & Exs. J, K).  Canopy maintained this position even after an independent third-party audit confirmed the flaws, particularly the lack of encryption, posed a "substantial risk" requiring "proactive steps" to remediate.  *Id.* ¶ 20 & Ex. O.

Canopy's inaccurate messaging bred uncertainty among Commure's customer base and undermined Commure's efforts to alert clients and work towards a solution.  Tandon Decl. ¶¶ 17-19; *see id.*, Ex. M at 3 (acknowledging "the confusion created by the security claims with a customer that is frustrated by being exposed to the conflict").  Canopy's actions hindered the urgent work of mitigating serious security risks it had allowed to persist.  *See id.*

### D.   Canopy's Pattern of Delay, Reversals, and Bad Faith

Since being notified of the Strongline® vulnerabilities in January 2024, Canopy has engaged in a persistent pattern of delay, contradiction, and bad faith refusal to address critical security flaws.  Tandon Decl. ¶¶ 14-25.[2]

From late January through early April, Canopy repeatedly assured Commure that the encryption defect could be easily fixed with a firmware update pushed "over-the-air" to all deployed Strongline badges.  *See, e.g.*, Tandon Decl. ¶ 14 & Ex. G.  Relying on these representations, Commure told customers in late January that a remedy was imminent.  *See id.*  But Canopy's assurances proved hollow.  When a customer specifically asked about encryption in late January,

---

[1]   As described *infra* Section D, these over-the-air updates never materialized and Mr. Sinha's reassurances proved illusory.

[2]   The same month that Commure notified Canopy of the security vulnerabilities, Canopy purported to terminate the Reseller Agreement for cause.  Tandon Decl. ¶ 10 & Ex. B.  This (wrongful) attempt at an immediate termination of the agreement, however, does not relieve Canopy of any of its security and warranty obligations.  *See* Tandon Decl. Ex. A § 13.5 ("The provisions of Sections 4, 5, 6, 7, 8.3, 10, 13.3, 13.5, 14, 16 through 20 will survive the termination of this Agreement for any reason.").  Indeed, Canopy itself conceded that that Canopy's "hardware lifetime warranty will remain in effect so long as Commure continues to pay the applicable solution fees."  Tandon Decl. ¶ 10.  Commure has continued to pay those fees.  *Id.*

Canopy's CEO Shan Sinha expressed surprise that Commure had "committed to doing a firmware update." Tandon Decl., ¶ 18 & Ex. M. He claimed no update had been deployed and told Commure to "walk all that back immediately," drawing a puzzling distinction between an update being "ready and working" versus "deployed in production." *Id.*

Despite Canopy's repeated promises, the over-the-air firmware update never materialized. Week after week passed with no progress, leaving Commure's customers and their staff exposed to ongoing risk. Then, in April, Canopy backtracked further. After Commure followed up seeking a firm timeline for the firmware update, Sinha asserted that Canopy no longer supported an update. *See* Tandon Decl. ¶ 21 & Ex. P. Instead, Sinha offered to provide Canopy's new "TAG7" badges, which he said had built-in encryption, as free replacements. *Id.* But this offer came with a catch: Canopy insisted the replacement badges bear its own "Canopy Protect" branding rather than the "Strongline" mark required under the parties' contract. *Id.* Despite Canopy's attempt to capitalize on the security crisis to promote its own offerings, Commure was willing to consider Canopy's TAG7 proposal. *Id.* ¶ 22 & Ex. Q. When Commure asked Canopy for details on how to proceed, however, Canopy went silent. *Id.*; *see also id.* ¶ 23 & Ex. R.

By June 2024, Canopy abandoned its April offer and failed to deliver on the promised encryption update. Tandon Decl., ¶ 24 & Ex. S. Instead, Canopy demanded that Commure pay $7 to $16 per badge to obtain new, encrypted badges as warranty replacements—despite its contractual obligation to provide free, lifetime warranty replacements. *Id.* Around that time, Canopy also sent out notifications to current Strongline® customers informing them that their badge batteries were low and required replacement—a sudden change in battery health classification that raised suspicions about Canopy's true motives. *Id.* ¶ 24. The timing of Canopy's new battery warnings, coupled with their new insistence on selling replacement badges, confirmed Canopy's intent to exploit the security vulnerability for financial gain. *See id.*

As the summer wore on with no progress, Commure's pleas to Canopy grew more urgent. In late July 2024, Commure emphasized its need for replacement badges to resolve the security defects—even offering to pay for what should be provided free under the warranty—but needed

Canopy to engage in good faith to allow orders to be placed.  Tandon Decl., ¶ 25.  But Canopy continued to ignore Commure's requests.  *See id.*

Now—over **seven months** since the vulnerabilities were first identified—not one of the thousands of unencrypted Strongline® badges deployed at hospitals has been replaced or adequately secured.  Tandon Decl. ¶ 25.  To date, despite holding itself out for months as ready and able to deliver suitably encrypted badges, Canopy has not provided a single such badge to Commure or its customers under any terms.  *Id.*

### E.      The Consequences of Canopy's Failure to Replace Defective Badges

Canopy's refusal to address the encryption flaws in the Strongline® badges exposes frontline healthcare workers to grave risks.  Nielson Decl. ¶¶ 57-59, 63-67.  The lack of encryption allows unauthorized parties to access sensitive data about workers' real-time locations and movements.  *Id.* ¶¶ 57-59, 63-66.  This information, if obtained by malicious actors, could enable them to stalk, harass, or even physically harm hospital staff.  *Id.* ¶¶ 57-59, 63.

The defective badges also prevent Commure and its hospital customers from effectively monitoring for or preventing devastating intrusions and attacks.  Nielson Decl. ¶ 66.  By their nature, these exploits are difficult to detect, making it impossible to know the extent to which bad actors have already improperly tracked healthcare workers or mined the unencrypted data.  *Id.*  Each day the vulnerabilities persist increases the chances of these calamitous outcomes.  *Id.* ¶¶ 64-67.

Commure's customers are in a perilous position as a result of Canopy misdeeds and, as a result, Commure faces imminent, irreparable harm to its reputation and customer relationships.  Tandon Decl. ¶¶ 27-28.  Since the defects became known, at least one major hospital terminated its Strongline® contract and another declined to renew due to security concerns.  *Id.*  More customer losses will likely occur if the problems remain unresolved.  *Id.*

### ARGUMENT

Canopy must be enjoined from its ongoing breaches of the Reseller Agreement.   A preliminary injunction is warranted because Commure satisfies each element of the traditional four-factor test: (1) Commure is likely to succeed on the merits of its breach of contract claim; (2) Commure will suffer irreparable harm absent preliminary relief; (3) the balance of equities tips

sharply in Commure's favor; and (4) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  Alternatively, even if Commure only raises "serious questions" going to the merits, an injunction remains proper because the balance of hardships tips sharply in its favor.  *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32, 1135 (9th Cir. 2011).  Under the Ninth Circuit's "sliding scale" approach, a stronger showing on the balance of hardships can support an injunction where the likelihood of success is less certain.  S*ee Pangea Legal Servs. v. U.S. Dep't of Homeland Sec*., 512 F. Supp. 3d 966, 972 (N.D. Cal. 2021).

Here, each factor weighs decisively in favor of granting preliminary injunctive relief to prevent further irreparable harm to Commure, its customers, and the healthcare workers who depend on Strongline for their safety.

## I.   COMMURE IS LIKELY TO SUCCEED ON THE MERITS OF ITS BREACH OF CONTRACT CLAIM.

Commure has a strong likelihood of prevailing on its claim that Canopy breached the Reseller Agreement by refusing to supply encrypted replacement badges, as required under the express lifetime warranty and support provisions.  *See Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (breach of contract requires: (1) a contract; (2) performance, (3) breach, and (4) damages).  The elements of the claim are readily met here.

### A.   The Reseller Agreement Is An Enforceable Contract

The Reseller Agreement is a valid, enforceable contract between the parties.  *See* Tandon Decl. Ex. A.  The agreement was negotiated at arm's length by sophisticated entities and signed by Canopy's CEO, and it sets forth definite terms that were performed by both sides for over a year without dispute.  *Id.*; *AMG & Assocs., LLC v. Ameri Pride Servs., Inc*., 2016 WL 9275402, at *4 (C.D. Cal. Aug. 29, 2016) ("The formation of a contract in California requires mutual assent, consisting of offer and acceptance.").

### B.   Commure Performed Its Obligations Under the Reseller Agreement

Commure substantially performed all of its own obligations under the Agreement.  Tandon Decl. ¶¶ 7, 10.  Commure continued paying all required fees even after Canopy's purported termination in January 2024.  *Id.* ¶ 10.  Thus, even if Canopy's purported termination for new

customer relationships were valid—which Commure disputes—Canopy remains bound by the Reseller Agreement's cobligations to support Commure's existing customers.  Tandon Decl. ¶ 9; *see also Fifty-Six Hope Rd. v. Jammin Java Corp*., 2017 WL 2457487, at *9 (C.D. Cal. Jan. 25, 2017), *aff'd sub nom. Hope Rd. Merch. LLC v. Jammin Java Corp*., 747 F. App'x 622 (9th Cir. 2019) ("[A] party cannot retroactively avoid performance by claiming the opposing party had previously breached without complying with the clear requirements of the written agreement regarding termination or suspension of performance."); *Allied Health Ass'n, Inc. v. Arthrocare Corp.*, 2009 WL 1424509, at *7 (N.D. Cal. May 20, 2009) (stating that even a prior material breach did not excuse performance because "such a result would require the Court to ignore the express language of the [contract]").  Indeed, Canopy expressly acknowledged that the warranty provisions are still in effect in the termination letter it sent to Commure.  Tandon Decl. ¶ 10 & Ex. B.

### C.   <u>Canopy Breached The Reseller Agreement</u>

Canopy breached the Agreement's unambiguous warranty and support obligations by refusing to replace the defective, unencrypted badges.  Section 10.2 required Canopy to deliver badges "free from defects" and for life replace any "Damaged Hardware" resulting from a "malfunction" at Canopy's "sole expense."  Tandon Decl. Ex. A § 10.2.  This language plainly encompasses the encryption flaw.  Canopy's CEO admitted encrypted replacements were needed for the defective, unencrypted badges.  *Id.* ¶ 24 & Ex. S.   And Canopy offered, and Commure accepted, to replace the unsecure badges with new ones that are encrypted.  *See id.*

Further, section 14.6 separately required Canopy to "promptly take necessary and appropriate corrective actions" to "protect the confidentiality, security, and integrity" of data transmitted through Strongline®.  *Id.* Ex. A § 14.6.  Canopy's failure to implement industry-standard encryption indisputably violates this provision.  Nielson Decl. ¶¶ 61, 67.  Canopy also breached its warranty to employ "industry standard measures" against any "harmful, malicious or hidden" mechanisms that could cause Strongline to depart from its intended function.  Tandon Decl. Ex. A § 10.1(a), (e); Nielson Decl. ¶¶ 68-70.  Critically, Sections 10 and 14.6 expressly survive any termination and remain in force for all previously deployed Strongline units.  Tandon Decl., Ex. A § 13.5.  Canopy conceded this fact. *Id.* Ex. B.

Canopy's excuses for noncompliance are unavailing.  Although it dismisses encryption as a "minimal risk" issue (Tandon Decl., Ex. C), third-party auditors assessed it as a "substantial risk" requiring "proactive steps" to fix (*id.*. Ex. E).  Canopy's promotion of encrypted badges in its own new product line belies any claim the defect is minor.  *Id*. ¶ 20, Ex. I.  Nor can Canopy invoke termination to escape duties that unambiguously survive.  *Id*. Ex. A § 13.5.  Having repeatedly assured Commure that a fix was quickly achievable first by firmware update, then via already-made badge replacements, Canopy cannot credibly claim providing those replacements is impossible or unnecessary.

### D.      Commure Has Been Damaged by Canopy's Breach

Commure has been damaged by Canopy's breach of the Reseller Agreement, and that damage is imminent and irreparable every day that the encryption vulnerability persists.  *See* Nielson Decl. ¶¶ 59, 60, 65-67.  Commure's reputation has already been harmed by the vulnerability, and Commure has had to devote significant resources to minimize its impact on customers.  Tandon Decl. ¶ 26.  Indeed, one of Commure's customers already terminated its relationship with Commure after Commure disclosed the security breach, and another customer declined to renew its contract with Commure.  *Id*.  The damage of Canopy's breach to Commure is real and material.  Commure will succeed in showing it has been harmed by Canopy's breach of the Reseller Agreement.

*      *      *

Commure is likely to prevail on its claim for breach of contract and has, at minimum, raised "serious questions" regarding the merits of this claim.  This factor weighs in favor of an injunction.

## II.    COMMURE WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

Commure faces a substantial risk of irreparable harm if Canopy is not immediately enjoined from further breaching the Reseller Agreement.  The encryption vulnerability jeopardizes the very foundation of Commure's business—providing trusted security solutions to safeguard healthcare workers.

Every day Canopy fails to deliver conforming replacement badges, sensitive data about the real-time locations and movements of frontline staff remains exposed to intolerable risk of unauthorized access and abuse.  Nielson Decl. ¶¶ 58-59, 63-67.  Indeed, a third-party auditor

assessed the encryption vulnerability as critical.  Tandon Decl., ¶ 20 & Ex. O; Nielson Decl., ¶ 59; *compare Novotech (Australia) Pty Ltd. v. SureClinical Inc.,* 2022 WL 17419168, at *4 (E.D. Cal. Dec. 5, 2022) ("*Novotech*") (irreparable harm established where there was an "immediate" risk of harm to the "safety of [clinical] trial patients").  A single breach by a bad actor could enable the stalking or harassment of hospital personnel, disruption of hospital operations, and even acts of workplace violence.  Nielson Decl. ¶¶ 57-58, 67.  These are the exact threats the Strongline® system was designed to prevent.

The potential consequences are devastating.  Irreparable damage to Commure's hard-earned reputation and customer goodwill is already occurring, with at least one hospital terminating its contract and another declining to renew due to the unresolved encryption issues.  Tandon Decl. ¶ 28.  More such losses are imminent if Canopy's intransigence persists.  This sort of irreparable injury is exactly what Commure sought to avoid when it negotiated the security provisions contained within the Reseller Agreement.  *See Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 949 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011) (harm to "reputation and goodwill, supported by compelling evidence, is sufficient to establish irreparable harm").

Courts have consistently held that threatened loss of customers and goodwill supports a finding of irreparable harm, particularly where the injuries are difficult to quantify.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm").  The harm Commure faces is far more than speculative—it is the exact sort of intangible, unquantifiable injury that warrants injunctive relief.  *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries" that are "difficult to valuate" constitute irreparable harm); *see also Mitchell v. 3PL Sys., Inc.*, 2013 WL 12129617, at *4 (C.D. Cal. Apr. 8, 2013) ("The difficulty in putting a dollar value on such intangible harms supports the . . . conclusion that they are irreparable.").

Despite Commure's repeated pleas and offers of assistance over the last seven months, Canopy has demonstrated no urgency to remedy these critical vulnerabilities.  Meanwhile, the risks to healthcare workers and Commure's business continue to compound.  For months, Canopy has

1   made repeated assurances to Commure regarding replacement badges and a security solution, only

2   to leverage the situation for further concessions.  Canopy's delays have placed Commure and its

3   hospital customers in an impossible situation.  Hospitals require extensive security review processes

4   that can take months.  By stringing Commure along for over six months with promises of a swift

5   resolution, Canopy has deprived these customers of the necessary time to properly evaluate and

6   implement alternative solutions, such as transitioning to Commure's Strongline Pro product.  Many

7   hospitals now lack sufficient time to conduct mandatory security assessments before their existing

8   badges become inoperable due to battery life.  Canopy's conduct has significantly escalated and

9   prolonged the risks for both Commure and the healthcare workers who depend on Strongline badges.

10  The irreparable harm factor weighs decisively in favor of granting a preliminary injunction.

11  **III.     THE BALANCE OF EQUITIES FAVORS GRANTING AN INJUNCTION.**

12       The balance of equities also supports an injunction.  Canopy faces minimal hardship from

13  an order that merely requires it to perform preexisting contractual duties.  Replacing defective units

14  is precisely what Canopy agreed to do under the Reseller Agreement, and what it has subsequently

15  offered to do.  Tandon Decl. Ex. A § 10.2.  This obligation does not impose any undue hardship,

16  especially given that Canopy's role is limited to placing an order with the third-party manufacturer

17  that provides the badges.  *Id.* ¶ 26; *see also Flextronics Int'l, Ltd. v. Parametric Tech.*, Corp., 2013

18  WL 5200175, at *8 (N.D. Cal. Sept. 16, 2013) (finding balance of equities favored defendant in

19  defendant's motion for a preliminary injunction where the relief requested through the injunction

20  was "exactly what [plaintiff] agreed to" in "a negotiated contract between two sophisticated

21  businesses.").  The burden on Canopy is especially minimal given its own repeated assurances that

22  fixes for the vulnerabilities were readily achievable.  At most, Canopy will incur the same costs of

23  supplying badges it already agreed to bear under the Reseller Agreement.  *Id.* Ex. A § 10.2.[3]

24

25

26  _____

    [3]  Further, Commure has offered to pay for the badges while this action is ongoing and until a final

27  determination is made with respect to Canopy's breach of warranty obligations.  Tandon Dec. ¶ 26.
    This means that Canopy will not bear any out of pocket expense—despite its obligation to do so

28  under the warranty provisions—until this portion of Commure's claim is finally adjudicated.  *Id.*

In stark contrast, the potential harm to Commure, healthcare workers, and the public if an injunction is denied is immeasurable and irreparable. With multiple customers already abandoning the system and more likely to follow, Commure confronts an existential threat to its business. Tandon Decl. ¶¶ 27-28. Further, hundreds of hospitals and thousands of nurses and doctors depend on Strongline® to safeguard them in dangerous environments. Tandon Decl. ¶ 5. Each day the encryption defect lingers is another chance for bad actors to access sensitive location data and use it to stalk, interfere, and violently attack frontline staff. Nielson Decl. ¶¶ 57-59, 63-67. The resulting physical and psychological damage could be catastrophic, and no monetary award could ever make it right. The human and economic costs of denying relief massively outweigh any cognizable burden on Canopy from continuing to perform its clear preexisting obligations. *See Novotech (Australia) Pty Ltd. v. SureClinical Inc*., 2022 WL 17419168, at *4 (E.D. Cal. Dec. 5, 2022) (finding "significant" burden on technology vendor from injunction requiring it to support software system for existing client inapposite because plaintiff faced risk of "reputational loss" and "patient safety" without access to platform). The balance tips sharply to Commure.

*Novotech* is instructive. *Novotech* involves a contract between the parties where the defendant agreed to give access to the plaintiff its platform to provide certain healthcare services in in support of clinical trials. 2022 WL 17419168, *1. The parties had a dispute regarding the contract, and the defendant cut off the plaintiff's access to the platform. *Id*. The plaintiff sought an injunction to for the defendant to comply with the contract provision and continue to provide access, as well as necessary technical support, to plaintiff, as it had been under the contract. *Id*. The defendant argued that compliance with the contract would require it to build out a custom tool to allow plaintiff to export data from its service, which would cost "over $2.7 million" and would lead it to "divert engineering resources away from other" priorities as it built out this feature. *Id*. Despite the significant financial consequences that the defendant faced, the *Novotech* court found that the "balance of equities weighs sharply in favor of" the plaintiff, who faced irreparable harms such as "reputational damages" and "threats to [the] safety" of the patients enrolled in clinical trials it ran. *Id*. The Court further noted that any "engineering costs" incurred by the defendant "can be

addressed by a monetary damages award in the underlying action," unlike the irreparable injuries that the plaintiff would experience if the injunction failed to issue. *Id.*

Here, the scope of the injuries that each party faces mirrors *Novotech*. As stated earlier, it imposes minimal burden on Canopy to simply supply Commure with encrypted badges that are already available to it. Any injunction will, at most, cause Canopy certain pecuniary losses which it would have incurred regardless had it not decided to upend the status quo. But even in the unlikely event that Canopy prove any such losses to be unjustified, Canopy may collect such losses from Commure at the ultimate resolution of this case. By contrast, if Canopy is not held to its end of the bargain, Commure will and continues to suffer from immediate and irreparable harm to its customer relationships and goodwill that will not be possible to rectify through damages alone. On balance, the third *Winter* factor clearly favors an injunction.

## IV.    GRANTING THE REQUESTED RELIEF FURTHERS THE PUBLIC INTEREST

The Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Clear Blue Specialty Ins. Co. v. Ozy Media, Inc.*, 669 F. Supp. 3d 907, 930 (N.D. Cal. 2023) (quoting *Winter*, 555 U.S. at 24); *see also Novotech*, 2022 WL 17419168 at *6 ("Special consideration is given to the potential impact on nonparties by the issuance or denial of injunctive relief."). Here, the public interest clearly favors granting relief.

An injunction would promote the public interest by protecting hospital and other frontline workers from the risks posed by insecure communication of sensitive data. *See* Nielson Decl. ¶¶ 57-60, 63-67. The consequences of unauthorized access to location and alert data transmitted by unencrypted Strongline badges could be catastrophic in a healthcare setting. Nielson Decl., ¶¶ 57, 64. Malicious actors could use the information to stalk or harass hospital employees, disrupt operations by triggering false alerts, exfiltrate confidential data, or even carry out violent attacks. Nielson Decl. ¶¶ 54-55, 57-58, 63-67. Replacing unencrypted badges with encrypted ones is essential to mitigate these risks. Nielson Decl. ¶¶ 54-56, 59, 65. There is an overwhelming public interest in safeguarding the security and resiliency of technologies used in hospitals. An injunction requiring Canopy to provide encrypted replacement badges advances this interest by closing a major vulnerability in a system hundreds of hospitals rely on each day to keep their staff and patients safe.

1    This public interest is especially compelling given Canopy's demonstrated indifference to

2    remedying known threats to nurse and doctor safety.  For more than seven months, Canopy has

3    alternately refused to acknowledge the encryption flaw, offered false assurances of forthcoming

4    fixes, and reneged on its own proposals and timelines for delivering secure replacement badges.

5    Even as Commure has repeatedly apprised Canopy of the mounting dangers to frontline workers

6    and pleaded for urgent action, Canopy has slow-walked its response and ultimately retreated into

7    complete radio silence, ignoring the crisis.  With Canopy unwilling to address these critical

8    vulnerabilities in the absence of judicial intervention, the public interest strongly favors an

9    injunction.

10   Finally, the public has an interest in holding companies to their contractual obligations and

11   ensuring the integrity of the healthcare technology market.  *See Flextronics Int'l, Ltd.*, 2013 WL

12   5200175, at *8 (recognizing public policy interests in enforcing contracts).  By shirking its warranty

13   commitments and exploiting the resulting vulnerabilities in Commure's product, Canopy has

14   betrayed the trust placed in it by both Commure and the hospitals who depend on the Strongline

15   system.  Allowing this misconduct to continue unchecked would set a troubling precedent and make

16   hospitals hesitant to adopt potentially lifesaving technologies for fear the vendors will not stand

17   behind their products.  An injunction sends a strong message that such behavior will not be tolerated.

18   **V.      THE SCOPE OF THE REQUESTED INJUNCTION IS APPROPRIATE.**

19   The injunction Commure seeks is precisely tailored to prevent Canopy's ongoing breach and

20   avert further harm to healthcare workers.  Importantly, the requested relief does not expand

21   Canopy's obligations or mandate any new actions; it simply prohibits Canopy from disregarding its

22   existing contractual commitments.  This renders the injunction prohibitory rather than mandatory in

23   nature.  *See, e.g.*, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 878-

24   79 (9th Cir. 2009) (explaining a prohibitory injunction preserves the status quo pending a

25   determination of the action on the merits, whereas a mandatory injunction compels a responsible

26   party to take affirmative action); *see also GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1210

27   (9th Cir. 2000) (explaining that the "status quo" refers to "the last, uncontested status which

28   preceded the pending controversy").

Here, the last uncontested status existed when Canopy actively performed its obligations under the Reseller Agreement by offering the replacement badge proposal.  Commure's requested injunction merely seeks to prohibit Canopy from further breaching the Agreement by compelling it to supply conforming badges free of defects.  This relief does not demand any novel action from Canopy but rather requires it to cease evading its ongoing contractual and commercial duties. Canopy may attempt to argue that the injunction is mandatory in nature because it would compel the provision of replacement badges.  However, this argument overlooks a critical fact: Canopy is already obligated to provide these replacements under the express warranty and support provisions of the Agreement.  Tandon Decl. Ex. A §§ 10.2, 14.6.  Preventing Canopy from breaching these preexisting commitments does not transform this into a mandatory injunction.  Instead, the relief simply prohibits Canopy from deviating from the last uncontested status between the parties.

In sum, the relief merely prohibits Canopy from changing course from the last uncontested status between the parties.  The Court should grant this prohibitory injunction to ensure the safety of frontline healthcare workers who depend on Strongline badges every day.

## CONCLUSION

For the foregoing reasons, Commure respectfully requests the Court grant its request for a preliminary injunction.

DATED: August 10, 2024

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By _____*/s/ Sam S. Stake*_____
Sam S. Stake
Attorneys for Commure, Inc.