NEEL CHATTERJEE (SBN 173985)
*NChatterjee@goodwinlaw.com*
MONTE COOPER (SBN 196746)
*MCooper@goodwinlaw.com*
THERESA A. SUTTON (SBN 211857)
*TSutton@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 Marshall Street
Redwood City, CA 94063
Tel.: (650) 752-3100
Fax: (650) 853-1038

*Attorneys for Defendants*
*Canopy Works, Inc., Shan Sinha, and Vinay Pulim*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMURE, INC., a Delaware corporation,<br><br>               Plaintiff,<br><br>     v.<br><br>CANOPY WORKS, INC. f/k/a SMPLABS, INC., a Delaware corporation; SHAN SINHA, an individual; and VINAY PULIM, an individual,<br><br>               Defendants.<br><hr>CANOPY WORKS, INC. f/k/a SMPLABS, INC., a Delaware corporation; SHAN SINHA, an individual; and VINAY PULIM, an individual,<br><br>               Counterclaimants,<br><br>     v.<br><br>COMMURE, INC., Delaware corporation; ATHELAS, INC., a Delaware corporation; TANAY TANDON, an individual; and DHRUV PARTHASARATHY, an individual,<br><br>               Counterclaim Defendants. | Case No. 3:24-cv-02592-AMO<br><br>**ANSWER TO AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS BY DEFENDANTS CANOPY WORKS, INC., SHAN SINHA, and VINAY PULIM'S ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIMS**<br><br>Courtroom:  10 (19TH Floor)<br>Judge:       Hon. Araceli Martínez-Olguín<br>               450 Golden Gate Avenue<br>               San Francisco, CA 94102<br><br>Complaint filed:    April 30, 2024<br>AC Filed:          June 24, 2024 |

Defendants Canopy Works, Inc. ("Canopy"), Shan Sinha ("Sinha"), and Vinay Pulim ("Pulim") (collectively "Defendants") hereby respond to Plaintiff Commure, Inc.'s ("Commure") Amended Complaint (Dkt. 20) ("AC") as follows: Defendants deny each and every allegation that is not expressly admitted below. Any factual allegation below is admitted only as to the specifically admitted facts, not as to any purported conclusions, characterizations, implications, or speculations that arguably may follow from the admitted facts. Defendants deny that Commure is entitled to the relief requested in the AC or to any other relief.

### INTRODUCTION[1]

1.    Defendants admit that Strongline® is an innovative system to reduce workplace violence. Defendants admit that Strongline® is a small badge with a big impact: nurses, doctors, and other frontline healthcare workers simply press a button on their wearable badge when under duress. Defendants admit that the button sends a silent alarm to onsite security teams and nearby colleagues, enabling early intervention and quick de-escalation of incidents. Except as expressly admitted, Defendants deny the allegations set forth in Paragraph 1.

2.    Defendants admit that Strongline® has been hugely successful. Except as expressly admitted, Defendants deny the allegations in Paragraph 2.

3.    Defendants admit that, in January 2024, Canopy lawfully terminated the Reseller Agreement between Canopy and Commure because Commure failed to make two consecutive timely payments of its monthly required license fees. Except as expressly admitted, Defendants deny the allegations in Paragraph 3.

4.    Paragraph 4 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 4.

### THE PARTIES

5.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 5, and therefore deny them.

6.    Admitted.

---

[1] For convenience, Defendants' Answer uses certain of the same headings as set forth in the AC. In doing so, Defendants do not admit any of the allegations contained in Commure's headings.

1

7.    Admitted.

8.    Admitted.

9.    Paragraph 9 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations set forth in Paragraph 9.

## **JURISDICTION AND VENUE**

10.    Paragraph 10 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny that Plaintiff has standing to assert federal trademark infringement and unfair competition claims, or that supplemental jurisdiction exists over Plaintiff's remaining state law claims.

11.    Paragraph 11 contains legal conclusions to which no response is required. To the extent a response is required, for the purposes of this action only, Defendants do not contest personal jurisdiction in this court.

12.    Paragraph 12 contains legal conclusions to which no response is required. To the extent a response is required, or the purposes of this action only, Defendants do not contest personal jurisdiction in this court.

13.    Paragraph 13 contains legal conclusions to which no response is required. To the extent a response is required, or the purposes of this action only, Defendants do not contest personal jurisdiction in this court.

14.    Paragraph 14 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny that Plaintiff has standing to assert federal trademark infringement and unfair competition claims, and for that reason Defendants also deny that venue is proper over Plaintiff's claims.

## **FACTUAL ALLEGATIONS**

### **Commure Develops The Strongline® Staff Safety System**

15.    Denied.

16.    Denied.

17.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 17, and therefore deny them.

2

18.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 18, and therefore deny them.

19.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 19, and therefore deny them.

**The Parties' December 2022 Reseller Agreement**

20.    Defendants admit that Commure and Canopy were parties to a Reseller Agreement, a copy of which is attached to the AC and is the best evidence of the effective date. Unless explicitly admitted, Defendants deny all of the allegations set forth in the introduction to Paragraph 20.

    a.    To the extent Commure characterizes but does not completely quote sections 2.1 and 15.2-15.3 of the Reseller Agreement, which sections are the best evidence of themselves, Paragraph 20(a) contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations of Paragraph 20(a).

    b.    To the extent Commure characterizes but does not completely quote sections 3.1-3.2 and 4.1 of the Reseller Agreement, which sections are the best evidence of themselves, Paragraph 20(b) contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the remaining set forth in Paragraph 20(b).

    c.    To the extent Commure characterizes but does not completely quote sections 13.1 and 13.5 of the Reseller Agreement, which sections are the best evidence of themselves, Paragraph 20(c) contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations set forth in Paragraph 20(c).

21.    To the extent Commure characterizes but does not quote any sections of the Reseller Agreement relating to the security and integrity of the Licensed Technology, which sections are the best evidence of themselves, Paragraph 21 contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations set forth in the introduction to Paragraph 21.

3

a. To the extent Commure characterizes but does not completely quote section 14.6 of the Reseller Agreement, which section are the best evidence of themselves, Paragraph 21(a) contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations set forth in Paragraph 21(a).

b. To the extent Commure characterizes but does not completely quote sections 10.1(a) and 10(e) of the Reseller Agreement, which sections are the best evidence of themselves, Paragraph 21(b) contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations set forth in Paragraph 21(b).

c. To the extent Commure characterizes but does not completely quote section 14.6 of the Reseller Agreement, which section are the best evidence of themselves, Paragraph 21(c) contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations set forth in Paragraph 21(c).

22. To the extent Commure characterizes but does not quote any sections of the Reseller Agreement relating to warranties and related matters, which sections are the best evidence of themselves, Paragraph 22 contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny all of the remainder of the allegations set forth in the introduction to Paragraph 22.

a. To the extent Commure characterizes but does not completely quote sections 10.2 and 13.5 of the Reseller Agreement, which sections are the best evidence of themselves, Paragraph 22(a) contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations set forth in Paragraph 22(a).

b. To the extent Commure characterizes but does not completely quote section 12, which section is the best evidence of its content, Paragraph 22(b) contains legal

4

conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations set forth in Paragraph 22(b).

23.    Paragraph 23 contains legal conclusions to which no response is required. To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 23, and therefore deny them.

**Canopy's' Refusal To Remediate Security Vulnerabilities**

24.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in in the introduction to Paragraph 24, and therefore deny them.

a.    Defendants admit that communications between badges and gateways were unencrypted, but otherwise deny the remainder of Paragraph 24(a).

b.    Denied.

c.    Denied.

d.    Denied.

25.    Defendants deny the first sentence of Paragraph 25. The remainder of Paragraph 25 contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations set forth in Paragraph 25.

26.    Denied.

27.    Defendants admit that Commure asked Canopy to refrain from communicating with Commure's customers. To the extent Commure purports to quote from communications with customers, those communications are the best evidence of their content, and Defendants therefore deny the allegations in Paragraph 27. Defendants deny the allegations set forth in Paragraph 27.

28.    The first sentence of Paragraph 28 contains legal conclusions to which no response is necessary. To the extent a response is necessary, Defendants deny the allegations in the first sentence of Paragraph 28. Defendants deny the allegations set forth in Paragraph 28.

29.     Defendants deny the allegations set forth in Paragraph 29.

30.    Paragraph 30 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 30.

**Canopy Engages in Unfair Competition and Infringement**

31.     Denied.

32.     Defendants admit that Canopy and Sinha announced the launch of Canopy Protect, which also incorporates Canopy's Licensed Technology. Except as expressly admitted, Defendants deny the allegations set forth in Paragraph 32.

33.     Defendants admit that in January 2024, Canopy terminated immediately the Reseller Agreement under both Sections 13.2 and 13.3 due to Commure's failure to make two consecutive timely payments of amounts due. Except as expressly admitted, Defendants deny the allegations of Paragraph 33.

34.     Paragraph 34 contains legal conclusions to which no response is required. To the extent a response is required, Defendants do not contest that Canopy made the statements, "Strongline was created by, owned and operated by Canopy," "Strongline has been resold by Commure," and "Strongline Pro and Strongline are completely unrelated." Except as expressly admitted, Defendants denythe allegations of Paragraph

35.     Paragraph 35 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 35.

36.     Denied.

37.     Defendants admit that the Canopy Protect product is encrypted. Except as expressly admitted, Defendants deny the allegations set forth in Paragraph 37.

**Canopy Continues to Exploit the Same Vulnerabilities It Created**

38.     Defendants admit that Canopy informed Commure of the availability of encrypted badges in April 2024. Except as expressly admitted, Defendants deny the allegations set forth in Paragraph 38.

39.     Defendants admit that, subject to other conditions which Commure rejected, Canopy offered to make available "immediately" to customers unbranded encrypted badges. Except as expressly admitted, Defendants deny the allegations set forth in Paragraph 39.

40.     Paragraph 40 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 40 of the AC.

6

41.    The first sentence in Paragraph 41 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 33. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence in Paragraph 41, and therefore deny them.

<b><u>Sinha Induced Commure Employees To Disclose<br>Commure's Confidential Information</u></b>

42.    Denied.

43.    Defendants admit that three current Canopy employees who are members of Canopy's sales team were previously employed by Commure as of December 6, 2023. Unless explicitly admitted, Defendants otherwise deny the allegations set forth in Paragraph 43.

44.    Denied.

45.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the first and second sentences of Paragraph 45, and therefore deny them. The third sentence in Paragraph 45 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations contained in the third sentence of Paragraph 45.

46.    Denied.

47.    Denied.

<b><u>FIRST CAUSE OF ACTION</u></b>

<b><u>Federal Trademark Infringement</u></b>

<b><u>(Lanham Act, 15 U.S.C. § 1114)</u></b>

<b><u>(Against All Defendants)</u></b>

48.    Canopy restates and incorporates by reference its responses to the preceding Paragraphs as if fully set forth herein.

49.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49, and therefore deny them.

50.    Denied.

51.    Denied.

52.    Denied.

53.    Denied.

54.    Denied.

55.    Denied.

56.    Denied.

57.    Denied.

## SECOND CAUSE OF ACTION

## Unfair Competition, False Designation of Origin, and False Advertising

## (Lanham Act, 15 U.S.C. § 1125(a))

## (Against All Defendants)

58.    Canopy restates and incorporates by reference its responses to the preceding Paragraphs as if fully set forth herein.

59.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence in Paragraph 59, and therefore deny them.

60.    Defendants deny the introductory paragraph of Paragraph 60 and, except as expressly admitted, Defendants deny all of the remaining allegations set forth in Paragraph 60.

    a.    Denied.

    b.    Defendants admit that Canopy made the statement that "Strongline was created by, owned and operated by Canopy." Except as expressly admitted, Defendants deny the allegations of Paragraph 60(b).

    c.    Defendants admit that Canopy made the statements that "Strongline has been resold by Commure" and "Strongline Pro and Strongline are completely unrelated." Except as expressly admitted, Defendants deny the allegations of Paragraph 60(c).

61.    Denied.

62.    Denied.

63.    Denied.

8

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

## THIRD CAUSE OF ACTION

### Breach of Contract

### (Against Defendant Canopy)

64.    Canopy restates and incorporates by reference its responses to the preceding Paragraphs as if fully set forth herein.

65.    Paragraph 65 contains legal conclusions to which no response is required. To the extent a response is required, Defendants admit that, prior to its termination, the Reseller Agreement constituted a valid and enforceable contract between Commure and Canopy. Except as expressly admitted, Defendants deny the allegations in Paragraph 65.

66.    Denied.

67.    Denied.

    a.    Denied.

    b.    Denied.

    c.    Denied.

    d.    Denied.

    e.    Defendants admit that Canopy terminated the Reseller Agreement on January 4, 2024. Except as expressly admitted, Defendants deny the allegations of Paragraph 67(e).

68.    Paragraph 68 contains legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Section 13.5 of the Reseller Agreement sets forth which provisions of the Reseller Agreement survive termination. Except as expressly admitted, Defendants deny the allegations of Paragraph 68.

69.    Denied.

70.    Denied.

9

**FOURTH CAUSE OF ACTION**

**Breach of The Implied Covenant of Good Faith and Fair Dealing**

**(Against Defendant Canopy)**

71.    Canopy restates and incorporates by reference its responses to the preceding Paragraphs as if fully set forth herein.

72.    Paragraph 72 contains legal conclusions to which no response is required. Except as expressly admitted, Defendants deny the allegations of Paragraph 72.

73.    Defendants deny the introductory sentence of Paragraph 73. Except as expressly admitted, Defendants deny the allegations set forth in Paragraph 73.

    a.    Denied.

    b.    Denied.

    c.    Denied.

    d.    Denied.

74.    Denied.

75.    Denied.

76.    Denied.

**FIFTH CAUSE OF ACTION**

**Tortious Interference with Contractual Relations**

**(Against Defendants Canopy and Sinha)**

77.    Canopy restates and incorporates by reference its responses to the preceding Paragraphs as if fully set forth herein.

78.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of Paragraph 78, and therefore deny them.

79.    Denied.

    a.    Denied.

    b.    Denied.

    c.    Defendants admit that Canopy offered Canopy Protect to Commure customers. Except as expressly admitted, Defendants deny the allegations of Paragraph 79(c).

10

  d. Denied.

80. Denied.

81. Denied.

82. Denied.

83. Denied.

## SIXTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

### (Against Defendants Canopy and Sinha)

84. Canopy restates and incorporates by reference its responses to the preceding Paragraphs as if fully set forth herein.

85. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 85, and therefore deny them.

86. Denied.

  a. Denied.

  b. Denied.

  c. Denied.

  d. Denied.

87. Denied.

88. Denied.

## SEVENTH CAUSE OF ACTION

### Unfair Competition (Cal. Bus. & Prof. Code § 17200, *et seq.*)

### (Against All Defendants)

89. Canopy restates and incorporates by reference its responses to the preceding Paragraphs as if fully set forth herein.

90. Denied.

  a. Denied.

  b. Denied.

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

     c.   Denied.

     d.   Denied.

     e.   Denied.

91.    Denied.

92.    Denied.

93.    Denied.

94.    Denied.

## EIGHTH CAUSE OF ACTION

### Declaratory Relief

### (Against All Defendants)

95.    Canopy restates and incorporates by reference its responses to the preceding Paragraphs as if fully set forth herein.

96.    Paragraph 96 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the introductory sentence of Paragraph 96. Except as expressly admitted, Defendants deny the allegations set forth in Paragraph 96.

     a.   Denied.

     b.   Denied.

     c.   Denied.

97.    Denied.

98.    Denied.

## PRAYER FOR RELIEF

Defendants deny any and all allegations contained in the remainder of the Amended Complaint, including any of the headings, and deny that Commure is entitled to any of the relief requested, or to any other relief, in any form, whatsoever.

## AFFIRMATIVE DEFENSES

Without any admissions as to burdens of proof or persuasion, and expressly reserving its right to assert additional defenses, Canopy asserts the following affirmative defenses.

12

## FIRST AFFIRMATIVE DEFENSE

Plaintiff lacks standing to assert the claims set forth in the AC to the extent Plaintiff has not established it owns any intellectual property.

## SECOND AFFIRMATIVE DEFENSE

The AC fails to state a claim upon which relief can be granted.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claim for relief under California's Unfair Competition Law (Bus. & Profs. Code § 17200, *et seq.*) is barred in whole or in part by the "safe harbor" provisions of that consumer protection statute.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claim for relief under California's Unfair Competition Law (Bus. & Profs. Code § 17200, *et seq.*) fails to plead fraud with particularity.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claim for relief under California's Unfair Competition Law (Bus. & Profs. Code § 17200, *et seq.*) fails to sufficiently articulate an economic injury.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims for trademark infringement, unfair competition, and violations of the Lanham Act are barred, in whole or in part, by the doctrine of Fair Use.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for trademark infringement, unfair competition, and violations of the Lanham Act are barred, in whole or in part, by the *de minimis* doctrine.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims for relief are barred, in whole or in part, because Defendants' conduct constitutes permissible reverse engineering under Cal. Civ. Code § 3426.1(a).

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants' conduct was not unlawful.

13

### TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants' conduct was not unfair.

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because none of Defendants' actions and/or statements was likely to mislead the reasonable consumer, and Plaintiff's consumers were not actually misled.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because consumers were not actually misled or deceived by and/or did not rely on any statements or omissions on the part of Defendants.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants did not breach the Reseller Agreement nor the implied covenant of good faith and fair dealing.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for breach of contract fail because Plaintiff fails to allege the existence of a valid contract between Commune and Canopy at the time of certain breaches.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff has suffered no damages, injury or loss as a result of any act or omission of Defendants.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to mitigate its damages, if any.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendants did not directly or proximately cause or contribute to any damage or loss allegedly sustained by Plaintiff or that Plaintiff seeks to recover in this action.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because an award on such claims would result in an unjust enrichment to Plaintiff.

14

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver on the ground hat Plaintiff was aware, but did not complain, about the functionality and branding of the Licensed Technology.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of acquiescence, to the extent that Plaintiff was aware, but did not complain, about the functionality and branding of the Licensed Technology.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Defendants are informed and believes, and upon such information and belief allege, that the AC and each cause of action contained therein is barred in whole or in part because Defendants at all times acted in good faith.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel to the extent that Plaintiff was aware, but did not complain, about the functionality and branding of the Licensed Technology.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the Limitations of Liability provision of Section 18 of the Reseller Agreement.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

Plaintiff's claims are barred, in whole or in part, by Plaintiff's unclean hands, including (a) its misrepresentations to customers that Plaintiff, rather than Canopy, owned the intellectual property underlying Strongline, and (b) its false representations that Strongline did not conform to industry standards and was defective due to lack of encryption between Strongline badges and gateways. In particular, Strongline LLC was fully aware in 2020 that communications between Strongline badges and the gateways were unencrypted. Strongline LLC approved and accepted the

15

product for commercial use. When Canopy terminated the Reseller Agreement, Plaintiff decided to falsely represent that Plaintiff owned the Licensed Technology, and used the lack of encryption between the Strongline badges and gateways as a way to confuse and sow doubt about the security of Strongline among Commure's customers, despite being aware at all times that Strongline was, in fact, secure. Upon information and belief, no Commure customer ever expressed concern to Plaintiff or Canopy that the communications between Strongline badges and gateways were unencrypted prior to January 2024, and even after January 2024 no Commure customer demanded that the communications between Strongline badges and gateways needed to be encrypted. Plaintiff never communicated concerns to Canopy about perceived vulnerabilities, including with respect to lack of encryption between the Strongline badges and the gateway until after the Reseller Agreement was terminated on January 4, 2024. Nonetheless, in derogation of industry standards and a non-disparagement obligation set forth in a Confidential Settlement Agreement and Mutual Release (ECF No. 14-2, Ex. 3), Plaintiff advised its customers that Strongline was allegedly insecure due lack of encryption between the badges and gateways before raising that issue with Canopy, again underscoring that Plaintiff knew the alleged vulnerabilities relating to lack of encryption that it cited to its customers were pretextual. Commure also publicly disclosed the alleged vulnerabilities in its exhibits, briefing and declarations in support of a motion for preliminary injunction, which motion was brought eight months after the alleged discovery of purported security vulnerabilities, when it was apparent there was no risk of irreparable injury. That the issues raised in the motion for preliminary injunction relating to lack of encryption between the Strongline badges and gateways were pretextual also is reflected by the fact Plaintiff set the motion for hearing in January 2025, did not seek to expedite hearing on the motion, cancelled without notice less than 24 hours before four depositions were scheduled of witnesses who supported the motion for preliminary injunction, and then withdrew the motion for preliminary injunction three months after it was filed. Further, as reflected by both the August 19, 2021 Agreement and the December 1, 2022 Reseller Agreement, Plaintiff has been fully aware that Canopy has at all times owned the intellectual property rights relating to the Licensed Technology and Documentation, including all improvements, modifications, translations, and derivative works thereof created by Canopy or on behalf of Canopy. Plaintiff

16

further at all times prior to January 4, 2024, was aware that it was required in each of its Customer Agreements related to Strongline to set forth in those Customer Agreements that Canopy owns all worldwide right, title and interest in and to the Licensed Technology and Documentation, all derivatives and improvements thereof, and all related intellectual property rights. Upon information and belief, prior to January 4, 2024, Plaintiff never included in any Customer Agreement terms that acknowledged that Canopy owns all worldwide right, title and interest in and to the Licensed Technology and Documentation, all derivatives and improvements thereof, and all related intellectual property rights.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Anticipatory Breach)

Plaintiff's claims are barred, in whole or in part, by its anticipatory breach by surreptitiously reverse engineering Canopy's Licensed Technology and reversing engineering the same.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Failure to Make Timely Payments)

Plaintiff's claims are barred, in whole or in part, by its failure to make timely payments pursuant to the Reseller Agreement.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

Plaintiff's claims are barred, in whole or in part, by the applicable statute of limitations.

## OTHER AFFIRMATIVE DEFENSES

Defendants hereby give notice that they will rely upon such other and further defenses as may become apparent during the course of this action.

17

## COUNTERCLAIMS

Counterclaimant Canopy, Inc. ("Canopy" or "Counterclaimant"), by and through its undersigned attorneys, alleges against Commure, Inc., ("Commure"), Athelas, Inc. ("Athelas"), Tanay Tandon ("Tandon"), and Dhruv Parthasarathy ("Parthasarathy") (collectively "Counterclaim-Defendants") as follows:

## NATURE OF THE ACTION

1.      This is a case about a $6 billion healthcare technology company—Commure and its scheming executives who stole a supplier's groundbreaking technology, bait-and-switched customers into believing it was their own, and is now doing everything their power to squash that company from competing in the marketplace. Commure, led by Chief Executive Officer Tanay Tandon and Chief Technology Officer Dhruv Parthasarathy, recently merged with another healthcare technology company, Athelas.

2.      Canopy is a pioneering healthcare safety startup. Canopy—originally formed as a three-person startup named Mawanzo and, later, SMPLabs, Inc.—developed pioneering technology for state-of-the-art security badges and alert systems for healthcare facilities. Canopy's badges have rapidly gained widespread adoption across the country due to their reliability, ease-of-use, and innovative functionality. SMPLabs, Inc. changed its name to Canopy in 2023. For clarity, "SMPLabs, Inc." and "Canopy" are referred to herein as "Canopy."

In 2019, Canopy signed an agreement with Strongline LLC to create, develop and manufacture the hardware and software for a staff safety solution and allow Strongline LLC to sell it to healthcare facilities under the *Strongline* name. A copy of the Agreement is attached and incorporated into this Answer and Counterclaims as Exhibit 1 (the "2019 Agreement"). Pursuant to the Agreement, Canopy retained all intellectual property related to the *Strongline* product. Commure purchased certain assets of Strongline LLC in late 2021. Following its acquisition of the asserts of Strongline LLC, Commure in 2021 amended the 2019 Agreement with Strongline and assumed Strongline LLC's obligations, a copy of which Amendment to Agreement is attached hereto as Exhibit 2. Soon after executing the Amendment, Commure began making its payments to Canopy late, resulting in litigation in the Delaware Chancery Court in 2022. Ultimately, the parties entered into a Confidential

18

Settlement Agreement and Mutual Release (the "Settlement Agreement"), along with a Reseller Agreement that was made effective December 1, 2022. A copy of the Reseller Agreement is attached hereto as Exhibit 3.

3. Under the Reseller Agreement, Canopy retained all intellectual property rights related to *Strongline* and Commure became the "non-exclusive reseller and distributor" of Canopy's technology. The Reseller Agreement prohibited Commure from reverse engineering, modifying or creating derivative works from Canopy's technology, and required that Commure represent Canopy's technology "accurately and fairly" and "avoid any misleading or unethical business practices."

4. Despite its valuation of $6 billion, as of fall 2023, upon information and belief, *Strongline* was Commure's only growing revenue source. However, Commure and Athelas faced a major problem: neither company owned any of the IP behind *Strongline*. Canopy did. Around that same time, Canopy provided notice that it intended to exercise its right to terminate the Reseller Agreement in a year's time and announced its own direct-to-consumer product. Shortly after, Commure was delinquent on two consecutive payments owed to Canopy, prompting Canopy to exercise its option to immediately terminate, on January 4, 2024, the Reseller Agreement .

5. Commure and Athelas, lacking any ownership of the technology behind *Strongline*, knew they could not fairly compete in the marketplace with Canopy. Instead, despite their contractual commitments not to engage in this exact behavior, the newly merged companies hatched and implemented a multifaceted scheme to rip off Canopy's intellectual property and suppress it in the market place.

6. ***First***, Commure, and later Athelas, engaged in a years-long scheme to misappropriate Canopy's intellectual property and Licensed Technology in order to create a derivative security badge product, which they named "Strongline Pro." Commure and Athelas, at the behest and participation of both Tandon and Parthasarathy, employed technical and product engineers mostly located in India who had been deeply involved with working with Canopy and studying *Strongline* throughout 2022 and 2023 as part of the relationship created by the Reseller Agreement, in order to reverse engineer Strongline and employ its functionality, including trade secrets and other Canopy

19

confidential information to create their own competitive product.

7.    ***Second***, Commure misrepresented to *Strongline* consumers that Strongline Pro was merely an upgraded version of Canopy's *Strongline* in order to get them to suggest to the customers that *Strongline* and Strongline Pro were versions of the same Licensed Technology.l Commure's sales team described the tactic as a "bait and switch" and raised grave concerns about switching customers to completely new, unproven technology without their knowledge.

8.    ***Third***, in January 2024, following the launch of Canopy Protect and the announcement of Strongline Pro, Commure and Athelas generated and circulated a "Cybersecurity Assessment" to nearly all *Strongline* customers, claiming that Canopy's *Strongline* Licensed Technology was unsafe because badge-to-gateway communication was not encrypted. Commure's report was entirely pretextual and motivated by its desire to sink Canopy. Commure had explicitly known for years that those communications were unencrypted and repeatedly signed off on those exact specifications.

9.    ***Fourth***, Commure commenced vexatious arbitration against three of its former employees who had left to join Canopy (the "Employees"), in an attempt to burden Canopy with legal fees and discourage any other Commure employees from jumping ship. In fact, despite knowing that these Employees were represented by counsel, Tandon personally emailed and continued to direct threats at them, including potential criminal prosecution and threats to bring further legal action given that "public filings and restraining orders are searchable on the internet, and appear on background checks."

10.   ***Fifth***, Commure filed the instant litigation, using it as a further vessel to publicly spread its lies and disparagement regarding the security vulnerabilities and to burden the much smaller Canopy with exorbitant legal costs, while buying time to introduce its own Strongline Pro product into the market. Further, despite decrying the imminent, irreparable harm it alleged the so-called security vulnerabilities would cause Commure and its customers, in August 2024, Commure filed on the public court docket as part of a motion for preliminary injunction the vulnerability reports and an expert declaration that provided near step-by-step guides on how an attacker could purportedly threaten the system—clearly indicating that Commure and Athelas were motivated by

20

pure commercial desires and a desire to disparage the product they had lost the right to resell before ensuring Strongline Pro was ready for the market. Commure then unilaterally twice cancelled four depositions of Tandon and the company less than 24 hours before they were scheduled to occur, and on November 10, 2024 withdrew the motion for preliminary injunction due to unspecified commercial developments.

11.     Canopy's number one priority is and has always been the safety and success of its customers, who depend on its products in life-or-death situations. When the Counterclaim-Defendants first raised their (pretextual) concerns about the security vulnerabilities, Canopy worked tirelessly towards reaching an amicable resolution and ensuring that existing *Strongline* customers did not get caught in the crossfire of the Counterclaim Defendants' misconduct. The Counterclaim-Defendants, however, chose to use litigation as a sword against its much smaller former-collaborator-turned-competitor, consistent with its escalating behavior that a third-party publication has characterized as "do[ing] whatever it takes to . . . win."[2]

12.     As described further herein, the Counterclaim-Defendants have misappropriated Canopy's intellectual property, breached numerous provisions of the Reseller Agreement, tortiously disparaged Canopy in front of its customers, tortiously interfered with Canopy's contractual relations and prospective economic opportunities, harassed Canopy's employees, mislead consumers, and have undertaken a host of anticompetitive and unfair business actions in violation of the Federal Lanham Act, and California's Bus. & Prof. Code §§ 16600, 16600.5, 17200, and 17500.

### THE PARTIES

13.     Plaintiff Canopy is a Delaware Corporation with its principal place of business at 868 Southampton Drive, Palo Alto, CA 94303. Canopy is a company founded in 2019 as SMP Labs. Canopy was founded to develop a technology solution to help with the escalating problem of physical and verbal assaults on healthcare workers. From its modest beginnings, Canopy developed a reliable, easy-to-use, affordable duress alerting system for healthcare workers. The technology is currently protecting 210,000 healthcare workers across 8000 locations.

[2] Business Insider.

21

14.     Defendant Commure, Inc. is upon information and belief a Delaware Corporation with its principal place of business at 1300 Terra Bella Avenue, 200 Mountain View, California 94043.

15.     Defendant Athelas, Inc. is upon information and belief a Delaware Corporation with its principal place of business at 1300 Terra Bella Avenue, 200 Mountain View, California 94043. Upon information and belief, Commure and Athelas merged in October 2023 to form an $8 billion healthcare services company that share the same headquarters.

16.     Defendant Tanay Tandon is a resident of California who, on information and belief, resides in Santa Clara, California. Mr. Tandon is the Chief Executive Officer of both Commure and Athelas, the latter of which entities he co-founded.

17.     Defendant Dhruv Parthasarathy is a resident of California who, on information and belief, resides in Cupertino, California. Mr. Parthasarathy is the Chief Technical Officer of Commure and has, along with Tandon, been directly involved with the development of Strongline Pro, including authorizing the misappropriation by Commure and Athelas of Canopy's trade secrets and misuse of confidential information.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over these Counterclaims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332, and 1338(a), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Subject matter jurisdiction over Canopy's related state common law claims is proper pursuant to 28 U.S.C. §§ 1338 and 1367.

19.     This Court has personal jurisdiction over both Commure and Athelas because each company's principal place of business is within this judicial District, and, on information and belief, each of Commure and Athelas has substantial, systematic, and continuous contacts within this judicial District. Commure and Athelas regularly conduct and carry on business in California, including within this judicial district, have purposefully availed themselves of the privilege of conducting activities in California, and committed the tortious acts giving rise to Canopy's claims within California, including within this judicial district, where both Commure and Athelas have caused injury to Canopy and and are likely to cause furth injury to Canopy.

22

20. This Court has personal jurisdiction over both Tandon and Parthasararthy because each individual resides within this judicial district in the Northern District of California, and regularly conducts and carries on business in California, including within this judicial district, have purposefully availed himself of the privilege of conducting activities in California, and committed a tortious act within California, including within this judicial district.

21. Venue is proper within the Northern District of California pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because this is a judicial district in which a substantial part of the events giving rise to the claims occurred, and/or in which Canopy's injury was suffered.

## STATEMENT OF FACTS

### Canopy's Innovative Technology and Agreement with Strongline LLC

22. Canopy, originally named SMPLabs, Inc., was formed in 2019 as a three-person startup, with a focus on healthcare security technology solutions. Despite its small size, Canopy was known for its expertise and innovative thinking, and it developed a proprietary platform comprised of cloud services infrastructure, IoT hardware, software and related services that could be used in, among other industries, the healthcare industry.

23. In 2019, Canopy was introduced to Strongline LLC, and thereafter under the management of Sinha and Pulim collaborated with Strongline LLC to develop a "Staff Duress" solution for which Strongline LLC had initiated pilot testing of a proof of concept version with health systems and health facilities. The result of this collaboration was the introduction of the *Strongline* platform, the intellectual property to which at all times was and is owned by Canopy.

### The Original 2019 Agreement

24. On or about August 30, 2019 Canopy and Strongline LLC entered into an Agreement (the "Agreement" attached and incorporated into this Answer and Counterclaims as Exhibit 1) which acknowledged Canopy's innovative contributions and permitted Strongline LLC to sell directly to consumers the Staff Duress solution as developed by Canopy .

25. As reflected by Sections 1.1, 1.8, 1.11, 2.1, 5.4, 10.1-10.2 and Exhibits A and B of the Agreement, from the very outset of the relationship between Canopy and Strongline LLC, the parties recognized that Canopy "own[ed] all worldwide right, title and interest to the Licensed

23

Technology." The Licensed Technology was described as Canopy's "proprietary platform, comprised of a cloud services infrastructure, IoT hardware, software and related technologies," as further described in Exhibit A to the Agreement and certain documentation, along with "all improvements, modifications, translations, and derivative works thereof" created by or on behalf of Canopy. Strongline LLC, meanwhile, retained its own intellectual property rights related to "Strongline Materials," defined as software and services developed by Strongline that could be integrated with the Licensed Technology through use of the APIs and delivered to customers by Strongline LLC. Strongline LLC never developed such APIs and, in any event, the Strongline Materials were excluded from the definition of Licensed Technology, and were not referenced in Exhibit A, which described the Staff Duress Solution.

26.    As reflected by Exhibit A to the Agreement, from the very outset of the relationship between Canopy and Strongline LLC, the only encryption of hardware or software contemplated by the parties involved the "backend" of the Staff Duress solution, such as the use of "[a]pplication-level security that utilize TLS encryptions for data exchanged between the gateways and the edge processor[.]" The parties, consistent with industry standards, did not contemplate that the badges used by hospital staff which issue alerts to the gateways when an incident occurred needed to be encrypted, because the information transmitted by the badges did not include personal identification or other sensitive information.

27.    Strongline LLC recognized encryption of the alert communications from the Staff Duress badges to the gateways was unnecessary and was consistent with industry standards is confirmed by an email exchange between Defendant Sinha and Justin Green ("Green"), one of the founders of Strongline LLC, occurring on January 8-9, 2000. In that email exchange Sinha informed Green that "generally the communication between badges and gateways is unencrypted" because "there is nothing of substance in that conversation other than a badge id and some metadata." Green responded "Perfect. Thank you." Upon information and belief, Green remains a consultant to Commure to this day. Under the terms of the Agreement, Canopy agreed to develop a proprietary platform which it licensed to Strongline LLC to sell and distribute to consumers (the "Strongline Platform" or "*Strongline*"). A major component of the platform was battery-powered, wireless

24

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

badges worn by healthcare workers. Canopy developed these badges and the associated network infrastructure. The badges tracked a healthcare workers' location in real time and allowed the worker to trigger an alert if the worker was in distress.

28.    Section 14.2 of the Agreement prevented Strongline LLC or any third party at its behest from (a) attempting to reverse engineer, decompile, disassemble or otherwise to discover the source code, object code or underlying algorithms of the Licensed technology or any part thereof, (b) from attempting to modify, translate or create derivative works based on the Licensed Technology, or (c) from using the Licensed Technology for any purpose other than for the benefit of Strongline LLC's customers, and even then only as permitted by the Agreement.

29.    The Agreement in Section 14.4 also defined what constitute confidential information under the Agreement, which information embraced Canopy's trade secrets, examples of which included (but were not limited to): how buttons and alerts were generated; how the badges' idle and alert modes functioned; the way that buttons worked and signal alerts were generated and processed; the way that the buttons conserved energy to ensure a longer battery life; the Licensed Technology's gateway infrastructure, including the tools used to deploy that infrastructure; the software used to monitor the Staff Duress systems; the functionality of the dashboard user interface, the data models used by the system; the system's integrations with LoRaWAN; the algorithms employed, including the algorithms for how notifications related to incidents occurrences, configurations of subscriptions, and proximity-based notifications; Canopy's relationships with vendors and manufacturers; the methods used for installations of the Staff Duress solution at hospitals; customer infosec reviews; the institutional knowledge of Canopy of healthcare systems and customers; and the problems underlying failed or unsuccessful instantiations of the Licensed Technology.

30.    Canopy at all times took efforts to maintain the secrecy of such trade secrets and confidential information. These efforts include, but are not limited to, source code was never made available to anyone other than Canopy engineers, documentation and other technical details about the *Strongline* system's operation were made available only to those individuals at Commure involved in the resell and support of *Strongline,* restricting client publication and disclosure of Canopy's information, requiring employees and contractors to sign confidentiality agreements, and

25

maintaining confidential information on a secure server. Additionally, whenever technical information (including, but not limited to, architecture, data schemas, algorithms, software code) must be shared, it is only made accessible to engineering teams and access is allowed solely through, and protected by, Secure Shell Protocol (SSH) and private-access keys. Finally, Canopy does not publicly disclose any of its secret, technical information online or in publications.

31.    Canopy's technology was an instant success and gained widespread adoption at healthcare facilities across the country.

32.    From the very outset of the relationship between Canopy and Strongline LLC, the only encryption of hardware or software contemplated by the parties involved the "backend" of the Staff Duress solution, such as the use described in Exhibit A of "[a]pplication-level security that utilize TLS encryptions for data exchanged between the gateways and the edge processor…."

33.    As reflected by a December 22, 2021 Amendment to Agreement, attached and incorporated into this Answer and Counterclaims as Exhibit 2, Commure entered into a proposed acquisition of certain assets of Strongline such that Canopy, Commure, and Strongline LLC amended the August 30, 2019 Agreement in part so that the parties could assign all rights and obligations of Strongline LLC under the Agreement to Commure. Upon information and belief, Commure had the ability as part of its due diligence related to the acquisition of the assets of Strongline to evaluate the security of the Staff Duress solution, and yet consistent with industry standards never voiced any objection to its known use of unencrypted communications between the badges and the gateway. Both Sinha and Green were signatories to the December 22, 2021 Amendment to Agreement.

**The Reseller Agreement**

34.    Shortly after Commure consummated its acquisition of Strongline LLC, the relationship between Commure and Canopy began to deteriorate, with Commure missing several months of payments owed to Canopy and failing to adhere to reporting obligations required by the Agreement.

35.    While Canopy attempted to forge ahead in the collaboration and reach a good faith resolution with Commure, Commure's misconduct continued to escalate. Ultimately these attempts

26

at resolution were unsuccessful and in November 2022, Canopy put Commure on notice of its material breach of the Agreement and voiced its intent to terminate the Agreement should Commure fail to cure its breaches.

36. On December 8, 2022, the day the cure period expired and the Agreement was terminated, Commure, represented by Cooley LLP, rushed to the Delaware Chancery Court and filed a Verified Complaint for Declaratory Relief and Specific Performance, and on December 27, 2022 filed a First Amended Verified Complaint for Declaratory Relief and Breach of Contract, in the Court of Chancery in the State of Delaware. On or about January 9, 2023, Canopy filed an Answer and Counterclaims. Thereafter, on or about March 3, 2023, the parties entered into a Confidential Settlement Agreement and Mutual Release. In conjunction with that Confidential Settlement Agreement and Mutual Release, the parties agreed that, effective November 30, 2022, the Agreement was terminated and was to be replaced with the Reseller Agreement attached hereto as Exhibit 3 and incorporated into this Answer and Counterclaims, which Reseller Agreement was deemed to be effective December 1, 2022.

37. The Reseller Agreement gave Commure certain rights to sell and distribute the *Strongline* devices Canopy developed under the previous Agreement. Notably, all references to *Strongline* were removed from the Reseller Agreement and made part of the Licensed Technology in Exhibit A.

38. The December 1, 2022 Reseller Agreement in Sections 1.7, 2, 7.3, 14.1-14.2, and Exhibits A and B again confirmed that Canopy "own[ed] all worldwide right, title and interest to the Licensed Technology," which again was now more broadly described as Canopy's "proprietary platform, comprised of a cloud services infrastructure, hardware, software and related technologies," as further described in Exhibit A to the Agreement and certain documentation, including Canopy's "software and Hardware " and all of Canopy's "intellectual property rights therein." Notably, Exhibit A now branded the Licensed Technology as the "Strongline solution" (hereinafter "*Strongline*") reflecting that nomenclature was part of Canopy's, rather than Commure's, intellectual property rights. Meanwhile, Section 15.2 of the Reseller Agreement, governing

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

Commure's marks, made no reference to "*Strongline*" being a trademark that constituted its own intellectual property relevant to the Licensed Technology set forth in Exhibit A.

39.    The parties in the December 1, 2022 Reseller Agreement also acknowledged that Canopy, not Commure, retained all intellectual property rights relating to the Licensed Technology, including "all improvements, modifications, translations, and derivative works thereof" created by or on behalf of Canopy. Unlike the August 30, 2019 Agreement, the Reseller Agreement included no references to Commure retaining any intellectual property rights related to "Strongline Materials," or software and services originally developed by Strongline LLC that could be integrated with the Licensed Technology.

40.    The Reseller Agreement contained several notable provisions regarding the treatment of intellectual property:

> **1.7 "Licensed Technology"** will mean Labs' proprietary platform, comprised of a cloud services infrastructure, Hardware, software and related technologies, as further described in Exhibit A attached hereto. The Licensed Technology includes all Labs' software and Hardware comprising the platform and all Labs' intellectual property rights therein.

> **1.8 "Marks"** will mean all proprietary trademarks, trade names, symbols, logos and/or brand names adopted from time to time to identify a party or any of its products or services.

> **14.1 Intellectual Property Rights**. [Canopy] will own and retain all intellectual property rights relating to the Licensed Technology and Documentation, including all improvements, modifications, translations and derivative works thereof created by or on behalf of [Canopy]. No rights or licenses are granted except as expressly set forth herein.

> **15.1 [Canopy's] Marks.** During the Term, [Canopy] hereby grants Commure the non-exclusive license and right to utilize [Canopy's] Marks (including, without limitation, "Powered by SMPLabs") solely in connection with Commure's marketing, selling and supporting of the Licensed Technology as set forth in Section 11, provided that Commure will: (a) only use [Canopy's] Marks in the form and manner, and in accordance with, the quality standards and usage guidelines that [Canopy] specifically prescribes and only in connection with the Licensed Technology; and (b) upon termination of this Agreement for any reason, immediately cease all use of [Canopy's] Marks. All use of [Canopy's] Marks will inure to the sole benefit of [Canopy].

> **15.2 Commure's Marks**. Commure shall have the right to establish branding to be used in connection with its white-labeled edition of the Licensed Technology in the Healthcare Industry (whether "Staff Safety Solution" or otherwise) and shall own all right, title and interest in such Marks. [Canopy] shall not use such Marks without Commure's prior approval. All use of Commure's Marks will inure to the sole benefit of Commure.

28

41. In short, these provisions gave Canopy exclusive ownership of all intellectual property related to *Strongline*, including the Strongline mark, as Exhibit A to the Reseller Agreement expressly defined Canopy's "Licensed Technology" to include "architecture for the Strongline solution," "Badges," "Strongline Cloud Services" and "Strongline Gateways," and Section 14.1 explicitly provides that Canopy "will own and retain all intellectual property rights to the Licensed Technology."

42. What's more, the Reseller Agreement further affirmed that the technology behind *Strongline* was developed and owned solely by Canopy, who merely "authorized Commure as a non-exclusive reseller and distributor of [Canopy's] Licensed Technology in the Healthcare Industry[.]" *Id* at Recital. Accordingly, Commure was prohibited from reverse engineering, making derivative works of, or otherwise misusing Canopy's Licensed Technology *i.e.* Strongline:

> **14.2 Restrictions**. Commure will not, and will not permit any third party to: reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying algorithms of the Licensed Technology or any part thereof (provided that reverse engineering is prohibited only to the extent such prohibition is not expressly contrary to applicable law); remove any approved Marks or notices from any portion of the Licensed Technology or Documentation; modify, translate, or create derivative works based on the Licensed Technology or Documentation, except with the prior written approval of Labs; use the Licensed Technology for any purpose other than for the benefit of its Customers as permitted hereunder; use the Licensed Technology other than in accordance with this Agreement and in compliance with all applicable laws and regulations (including export laws).

43. Further, Section 3.2 and Exhibit B to the Reseller Agreement required that Commure "use commercially reasonable efforts to enforce the terms and conditions of the Customer Agreements with respect to [Canopy's] rights," including by informing Commure's customers that Canopy "owns all worldwide right, title and interest in and to the Licensed Technology and Documentation, all derivatives and improvements thereof, and all related intellectual property rights."

44. The Reseller Agreement also contained multiple provisions dealing with termination of the agreement itself. Section 13.3–implemented following Commure's failure to make timely payments in the prior Agreement–authorized Canopy to terminate the Reseller Agreement

29

immediately, without the right to cure, "in the event of two (2) consecutive late (or non-) payments of amounts due by Commure in any twelve (12) month period."

45. Additionally, any delays of payments were explicitly excluded from the Reseller Agreement's leniency provision contained in Section 20.4, which stated that "[n]either party will be liable to the other for any delay or failure to perform hereunder (***excluding payment obligations***) due to any matter beyond its reasonable control" (emphasis added).

46. Further, Section 13.5 of the Reseller Agreement specifically outlined the parties' respective rights in the event of termination:

> "… Upon any termination, Commure shall cease all marketing and promotion of the Licensed Technology, but any rights or licenses previously granted to Customers in accordance with the terms hereof shall not be affected by termination of this Agreement. Accordingly, Commure shall retain its license to use the Licensed Technology solely as necessary to support such pre-existing Customers through the end of their then-current contract term with Commure, and Labs shall continue to provide access to the Licensed Technology and support such efforts as specified in this Agreement, subject to Commure's ongoing payment of all applicable Solution Fees. …"

47. Lastly, Section 20.5 of the Reseller Agreement provided that that:

> [The Reseller] Agreement (together with the Settlement Agreement) is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous written and oral agreements, communications and other understandings relating to the subject matter of this Agreement including the all portions of the Prior Agreement, and that all waivers and modifications must be in a writing signed by both parties, except as otherwise provided herein. (emphasis added).

### Commure Misappropriates Canopy's Licensed Technology

48. Commure was reliant on Canopy's *Strongline* to drive and sustain its business: despite its $6 billion valuation, by late 2023 *Strongline* was believed to be Commure's *only* growing source of revenue.[3] However "Commure didn't actually own the technology behind *Strongline*."[4] Canopy did.

49. Wanting to gain independence and control over the product it merely resold, Commure hatched an elaborate scheme to secretly build its own version of *Strongline* and migrate customers over. Commure referred to the project as "Coffee" in internal communications.

---

[3] Business Insider.
[4] *Id*.

30

50. In or around fall 2022, Commure under prior management first engaged a third-party vendor to design, develop and build the first iteration of Coffee. However, this product soon proved to be a colossal failure when Commure attempted to roll it out to a customer in or around January 2023. The product was borderline inoperable and Commure was left to supply *Strongline* so the customer could have a safe, proven and technologically advanced staff safety system.

51. Understanding the difficulty in building a successful staff duress alert system from the ground up, Commure misappropriated and reverse-engineered Canopy's proprietary technology.

52. Uncovered evidence shows a massive scheme by Commure and Athelas to promote the derivative product and then "bait and switch" existing *Strongline* customers into switching to Strongline Pro. For instance, in August 2023, Commure used a third-party to file an FCC license application covering the product that it then called "Commure Tag." Previously, in or about December 2022, Commure asked the exact same factory in China that manufactures Canopy's Licensed Technology to develop this Commure Tag product described in the information submitted to the FCC, reflecting that no clean room prohibitions were in place to ensure it did not incorporate Canopy's confidential information. Based on the specifications and description of the Commure Tag from the user manual Commure submitted to the FCC, Commure Tag is a near identical copy or derivative work of the Licensed Technology. The documentation included with the FCC application implied that the cloud services associated with the Commure Tag would need to work in such a way that those services are themselves another copy or derivative work. The submitted documentation also suggested that the firmware of the Commure Tag must have been obtained via a violation of reverse engineering restrictions. Indeed, even the description of the Commure Tag device in the FCC license application is nearly identical to the description of the TAG6 device set forth in Commure's own User Manual that Commure submitted to the FCC prior to Commure's FCC submission. Commure even blatantly copied verbatim language describing features available on Canopy's *Strongline* product, but not present on the device described by Commure in its FCC filings.

31

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

53.     Indeed, the similarities between Canopy's *Strongline* and Commure's Strongline Pro ultimately were so blatant that *Business Insider* in a 2024 article described Strongline Pro has having "nearly identical product details and photos" to Canopy's technology in FCC filings.[5]

54.     Strongline Pro incorporated Canopy's confidential information and trade secrets in violation of Sections 14.1, 14.2, and 14.4 of the Reseller Agreement. Among Canopy's trade secrets and confidential information incorporated into Strongline Pro are the following non-exclusive examples: how buttons and alerts were generated; how the badges' idle and alert modes functioned; the way that buttons worked and signal alerts were generated and processed; the way that the buttons conserved energy to ensure a longer battery life; the Licensed Technology's gateway infrastructure, including the tools used to deploy that infrastructure; the software used to monitor the Staff Duress systems; the functionality of the dashboard user interface, the data models used by the system; the system's integrations with LoRaWAN; the algorithms employed, including the algorithms for how notifications related to incidents occurrences, configurations of subscriptions, and proximity-based notifications; Canopy's relationships with vendors and manufacturers; the methods used for installations of the Staff Duress solution at hospitals; customer infosec reviews; the institutional knowledge of Canopy of healthcare systems and customers; and the problems underlying failed or unsuccessful instantiations of the Licensed Technology.

55.     Canopy at all times took efforts to maintain the secrecy of such trade secrets and confidential information These efforts include, but are not limited to, source code was never made available to anyone other than Canopy engineers, documentation and other technical details about the *Strongline* system's operation were only made available to those individuals at Commure involved in the resell and support of *Strongline,* restricting client publication and disclosure of Canopy's information, requiring employees and contractors to sign confidentiality agreements, and maintaining confidential information on a secure server. Additionally, whenever technical information (including, but not limited to, architecture, data schemas, algorithms, software code) must be shared, it is only made accessible to engineering teams and access is allowed solely through,

---

[5] Business Insider.

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

and protected by, Secure Shell Protocol (SSH) and private-access keys. Finally, Canopy does not publicly disclose any of its secret, technical information online or in publications.

### Commure Attempts to Pass Off Canopy's Technology As Its Own

56.    In the fall of 2023, when Athelas and Commure were in merger discussions, Canopy made a major strategic pivot: it would begin to offer its proven and trusted staff safety system directly to consumers, eliminating the need for intermediaries and allowing it to offer expanded capabilities and an improved product experience. Thereafter, on November 28, 2023, Canopy gave Commure notice of its intent to let the Reseller expire, thereby officially terminating on December 1, 2024.

57.    On December 6, 2023, Canopy publicly announced the launch of its direct-to-consumer Canopy Protect system and, much to Canopy's surprise, Commure publicly announced the launch of a new competing product just days later on December 11, 2023.

58.    Despite the fact that the Reseller Agreement gave Canopy exclusive ownership of the *Strongline* mark, Commure's new product was confusingly named and marketed as the "Strongline Pro."

59.    At no point did Canopy authorize Commure to use the *Strongline* name or mark for Commure's new product.

60.    Strongline Pro is nearly identical to Canopy's *Strongline* product, as an be plainly seen in filings made with the Federal Communications Commission, with Canopy's July 31, 2023 submission appearing on the left and the filing for the "Commure Tag" (made through Moko Technology Limited on or about August 2, 2023) appearing on the right:

33



**TAG6**

The TAG6 is a battery-powered, wearable Bluetooth device containing a single button used to signal for duress as part of the SMP Staff Secure solution. The TAG6 is designed so that it can be easily worn as part of an individual badge real on their uniform.

**Features**
- Double-tap activation mechanism
- Raised, protective button edge to minimize accidental button presses
- Soft carbon-pill based, ergonomic button designed for comfort and durability
- Designed to work with the Strongline Staff Safety system
- Easily mounted
- Operational self-check feature
- Piezoelectric speaker used to provide audible feedback on alert trigger
- Flashing red light to indicate alert receipt by Strongline Cloud Services
- Minimal radio spectrum footprint

**Commure Tag**

The Commure Tag is a battery-powered, wearable Bluetooth device containing a single button used for medical situations.

With BLE tech and positioning technology, the beacon helps ensure immediate and effective response to your patients and staff emergency situations. So you can create a safer workplace environment for your patients and staff.

**Features**
- Raised, protective button edge to minimize accidental button presses
- Soft carbon-pill based, ergonomic button designed for comfort and durability
- Easily mounted
- Operational self-check feature
- Piezoelectric speaker used to provide audible feedback on alert trigger
- Flashing red light to indicate alert receipt by Cloud Services
- Minimal radio spectrum footprint

**The Commure Tag FCC filing (pictured on the right) is strikingly similar to SMP Labs' filing, submitted two weeks earlier.** FCC.report

63.    The similarities are so blatant and stark that Business Insider characterized Commure's filing as containing "near-identical product details and photos" and being "strikingly similar" to Canopy's filing.

64.    Upon information and belief, Commure did not disclose to its existing customers that the new Strongline Pro product bore no relation to Canopy or its existing *Strongline* product. Canopy has received multiple inquiries from customers expressing confusion about whether Strongline Pro is based upon the same technology as Canopy's *Strongline* solution.

**Commure Fails to Timely Make Payments and the Reseller Agreement is Terminated**

65.    While Commure was launching its infringing Strongline Pro product, it became delinquent on payments to Canopy for the existing Strongline badges.

66.    Canopy transmitted Invoice No. CO-202311 to Commure on November 2, 2023 with payment due 30-days letter on December 2, 2023.

67.    Commure initiated payment on December 19, 2023 and Canopy received payment on December 26, 2023–24 days late.

68.    Canopy transmitted the subsequent invoice, Invoice No. CO-202312 on December 2, 2023 with payment due 30-days later on January 1, 2024.

34

69. Commure informed Canopy on January 4, 2023 that payment would be transmitted by January 11, 2024–10 days late.

70. Commure did not dispute any portion of the November and December invoices. It simply was untimely in its payments to Canopy.

71. On January 4, 2024–following Commure's two consecutive late payments–Canopy gave notice of the immediate termination of the Reseller Agreement (the "Notice").

72. The Notice specifically demanded that Commure cease all marketing and promotion of the Licensed Technology, while also noting that Canopy would continue to fulfill its obligations under the Reseller Agreement and take all actions necessary to ensure the functionality of all Strongline badges.

73. On January 12, 2024, counsel for Commure responded to the Notice, incorrectly asserting that the parties reached a "mutual agreement" to excuse Commure's delinquent payment of the November 2023 invoice. As such, Commure contended that the termination of the Reseller Agreement was ineffective.

74. Canopy responded to Commure on January 16, 2024, categorically denying that any such "mutual agreement" had occurred, and emphasizing that any such waiver of Commure's delinquent payments would had to have been explicitly made in a writing signed by both parties per Section 20.5 of the Reseller Agreement. Further, Canopy put Commure on notice that its use of the *Strongline* mark in its new Strongline Pro product directly violated Canopy's rights under the Reseller Agreement.

75. Commure also was late in its payment of the January 2024 invoice, reflecting that it was late in three consecutive monthly payments.

**Tandon, Commure and Athelas Harass Canopy's Employees**

76. Commure, Athelas and their joint CEO Tandon did not take the termination of the Reseller Agreement well. Just two days after Canopy sent its January 16, 2024 letter, Commure sent demand letters to a host of Canopy employees who had previously worked at Commure (the "Employees"),[6] making outlandish and baseless accusations about breaches of confidentiality

---

[6] The Employees include Amy Burton, Sean Cavanagh, Scott McClung and Anil Mitra.

35

agreements. Commure and Athelas then escalated these disputes by filing arbitration demands against every Employee who has left Commure for Canopy. These demands were a transparent scare tactics to chill employee mobility and to frighten employees simply seeking better opportunities for themselves.

77.    Tandon's actions were further made with goal of scaring Canopy and its team from reaching out to existing *Strongline* customers in an brazen attempt to prevent Canopy from gaining users for its new Canopy Protect product.

78.    Commure's, Athelas's, and Tandon's harassment of the Employees did not end with the filing of the arbitration demands; in fact it was just beginning. Despite knowing that the Employees were represented by counsel, Tandon and Commure continued to directly contact the Employees with a series of threatening emails. For instance, on March 22, 2024, Tandon emailed Canopy's Vice President of Sales, Scott McClung ("McClung"), informing McClung that Commure intended to publicly file a restraining order against him and emphasizing that "public filings and restraining orders are searchable on the internet, and appear on background checks." Tandon also threatened to bankrupt the Employees through litigation and seek criminal prosecution, likening the Employees' lawful actions to a high profile criminal prosecution within this district. On information and belief, Tandon also emailed all current Commure employees and threatened legal action if any of them dared to join Canopy.

### The Counterclaim-Defendants Disparage Canopy

79.    At the same time that Commure was targeting Canopy's employees, the Counterclaim-Defendants began to materially misrepresent and disparage Canopy to existing *Strongline* customers.

80.    First, on January 22, 2024–less than one week after Commure received Canopy's January 16, 2024 letter–Commure published a "Cybersecurity Assessment" of the Strongline product, which purported to "uncover[] critical vulnerabilities in Canopy Labs / SMP's security and data privacy systems." The majority of its claimed "vulnerabilities" were either misrepresentations, strategic design choices, or outright false, as evidenced by Canopy's January 23, 2024 "Response to Commure's Security Vulnerability Report."

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

81. For instance, one of the "critical" "vulnerabilities" alleged by Commure was that "[a]ll hospital floor plans are stored in a public folder on the internet" by Canopy, so that "[a]nyone with a browser can open up the floor plans of a hospital." Such claim is demonstrably false, as floor plan URLs are only transmitted via https (never in the clear) and contain a secure random string, which can only be obtained by trusted, authenticated users. While an authenticated user does have the ability to share a floor plan as needed, it is preposterous to state that "all hospital floor plans" are publicly available to "[a]nyone with a browser."

82. Similarly, Commure noted another "critical" "vulnerability" related to "Man in the Middle Attacks between Badges and Gateways," alleging that messages between badges and gateways "are easily sniffed and spoofed by an attacker." This claim is highly misleading on several levels. First, any such vulnerability would be incredibly difficult to exploit, as it would require a heavily motivated attacker to complete several arduous steps, including harvesting and filtering MAC addresses, creating multiple fake transmitters, and defeating multiple mechanisms to prevent alert duplication, replay attacks and false alarms. Commure's characterization of such process as "easily sniff[ing] and spoof[ing]" is simply not true. Further, this property of the Strongline system had been known to Commure the entire time it had been reselling Strongline (since 2022) and the risk of exploit had been assessed to be minimal in all prior assessments. What's more, any risk that does exist can be easily mitigated through an over-the-air firmware update available for all Strongline badges. In mid-2023, new generations of Strongline badges containing the mitigation were made available to Commure but were never introduced to its customers.

83. Despite this, Commure insisted that in order to remediate these issues, its customers should replace Canopy's Strongline badges with Commure's Strongline Pro badges . Never once between August 30, 2019 and January 4, 2024, did Commure or any Commure customer raise any concerns with Canopy that the Staff Safety/*Strongline* solution developed by and owned by Canopy, and employed by Commure and its customers in numerous hospitals and health facilities, used unencrypted communications between the badges and the gateway. Upon information and belief, not a single Commure customer prior to January 4, 2024 ever raised any concerns with Commure that the Staff Safety/*Strongline* solution developed by and owned by Canopy, and employed by

37

Commure and its customers in numerous hospitals and health facilities, used unencrypted communications between the badges and the gateway.

84. Ultimately, Commure's Cybersecurity Assessment used its false and misleading claims to portray the Strongline badges as inherently compromised and as a pretextual basis to encourage its customers to switch to Commure's Strongline Pro products.

85. Beyond the Cybersecurity Assessment, Commure continued to make false statements and misrepresentations regarding Canopy's products and obligations. On multiple occasions, Commure and Tandon told existing *Strongline* customers that Canopy had an ongoing obligation to support Commure customers with auto-renew provisions, despite the fact that the then-terminated Reseller Agreements specified that Commure "retain[ed] its license to use the Licensed Technology solely as necessary to support . . . pre-existing Customers through the end of their *then-current contract term* with Commure."

86. Such statements were material representations, as the Reseller Agreement unambiguously does not extend to renewed or extended terms, whether triggered by auto-renewal provisions or by other mechanisms. Further, nothing in the Reseller Agreement authorizes Commure, after termination, to grant to its Customers any rights to the Licensed Technology or ongoing support beyond any term in existence at the time Canopy terminated the Agreement.

87. Commure's misrepresentations caused confusion among existing Strongline customers by passing off Strongline Pro as being Licensed Technology that shared the same popular features as *Strongline*. For instance, Oschner Health System ("Oschner"), a large healthcare provider in Louisiana operating over 40 facilities, had used and subscribed to Canopy's *Strongline* system via Commure. Upon information and belief, , Tandon informed Oschner, that Canopy was obligated to continue providing support for Oschner's existing Strongline products should Oschner renew its contract with Commure. Tandon knew or should have known that such statement was misleading. Acting in reliance on Tandon's misrepresentation, Oschner renewed its agreement with Commure. Because of Oschner's satisfaction with and reliance on Canopy's *Strongline* products, it is highly likely that Oschner would have signed an agreement with Canopy had it not been for Tandon's misrepresentations.

38

**FIRST CLAIM FOR RELIEF**

**(Trade Secret Misappropriation Under the Defend Trade Secrets Act – 18 U.S.C. § 1836(b), – All Counterclaim-Defendants)**

88.     Canopy realleges and incorporates by reference Paragraphs 1 through 87 as though fully set forth herein.

89.     Canopy owns and possesses certain confidential, proprietary, and trade-secret information, as alleged above. For example, Canopy's confidential and trade-secret information includes (but is not limited to how buttons and alerts were generated; how the badges' idle and alert modes functioned; the way that buttons worked and signal alerts were generated and processed; the way that the buttons conserved energy to ensure a longer battery life; the Licensed Technology's gateway infrastructure, including the tools used to deploy that infrastructure; the software used to monitor the Staff Duress systems; the functionality of the dashboard user interface; the data models used by the system; the system's integrations with LoRaWAN; the algorithms employed, including the algorithms for how notifications related to incidents occurrences, configurations of subscriptions, and proximity-based notifications; Canopy's relationships with vendors and manufacturers; the methods used for installations of the Staff Duress solution at hospitals; customer infosec reviews; the institutional knowledge of Canopy of healthcare systems and customers; and the problems underlying failed or unsuccessful instantiations of the Licensed Technology.

90.     Canopy's confidential, proprietary, and trade-secret information relates to products and services used, sold, shipped, and/or ordered in, or intended to be use used, sold, shipped and/or ordered in, interstate or foreign commerce.

91.     Canopy has taken reasonable measures to keep its confidential, proprietary, and trade-secret information secret. Canopy at all times took efforts to maintain the secrecy of such trade secrets and confidential information. These efforts include, but are not limited to the following: Defendants never made source code available to anyone other than Canopy engineers; Only Commure employees involved in the resale and support of *Strongline* were authorized to access Defendants' documentation and other technical details about the *Strongline* system's operation; Defendants also restricted client publication and disclosure of Canopy's information, requiring

39

employees and contractors to sign confidentiality agreements; and maintaining confidential information on a secure server. Additionally, whenever technical information (including, but not limited to, architecture, data schemas, algorithms, software code) must be shared, it is only made accessible to engineering teams and access is allowed solely through, and protected by, Secure Shell Protocol (SSH) and private-access keys. Finally, Canopy does not publicly disclose any of its secret, technical information online or in publications.

92.    Due to these security measures, Canopy's confidential and proprietary trade-secret information is not available to the public through any legitimate means.

93.    Counterclaim-Defendants knew or should have known under the circumstances that the information misappropriated by Commure and Athelas constituted Canopy's trade secrets.

94.    Canopy's confidential, proprietary, and trade-secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

95.    In violation of Canopy's rights, Counterclaim-Defendants misappropriated Canopy's confidential, proprietary, and trade-secret information by using this information to create a competing product—Strongline Pro.

96.    Counterclaim-Defendants' misappropriation of Canopy's confidential, proprietary, and trade-secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive, and thereby entitles Canopy to an award of exemplary damages of two times the amount to which Canopy would otherwise be entitled, pursuant to 18 U.S.C. § 1836(b)(3)(C).

97.    Each of the Counterclaim-Defendants has attempted, and continues to attempt, to conceal their misappropriation.

98.    On information and belief, if Counterclaim-Defendants are not enjoined, Counterclaim-Defendants will continue to misappropriate and use Canopy's trade-secret information for their own benefit and to Canopy's detriment.

99.    As a direct and proximate result of Counterclaim-Defendants' conduct, Canopy has suffered, and if Counterclaim-Defendants' conduct is not stopped, Counterclaim-Defendants will

40

continue to suffer severe competitive harm, irreparable injury, and significant damages in an amount to be proven at trial. In addition to damages, Canopy seeks preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade-secret information and to protect other legitimate business interests. Canopy's business operates in a competitive market and will continue to suffer irreparable harm absent injunctive relief.

100.    Canopy has been damaged by all the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

### SECOND CLAIM FOR RELIEF
### (California Uniform Trade Secrets Act—California Civil Code § 3426, *et seq.* – All Counterclaim Defendants)

101.    Canopy realleges and incorporates by reference Paragraphs 1 through 100 as though fully set forth herein.

102.    Canopy owns and possesses certain confidential, proprietary, and trade-secret information, as alleged above. For example, Canopy's confidential and trade-secret information includes (but is not limited to how buttons and alerts were generated; how the badges' idle and alert modes functioned; the way that buttons worked and signal alerts were generated and processed; the way that the buttons conserved energy to ensure a longer battery life; the Licensed Technology's gateway infrastructure, including the tools used to deploy that infrastructure; the software used to monitor the Staff Duress systems; the functionality of the dashboard user interface; the data models used by the system; the system's integrations with LoRaWAN; the algorithms employed, including the algorithms for how notifications related to incidents occurrences, configurations of subscriptions, and proximity-based notifications; Canopy's relationships with vendors and manufacturers; the methods used for installations of the Staff Duress solution at hospitals; customer infosec reviews; the institutional knowledge of Canopy of healthcare systems and customers; and the problems underlying failed or unsuccessful instantiations of the Licensed Technology.

103.    Canopy has taken reasonable measures to keep its confidential, proprietary, and trade-secret information secret. Canopy at all times took efforts to maintain the secrecy of such trade secrets and confidential information. These efforts include, but are not limited to, restricting client publication and disclosure of Canopy's information, requiring employees and contractors to sign

41

confidentiality agreements, and maintaining confidential information on a secure server. Additionally, whenever technical information (including, but not limited to, architecture, data schemas, algorithms, software code) must be shared, it is only made accessible to development teams and access is allowed solely through, and protected by, Secure Shell Protocol (SSH) and private-access keys. Finally, Canopy does not publicly disclose any of its secret, technical information online or in publications.

104.    Due to these security measures, Canopy's confidential and proprietary trade-secret information is not available to the public through any legitimate means.

105.    Counterclaim-Defendants knew or should have known under the circumstances that the information misappropriated by Counterclaim-Defendants constituted trade secrets.

106.    Canopy's confidential, proprietary, and trade-secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

107.    In violation of Canopy's rights, Counterclaim-Defendants misappropriated Canopy's confidential, proprietary, and trade-secret information by using this information to create a competing product—Strongline Pro.

108.    Counterclaim-Defendants' misappropriation of Canopy's confidential, proprietary, and trade-secret information was willful, malicious, and fraudulent. Canopy is thereby entitled to exemplary damages under California Civil Code § 3426.3.

109.    Counterclaim-Defendants have attempted and continue to attempt to conceal their misappropriation.

110.    If Counterclaim-Defendants are not enjoined, they each will continue to misappropriate and use Canopy's trade-secret information for their own benefit and to Canopy's detriment.

111.    As a direct and proximate result of Counterclaim-Defendants' conduct, Canopy has suffered and if Counterclaim-Defendants' conduct is not stopped, Canopy will continue to suffer severe competitive harm, irreparable injury, and significant damages in an amount to be proven at

42

trial. In addition to damages, Canopy seeks preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade-secret information and to protect other legitimate business interests. Canopy's business operates in a competitive market and will continue to suffer irreparable harm absent injunctive relief.

112.    Counterclaim-Defendants' conduct constitutes transgressions of a continuing nature for which Canopy has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Counterclaim-Defendants will continue to retain and use Canopy's trade-secret information to enrich themselves and divert business away from Canopy. Pursuant to California Civil Code § 3426.2, Canopy is entitled to an injunction against the continued misappropriation of trade secrets as alleged herein and further asks the Court to restrain Counterclaim-Defendants from using all trade-secret information misappropriated from Canopy and to return all trade-secret information to Canopy.

113.    Pursuant to California Civil Code § 3426.4 and related law, Canopy is entitled to an award of attorney's fees for Counterclaim-Defendants's misappropriation of trade secrets.

## THIRD CLAIM FOR RELIEF

### (Federal Trademark Infringement – 15 U.S.C. § 1114 – against Commure)

114.    Canopy realleges and incorporates by reference Paragraphs 1 through 113 as though fully set forth herein.

115.    As described above, Canopy owns all rights and title to the Strongline mark pursuant to Section 14.1 of the Reseller Agreement. Under Section 15.1 of the Reseller Agreement, Canopy provided Commure with a limited license to use the Strongline mark in limited forms and manners "only in connection with the Licensed Technology" during the term of the Reseller Agreement.

116.    Acting without Canopy's license, authorization, or consent, Commure has used–and will continue to use–the *Strongline* mark to advertise, market, and sell in interstate commerce Commure's separate and competing "Strongline Pro" product.

117.    Upon information and belief, given the success and popularity of the Strongline product, Commure's conduct represents a willful and intentional attempt to free-ride on the goodwill associated with the Strongline mark.

43

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

118.    Commure's use of the Strongline mark, as described above, constitutes federal trademark infringement in violation of 15 U.S.C. § 1114 in that it is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Commure with Canopy and/or as to the origin, sponsorship, or approval by Canopy of Commure's goods, services, or commercial activity, and will irreparably harm Canopy and the goodwill it has developed in the Strongline mark.

119.    On information and belief, Commure has and will continue to realize substantial revenues, profits, and other benefits rightfully belonging to Canopy as a result of its wrongful conduct.

120.    Commure's acts have harmed and will continue to harm Canopy's reputation and goodwill.

121.    Commure's acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages.

## FOURTH CLAIM FOR RELIEF

### (Unfair Competition – 15 U.S.C. § 1125 – against Commure)

122.    Canopy realleges and incorporates by reference Paragraphs 1 through 121 as though fully set forth herein.

123.    As described above, Canopy owns all rights and title to the Strongline mark pursuant to Section 14.1 of the Reseller Agreement. Under Section 15.1 of the Reseller Agreement, Canopy provided Commure with a limited license to use the Strongline mark in limited forms and manners "only in connection with the Licensed Technology" during the term of the Reseller Agreement.

124.    Acting without Canopy's license, authorization, or consent, Commure has used–and will continue to use–the *Strongline* mark to advertise, market, and sell in interstate commerce Commure's separate and competing "Strongline Pro" product.

44

125. Upon information and belief, given the success and popularity of the Strongline product, Commure's conduct represents a willful and intentional attempt to free-ride on the goodwill associated with the Strongline mark.

126. Commure's use of the Strongline mark, as described above, constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A) in that it is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Commure with Canopy and/or as to the origin, sponsorship, or approval by Canopy of Commure's goods, services, or commercial activity, and will irreparably harm Canopy and the goodwill it has developed in the Strongline mark.

127. On information and belief, Commure has and will continue to realize substantial revenues, profits, and other benefits rightfully belonging to Canopy as a result of its wrongful conduct.

128. Commure's acts have harmed and will continue to harm Canopy's reputation and goodwill.

129. Commure's acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages.

## FIFTH CLAIM FOR RELIEF

### (False Designation of Origin – 15 U.S.C. § 1125 – against Commure)

130. Canopy realleges and incorporates by reference Paragraphs 1 through 129 as though fully set forth herein.

131. As described above, Canopy owns all rights and title to the Strongline mark pursuant to Section 14.1 of the Reseller Agreement. Under Section 15.1 of the Reseller Agreement, Canopy provided Commure with a limited license to use the Strongline mark in limited forms and manners "only in connection with the Licensed Technology" during the term of the Reseller Agreement.

45

132.    Acting without Canopy's license, authorization, or consent, Commure has used–and will continue to use–the *Strongline* mark to advertise, market, and sell in interstate commerce Commure's separate and competing "Strongline Pro" product.

133.    Upon information and belief, given the success and popularity of the Strongline product, Commure's conduct represents a willful and intentional attempt to free-ride on the goodwill associated with the Strongline mark.

134.    Commure's use of the Strongline mark, as described above, constitutes false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A) in that it is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Commure with Canopy and/or as to the origin, sponsorship, or approval by Canopy of Commure's goods, services, or commercial activity, and will irreparably harm Canopy and the goodwill it has developed in the Strongline mark.

135.    On information and belief, Commure has and will continue to realize substantial revenues, profits, and other benefits rightfully belonging to Canopy as a result of its wrongful conduct.

136.    Commure's acts have harmed and will continue to harm Canopy's reputation and goodwill.

137.    Commure's acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages.

### SIXTH CLAIM FOR RELIEF

### (False Advertising – 15 U.S.C. § 1125 – against Commure)

138.    Canopy realleges and incorporates by reference Paragraphs 1 through 137 as though fully set forth herein.

139.    As described above, Canopy owns all rights and title to the Strongline mark pursuant to Section 14.1 of the Reseller Agreement. Under Section 15.1 of the Reseller Agreement, Canopy

46

provided Commure with a limited license to use the Strongline mark in limited forms and manners "only in connection with the Licensed Technology" during the term of the Reseller Agreement.

140. Commure intentionally and/or negligently made untrue or misleading statements regarding its Strongline Pro product and misrepresented to potential customers that it is, or is somehow associated and/or affiliated with, Canopy.

141. Commure's use of the Strongline mark, as described above, constitutes false advertising in violation of 15 U.S.C. § 1125(a)(1)(A) because they have created, and are likely to create, confusion with consumers and the marketplace as to the source of origin, sponsorship, or approval of its products, in that purchasers have believed and/or are likely to believe that Commure's Strongline Pro product is in fact somehow affiliated with Canopy.

142. On information and belief, Commure has and will continue to realize substantial revenues, profits, and other benefits rightfully belonging to Canopy as a result of its wrongful conduct.

143. Commure's acts have harmed and will continue to harm Canopy's reputation and goodwill.

144. Commure's acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages.

### SEVENTH CLAIM FOR RELIEF

**(Violation of Cal. Bus. & Prof. Code § 17200 *et seq.* – against Commure and Athelas)**

145. Canopy realleges and incorporates by reference Paragraphs 1 through 144 as though fully set forth herein.

146. California Business and Professions Code Section 17200 *et seq*. prohibits any unlawful, unfair, or fraudulent business acts or practices. Section 17200 imposes strict liability for violations and does not require proof that Counterclaim-Defendants intended to injure anyone.

147. Section 17200 borrows violations of other laws and treats those transgressions, when committed as business activity, as "unlawful" business practices. The unlawful practices prohibited

47

by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. Defendants have engaged in numerous unlawful business practices, as alleged herein.

148.    As described above, Canopy owns all rights and title to the *Strongline* mark pursuant to Section 14.1 of the Reseller Agreement. Under Section 15.1 of the Reseller Agreement, Canopy provided Commure with a limited license to use the *Strongline* mark in limited forms and manners "only in connection with the Licensed Technology" during the term of the Reseller Agreement.

149.    Acting without Canopy's license, authorization, or consent, Commure and Athelas have used–and will continue to use–the *Strongline* mark to advertise, market, and sell in interstate commerce Commure's separate and competing "Strongline Pro" product.

150.    Upon information and belief, given the success and popularity of the *Strongline* product, Commure's and Athelas's conduct represents a willful and intentional attempt to free-ride on the goodwill associated with the *Strongline* mark.

151.    Commure's and Athelas's acts, as alleged above, constitute unlawful business practices in violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.

152.    Commure's and Athelas's acts are unlawful because they have created, and are likely to create, confusion with consumers and the marketplace as to the source of origin, sponsorship, or approval of its products, in that purchasers have believed and/or are likely to believe that Commure's and Athelas's Strongline Pro product is in fact somehow affiliated with Canopy.

153.    Upon information and belief, Commure and Athelas have realized and will continue to realize substantial revenues, profits, and other benefits rightfully belonging to Canopy as a result of its wrongful conduct.

154.    Commure's and Athelas's acts have harmed and will continue to harm Canopy's reputation and goodwill. Canopy has suffered injury-in-fact in a monetary amount not yet ascertained and has suffered a loss of property in the form of its Licensed Technology, and is thus entitled to the remedies provided for it in § 17200 of the California Business and Professions Code.

155.    Commure's and Athelas's acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy

48

will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief.

## EIGHTH CLAIM FOR RELIEF

**(False Advertising – Cal. Bus. & Prof. Code § 17500 *et seq.* – against Commure and Athelas)**

156.    Canopy realleges and incorporates by reference Paragraphs 1 through 155 as though fully set forth herein.

157.    As described above, Canopy owns all rights and title to the *Strongline* mark pursuant to Section 14.1 of the Reseller Agreement. Under Section 15.1 of the Reseller Agreement, Canopy provided Commure with a limited license to use the Strongline mark in limited forms and manners "only in connection with the Licensed Technology" during the term of the Reseller Agreement.

158.    Commure intentionally and/or negligently made untrue or misleading statements regarding its Strongline Pro product and misrepresented to potential customers that it is, or is somehow associated and/or affiliated with, Canopy.

159.    Commure's acts, as alleged above, constitutes false advertising in violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17500.

160.    Commure's acts are unlawful because they have created, and are likely to create, confusion with consumers and the marketplace as to the source of origin, sponsorship, or approval of its products, in that purchasers have believed and/or are likely to believe that Commure's Strongline Pro product is in fact somehow affiliated with Canopy. By reason of the foregoing, Canopy has been injured in an amount not yet ascertained and is entitled to the remedies provided for it in § 17500 of the California Business and Professions Code.

161.    Upon information and belief, Commure has realized and will continue to realize substantial revenues, profits, and other benefits rightfully belonging to Canopy as a result of its wrongful conduct.

162.    Commure's acts have harmed and will continue to harm Canopy's reputation and goodwill.

163.    Commure's acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to

49

suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages

### NINTH CLAIM FOR RELIEF

### (Unfair Competition – against Commure and Athelas)

164.    Canopy realleges and incorporates by reference Paragraphs 1 through 163 as though fully set forth herein.

165.    As described above, Canopy owns all rights and title to the *Strongline* mark pursuant to Section 14.1 of the Reseller Agreement. Under Section 15.1 of the Reseller Agreement, Canopy provided Commure with a limited license to use the Strongline mark in limited forms and manners "only in connection with the Licensed Technology" during the term of the Reseller Agreement.

166.    Acting without Canopy's license, authorization, or consent, Commure and Athelas have used–and will continue to use–the *Strongline* mark to advertise, market, and sell Commure's and Athelas's separate and competing "Strongline Pro" product. As described above, Strongline Pro is nearly identical to Canopy's *Strongline* product, as can be plainly seen in filings made with the Federal Communications Commission, and as characterized by Business Insider, such that Commure attempts to pass off Commure's technology as that of Canopy's.

167.    Upon information and belief, given the success and popularity of the Strongline product, Commure's conduct represents a willful and intentional attempt to free-ride on the goodwill associated with the Strongline mark.

168.    Commure's and Athelas's use of Canopy's *Strongline* mark causes consumer confusion and constitutes common law unfair competition.

169.    Commure's and Athelas's acts are unlawful because they have created, and are likely to create, confusion with consumers and the marketplace as to the source of origin, sponsorship, or approval of its products, in that purchasers have believed and/or are likely to believe that Commure's and Athelas's Strongline Pro product is in fact somehow affiliated with Canopy.

170.    Upon information and belief, Commure and Athelas have realized and will continue to realize substantial revenues, profits, and other benefits rightfully belonging to Canopy as a result of its wrongful conduct.

171. Commure's and Athelas's acts have harmed and will continue to harm Canopy's reputation and goodwill.

172. Commure's and Athelas's acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages.

## TENTH CLAIM FOR RELIEF

### (Tortious Interference with Contractual Relations – against Commure, Athelas and Tandon)

173. Canopy realleges and incorporates by reference Paragraphs 1 through 172 as though fully set forth herein.

174. There exist valid and enforceable contracts by and between Canopy and the Employees. Commure, Athelas, and Tandon were and are aware of such contracts.

175. As described above, Commure, Athelas, and Tandon have undertaken intentional acts to harass the Employees and induce a breach and/or disruption of the contractual relationships.

176. As a result of the Commure's, Athelas's, and Tandon's intentional acts, Canopy has had to pay tens of thousands of dollars in legal fees to address these Counterclaim-Defendants' harassment and bogus arbitration claims.

177. Commure's, Athelas's, and Tandon's acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages.

## ELEVENTH CLAIM FOR RELIEF

### (Tortious Interference with Prospective Economic Advantage – against Commure, Athelas, and Tandon)

178. Canopy realleges and incorporates by reference Paragraphs 1 through 177 as though fully set forth herein.

179. Canopy has ongoing business relationships with existing *Strongline* customers and prospective customers. Counterclaim-Defendants are and were aware of such relationships.

51

180. As described above, the Counterclaim-Defendants have undertaken intentional acts to disrupt such relationships, including, but not limited to, by misusing Defendants' *Strongline* mark in a way to mislead customers, misrepresenting Counterclaim-Defendants' obligations to *Strongline* customers who have renewed their agreements with Commure, and by spreading false and defamatory comments regarding the quality of Canopy's products (including baseless accusations of vulnerabilities), while also suggesting that Strongline Pro is an "upgrade" of *Strongline*. Further, the Counterclaim-Defendants' harassment of the Canopy Employees has unfairly harmed Defendants' pursuit of potential customers.

181. The Counterclaim-Defendants' acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages.

## TWELFTH CLAIM FOR RELIEF

### (Trade Libel / Product Disparagement – against All Counterclaim Defendants)

182. Canopy realleges and incorporates by reference Paragraphs 1 through 181 as though fully set forth herein.

183. As described above, each of the Counterclaim-Defendants have made false and/or misleading statements about Canopy and its products to consumers, including, but not limited to, by publishing in writing false and misleading characterizations regarding the quality and security vulnerabilities of Canopy's products, and suggesting Commure and/or Athelas owns the technology and intellectual property associated with *Strongline*.

184. Upon information and belief, each of the Counterclaim-Defendants knew or should have known such statements were false.

185. Upon information and belief, each of the Counterclaim-Defendants intentionally made such false statements to interfere with Canopy's business relationships and dissuade potential consumers from engaging with Canopy.

186. The Counterclaim-Defendants' acts have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy

52

will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages.

### THIRTEENTH CLAIM FOR RELIEF

#### (Breach of Contract – against Commure)

187.   Canopy realleges and incorporates by reference Paragraphs 1 through 186 as though fully set forth herein.

188.   Despite its termination on January 4, 2024, the Reseller Agreement remains a valid and enforceable contract by and between Commure and Canopy as to all provisions referenced in Section 13.5 as surviving termination.

189.   Pursuant to Sections 14.1 and 14.2., Canopy was confirmed to own all intellectual property rights relating to the Licensed Technology and Documentation, and Commure was prohibited from reverse engineering, making derivative works of, or otherwise misusing Canopy's Licensed Technology or Documentation:

> **14.1 Intellectual Property Rights**. [Commure] will own and retain all intellectual property rights relating to the Licensed Technology and Documentation, including all improvements, modifications, translations, and derivative works thereof created by or on behalf of [Canopy]. No rights or licenses are granted except as expressly provided herein.

> **14.2 Restrictions**. Commure will not, and will not permit any third party to: reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying algorithms of the Licensed Technology or any part thereof (provided that reverse engineering is prohibited only to the extent such prohibition is not expressly contrary to applicable law); remove any approved Marks or notices from any portion of the Licensed Technology or Documentation; modify, translate, or create derivative works based on the Licensed Technology or Documentation, except with the prior written approval of Labs; use the Licensed Technology for any purpose other than for the benefit of its Customers as permitted hereunder; use the Licensed Technology other than in accordance with this Agreement and in compliance with all applicable laws and regulations (including export laws).

190.   As set forth in Section 1.7, the Licensed Technology referenced in Section 14.1 constituted Canopy's proprietary *Strongline* platform set forth in Exhibit A to the Reseller Agreement, and comprised of cloud services, infrastructure, Hardware, software, and related technologies. Canopy's Licensed Technology includes all of Canopy's software and Hardware comprising the platform and all of Canopy's intellectual property rights therein.

53

191.    Both before and after January 4, 2024, Commure materially breached Sections 14.1 and 14.2 of the Reseller Agreement through its development, sales, and marketing of Strongline Pro, which incorporates Canopy's Licensed Technology and Documentation without Canopy's permission, and constitutes a modification and derivative work based on the Licensed Technology and Documentation.

192.    Commure's breach has caused significant harm to Canopy and Canopy is entitled to damages in an amount to be determined at trial, as well as costs and attorney fees pursuant to Section 20.6 of the Reseller Agreement.

## FOURTEENTH CLAIM FOR RELIEF

### (Breach of Contract – against Commure)

193.    Canopy realleges and incorporates by reference Paragraphs 1 through 192 as though fully set forth herein.

194.    Prior to January 4, 2024, the Reseller Agreement was a valid and enforceable contract by and between Commure and Canopy as to all provisions contained therein. For all customer agreements entered into by Commure prior to or on January 4, 2024, Section 3.2 and Exhibit B of the Reseller Agreement required that Commure "use commercially reasonable efforts to enforce the terms and conditions of the Customer Agreements with respect to [Canopy's] rights," including by informing Commure's customers that Canopy "owns all worldwide right, title and interest in and to the Licensed Technology and Documentation, all derivatives and improvements thereof, and all related intellectual property rights."

195.    Canopy has performed all its material obligations under the Reseller Agreement.

196.    Upon information and belief, on or before January 4, 2024, Commure materially breached Section 3.2 and Exhibit B of the Reseller Agreement, at least by failing to inform each of Commure's Strongline customers that Canopy owns all worldwide right, title, and interest in and to the Strongline product, and by misusing Canopy's *Strongline* mark for Commure's own Strongline Pro product.

197.    Commure's breach has caused significant harm to Canopy and Canopy is entitled to damages in an amount to be determined at trial, as well as costs and attorney fees pursuant to Section 20.6 of the Reseller Agreement.

### FIFTEENTH CLAIM FOR RELIEF

### (Breach of Contract – against Commure)

198.    Canopy realleges and incorporates by reference Paragraphs 1 through 197 as though fully set forth herein.

199.    Prior to January 4, 2024, the Reseller Agreement was a valid and enforceable contract by and between Commure and Canopy as to all provisions contained therein. Section 11.1 of the Reseller Agreement specifically required Commure to avoid "any misleading or unethical business practices." Likewise, Section 8 of the Confidential Settlement Agreement and Mutual Release precludes Commure from disparaging Canopy's products and services, including disparaging Canopy's products and services as they existed at the time of the execution of the Confidential Settlement Agreement and Mutual Release.

200.    As described above, both before and after January 4, 2024 Commure intentionally committed a series of misleading and unethical business practices, including, but not limited to, by misusing Canopy's *Strongline* mark in a way to mislead customers, misrepresenting Canopy's obligations to *Strongline* customers who have renewed their agreements with Commure, and by spreading disparaging, false, and defamatory comments regarding the quality of Canopy's products and perceived vulnerabilities with such products, including disparaging, false, and defamatory comments related to the purported need for encryption in communications between badges and gateways despite Commure being aware of the lack of encryption since at least 2020. As such, Commure materially breached Section 11.1 of the Reseller Agreement and Section 8 of the Confidential Settlement Agreement and Mutual Release.

201.    Canopy has performed all its material obligations under the Reseller Agreement.

202.    Commure's breaches have caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and

55

is thus entitled to injunctive relief in addition to damages, as well as costs and attorney fees pursuant to Section 20.6 of the Reseller Agreement and Section 9 of the Confidential Settlement Agreement and Mutual Release.

### SIXTEENTH CLAIM FOR RELIEF

### (Breach of Contract – against Commure)

203.    Canopy realleges and incorporates by reference Paragraphs 1 through 202 as though fully set forth herein.

204.    Prior to January 4, 2024, the Reseller Agreement was a valid and enforceable contract by and between Commure and Canopy as to all provisions contained therein. Section 15.1 of the Reseller Agreement provides that, "[d]uring the Term, [Canopy] hereby grants Commure the non-exclusive license and right to utilize [Canopy's] Marks . . . solely in connection with Commure's marketing, selling and supporting of the Licensed Technology as set forth in Section 11, provided that Commure will: (a) only use [Canopy's] Marks in the form and manner, and in accordance with, the quality standards and usage guidelines that [Canopy] specifically prescribes and only in connection with the Licensed Technology; and (b) upon termination of this Agreement for any reason, immediately cease all use of [Canopy's] Marks. All use of [Canopy's] Marks will inure to the sole benefit of [Canopy]."

205.    Canopy has performed all its material obligations under the Reseller Agreement.

206.    As described above, Commure has materially breached this provision, at least by using Canopy's *Strongline* mark in connection with the marketing and sale of Commure's Strongline Pro product, and by continuing to use the Strongline mark following the termination of the Reseller Agreement.

207.    Commure's breach has caused and will cause great and irreparable injury to Canopy, and unless these acts are restrained by this Court, they will continue and Canopy will continue to suffer great and irreparable injury. As such, Canopy has no adequate remedy at law, and is thus entitled to injunctive relief in addition to damages.

## SEVENTEENTH CLAIM FOR RELIEF

### (Declaratory Judgment – against Commure)

208. Canopy realleges and incorporates by reference Paragraphs 1 through 207 as though fully set forth herein.

209. There is an actual, substantial, continuing, and justiciable controversy between Canopy and Commure regarding their respective rights under the Reseller Agreement.

210. Section 13.3 of the Reseller Agreement gives Canopy the ability to terminate the Reseller Agreement in the event of two (2) consecutive late (or non-) payments of amounts due by Commure in any twelve (12) month period."

211. As described herein, Commure was late on three consecutive payments of amounts due. Canopy did not waive or excuse Commure's late payments, as any such waiver or modification of a term of the Reseller Agreement was required to "be in a writing signed by both parties" to be effective per Section 20.5 of the Reseller Agreement, and no such action occurred.

212. Canopy seeks and is entitled to a declaratory judgement that: (a) its termination of the Reseller Agreement was valid, lawful and enforceable; and (b) that it has no ongoing obligation to provide support to Strongline customers whose terms renewed following the termination.

## EIGHTEENTH CLAIM FOR RELIEF

### (Declaratory Judgment – Cal. Bus. & Prof. Code §§ 16600 and 16600.5 as Implemented through Cal. Bus. & Prof. Code § 17200, *et seq.* – against Commure and Athelas)

213. Canopy realleges and incorporates by reference Paragraphs 1 through 212 as though fully set forth herein.

214. As described above, Commure and Athelas, both of which are headquartered in California, have initiated three arbitrations against former Commure employees currently employed by Canopy–Mitra, Cavanagh, and McClung. In each arbitration, Commure and Athelas allege that Mitra, Cavanagh, and McClung violated non-disclosure agreements and non-solicitation agreements, including Confidential Information and Invention Assignment Agreements ("CIIAAs"), and disclosed Commure's confidential information in order to unfairly compete and tortiously interfere with Commure's relationships with both its existing and prospective customers.

57

215.    Commure and Athelas further have alleged in this action that Defendants Canopy, which is headquartered in California, and Sinha, a California resident, induced each of Mitra, Cavanagh, and McClung to breach the non-disclosure and non-solicitation agreements, including the CIIAAs, and are thereby liable for damages for allegedly tortiously interfering with Commure's contractual relations, tortiously interfering with prospective economic advantage, and unfair competition.

216.    Neither Commure nor Athelas have alleged that any of the confidential information that Mitra, Cavanagh, and McClung allegedly disclosed to Canopy, or that Canopy and Sinha allegedly induced Mitra, Cavanagh, and McClung, constitutes a trade secret under California or federal law.

217.    California Business & Professions Code § 16600(a) provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is, to that extent void . . . . no matter how narrowly tailored, that does not satisfy an exception in this chapter." Section 16600(b) further provides that "This section shall be read broadly, in accordance with *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937 (2008), to void the application of any noncompete agreement in an employment context, or any noncompete clause in an employment contract, no matter how narrowly tailored, that does not satisfy an exception in this chapter."

218.    California Business & Professions Code § 16600.5(a) further provides that "Any contract that is void under this chapter is unenforceable regardless of where and when the contract was signed." Further, California Business & Professions Code § 16600.5(b) provides that "An employer or former employer shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California."

219.    Both Canopy and Sinha have standing pursuant to California Business & Professions Code § 17200, *et seq.*, to seek declarations that the non-disclosure agreements and non-solicitation agreements, including the CIIAAs, executed by Mitra, Cavanagh, and McClung are unenforceable pursuant to California Business & Professions Code §§ 16600(a)-(b), and 16600.5(a)-(b).

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

220. The enforcement by Commure and Athelas of these non-disclosure agreements and non-solicitation agreements, including the CIIAAs, against Mitra, Cavanagh, and McClung constitutes a form of unfair competition and/or operates as a restraint on trade, both of which conditions exist here, given that Commure and Athelas claim that Canopy and Sinha are liable for damages for allegedly inducing each of Mitra, Cavanagh, and McClung to violate the non-disclosure agreements and non-solicitation agreements, including the CIIAAs and allegedly tortiously interfering with Commure's contractual relations, tortiously interfering with prospective economic advantage, and unfair competition.

221. Sinha further has standing pursuant to California Business & Professions § 16600(c) to seek declarations that the non-disclosure agreements and non-solicitation agreements, including the CIIAAs, executed by Mitra, Cavanagh, and McClung are unenforceable pursuant to California Business & Professions Code § 16600(a)-(b), to the extent that he is a person who, though not a party to the non-disclosure agreements and non-solicitation agreements, including the CIIAAs, executed by Mitra, Cavanagh, and McClung, nonetheless is a person being restrained from engaging in a lawful profession, trade, or business as a result of the enforcement by Commure and Athelas of the non-disclosure agreements and non-solicitation agreements, including the CIIAAs.

222. There is an actual, substantial, continuing, and justiciable controversy between Canopy, Sinha, Commure and Athelas regarding the enforceability pursuant to California Business & Professions Code §§ 16600(a)-(b) and 16600.5(a)-(b) of non-disclosure agreements and non-solicitation agreements, including the CIIAAs, executed by Mitra, Cavanagh and McClung, and whether Defendants Canopy and Sinha can be liable for allegedly inducing each of Mitra, Cavanagh, and McClung to breach the non-disclosure and non-solicitation agreements, including the CIIAAs

223. Canopy and Sinha each seek and are entitled to a declaratory judgement that: (a) the non-disclosure agreements and non-solicitation agreements, including the CIIAAs, executed by Mitra, Cavanagh, and McClung are unenforceable pursuant to California Business & Professions Code §§ 16600(a)-(b) and 16600.5(a)-(b); and (b) that Mitra, Cavanagh, and McClung have not disclosed any confidential information to Canopy or Sinha, or been induced to disclose any

59

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

confidential information to Canopy or Sinha that constitutes a trade secret or otherwise is protectable as confidential information pursuant to California law.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim-Plaintiff Canopy Works, Inc., pray for judgment against Counterclaim-Defendants Commure, Inc.; Athelas, Inc.; Tanay Tandon, and Dhruv Parthasarathy and request all of the following relief:

A.    Judgment against Counterclaim-Defendants on all causes of action alleged herein

B.    For a permanent injunction, as follows: (a) compelling Counterclaim-Defendants to immediately return to Defendants all of Counterclaim-Defendants' trade secrets and confidential information and Licensed Technology; (b) enjoining Counterclaim-Defendants, their agents, servants, employees and all other persons in privity or acting in concert with Counterclaim-Defendants, or any of them, from directly or indirectly using or disclosing, or attempting to use or disclose, any of Counterclaim-Defendants' trade secrets and confidential information and Licensed Technology; (c) ordering Counterclaim-Defendants to account for all gains, profits, and advantages it has derived from their misappropriation of Counterclaim-Defendants' trade secrets and confidential information and Licensed Technology; (d) prohibiting Counterclaim-Defendant from directly or indirectly threatening to or interfering with Defendants' current customers, prospects or employee relationships; (f) enjoining Counterclaim-Defendants from using or threatening to use Defendants' trade secret and confidential information and Licensed Technology to solicit, directly or indirectly, any current employee or customer of Defendants' to leave his or her employment with Defendants, or to choose to use Counterclaim-Defendants' products that employ or were developed with Defendants' trade secret and confidential information and Licensed Technology; (h) ordering Counterclaim-Defendants to return to Defendants immediately all copies and electronic media, including, but not limited to, original copies of any emails, documents, records, files or computer disks removed, obtained, or otherwise derived from Counterclaim-Defendants' trade secrets and confidential information and Licensed Property or through reverse engineering, including, but not limited to, information pertaining to Defendants' trade secrets and confidential information and Licensed Technology;

60

(i) enjoining Counterclaim-Defendants from retaining on any computer, electronic media or storage device, personal data assistant, cellular or other telephone, or any other form of electronic or recording or storage device, any information that was removed, obtained, or otherwise derived from Defendants' trade secrets and confidential information and Licensed Technology; and (j) any other appropriate injunctive or equitable relief, including appointment of a special master to oversee Counterclaim-Defendants to ensure that they do not use or disclose Defendants' trade secrets, confidential information and Licensed Technology;

C.    The imposition of a constructive trust for the benefit of Defendants upon (i) all trade secrets and confidential information and Licensed Technology misappropriated, converted, disclosed or used by any of the Counterclaim-Defendants in violation of any contractual agreement with, or duty owed to, Defendants, including but not limited to profits or, equity interests in, and/or increase in the value of any equity interests in, Commure or Athelas, derived from any breach of any contract with Defendants that was induced by Counterclaim-Defendants from the breach of any fiduciary duty or duty of loyalty to Defendants that was induced or ratified by Counterclaim-Defendants, or from any misappropriation of Defendants' trade secrets and confidential information and Licensed Technology by Counterclaim Defendants and/or their employees or agents;

D.    A determination that: (a) Commure's termination of the Reseller Agreement was valid, lawful and enforceable; (b) that Canopy has no ongoing obligation to provide support to Strongline customers whose terms renewed following the termination; (c) that the non-disclosure agreements and non-solicitation agreements, including the CIIAAs, executed by Mitra, Cavanagh and McClung are unenforceable pursuant to California Business & Professions Code §§ 16600(a)-(b) and 16600.5(a)-(b); and (d) that Mitra, Cavanagh and McClung have not disclosed any confidential information to Canopy or Sinha, or been induced to disclose any confidential information to Canopy or Sinha, that constitutes a trade secret or otherwise is protectable as confidential information pursuant to California law.

E.    A preliminary and thereafter permanent injunction enjoining Tandon and Commure and all of its respective officers, employees, agents, servants ,parent and subsidiary corporations,

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

assigns and successors in interest, and all persons or entities acting in concert or participation with it from:

    1.  using the Strongline mark or name, whether alone or in combination with other words or elements, or any other formative variations thereof or any mark confusingly similar to the Strongline mark, in marketing, advertising, selling and/or providing any of Commure's goods and services, including on or in connection with the development of staff safety solutions and related services;

    2.  falsely designating the origin of the infringing Strongline mark or otherwise creating a false association with Canopy;

    3.  injuring Defendants' goodwill and reputation;

    4.  engaging in any further acts of disparagement of Defendants' brand, products or company;

F.    An order that Commure, in accordance with 15 U.S.C. § 1116(a), be directed to file with this Court and serve upon Canopy within thirty (30) days after service of the permanent injunction a report in writing under oath, setting forth in detail the manner and form in which Commure has complied with the permanent injunction;

G.    An order that Commure destroy all goods bearing the Strongline Pro mark, and/or which use or are derived from Defendants' trade secrets and confidential information and Licensed Technology.

H.    Restitution and all other relief authorized under California Business and Professions Code § 17200;

I.    An award of damages and all other appropriate monetary relief to Canopy, including without limitation actual damages according to proof, disgorgement of Counterclaim-Defendants' profits, and punitive and exemplary damages;

J.    An award of prejudgment and post-judgment interest to Canopy;

K.    An award of costs and attorneys' fees incurred by Canopy in prosecuting this action as allowed by law; and

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO

L.     Such other and further relief the Court deems just and proper.


Dated:  December 11, 2024                    Respectfully submitted,

                                             By: /s/ Neel Chatterjee
                                                 NEEL CHATTERJEE (SBN 173985)
                                                 NChatterjee@goodwinlaw.com
                                                 MONTE COOPER (SBN 196746)
                                                 MCooper@goodwinlaw.com
                                                 THERESA ANN SUTTON (SBN 211857)
                                                 TSutton@goodwinlaw.com
                                                 DAVID RAPP-KIRSHNER (SBN 344494)
                                                 DRappKirshner@goodwinlaw.com
                                                 **GOODWIN PROCTER LLP**

                                                 Attorneys for Defendants
                                                 Canopy Works, Inc., Shan Sinha, and Vinay
                                                 Pulim

63

**<u>DEMAND FOR JURY TRIAL</u>**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendant hereby demands a trial by jury of all issues triable of right before a jury.

Dated: December 11, 2024                    Respectfully submitted,

By:  /s/ Neel Chatterjee
NEEL CHATTERJEE (SBN 173985)
*NChatterjee@goodwinlaw.com*
MONTE COOPER (SBN 196746)
*MCooper@goodwinlaw.com*
THERESA A. SUTTON (SBN 211857)
*TSutton@goodwinlaw.com*
DAVID RAPP-KIRSHNER (SBN 344494)
*DRappKirshner@goodwinlaw.com*
**GOODWIN PROCTER LLP**

Attorneys for Defendants
Canopy Works, Inc., Shan Sinha, and Vinay Pulim

64

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on **December 11, 2024**. I further certify that all participants in the case are registered CM/ ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **December 11, 2024**.

/s/ Neel Chatterjee
NEEL CHATTERJEE
MONTE COOPER
THERESA ANN SUTTON

65

DEFENDANTS' ANSWER AND COUNTERCLAIMS

Case No. 3:24-CV-02592-AMO